UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

Grand Jury N-06-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 3:06-CR-137(PCD) |
| | : | |
| v. | : | Count 1: 18 U.S.C. § 371 |
| | : | (Conspiracy) |
| | : | |
| RONALD E. FERGUSON, | : | Counts 2-5, 8-10: 15 U.S.C. §§ 78j(b) & 78ff |
| (Counts 1-16) | : | (Securities Fraud) |
| | : | |
| CHRISTOPHER P. GARAND, | : | Counts 6-7, 11-13: 15 U.S.C. §§ 78m(a) & 78ff |
| (Counts 1, 8-16) | : | (False Statements to the SEC) |
| | : | |
| ROBERT D. GRAHAM, | : | Counts 14-16: 18 U.S.C. § 1341 |
| (Counts 1-16) | : | (Mail Fraud) |
| | : | |
| CHRISTIAN M. MILTON and | : | Forfeiture: 18 U.S.C. § 981(a)(1)(c) and |
| (Counts 1-16) | : | 28 U.S.C. § 2461 |
| | : | |
| ELIZABETH A. MONRAD, | : | |
| (Counts 1-16) | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

## SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES that at all times relevant to this Indictment:

### GENERAL ALLEGATIONS

#### Relevant Entities

1.      American International Group, Inc. ("AIG") was a Delaware corporation with its

principal place of business in New York, New York.  AIG's stock was traded publicly on the

New York Stock Exchange, a national securities exchange.  As a publicly traded company, AIG

and its directors, officers and employees were required to comply with the federal securities laws

and regulations, which were designed to ensure that the financial information of publicly traded companies was accurately recorded and disclosed to the investing public.  AIG was in the insurance and financial services business.  Two of AIG's subsidiaries were: National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("NUFIC") and, since approximately November 2000, Hartford Steam Boiler Inspection and Insurance Company of Hartford, Connecticut ("HSB").  The financial information of NUFIC and HSB was consolidated into AIG's financial reports.  AIG and its related companies are collectively referred to herein as AIG.

2.      General Re Corporation ("General Re") was a Connecticut-based company and a subsidiary of Berkshire Hathaway, Inc. ("Berkshire"), which was a Delaware corporation with its principal place of business in Omaha, Nebraska.  Berkshire's stock was traded publicly on the New York Stock Exchange.  As a publicly traded company, Berkshire and its directors, officers and employees were required to comply with the federal securities laws and regulations.  General Re's financial information was consolidated into Berkshire's financial reports.  The directors, officers and employees of General Re also were required to comply with the federal securities laws and regulations.  General Re was a holding company for global reinsurance and related risk operations.  As a holding company, General Re owned General Reinsurance Corporation and held a controlling interest in Kölnische Rückversicherungs-Gesellschaft AG ("Cologne Re"), which had a subsidiary in Dublin, Ireland known as Cologne Re Dublin ("CRD").  Together, General Re and Cologne Re conducted business as Gen Re.  Gen Re and its related companies are collectively referred to herein as Gen Re.

The Defendants

3.      Defendant RONALD E. FERGUSON was employed in various senior executive positions at Gen Re from in or about 1984 until in or about 2002.  From in or about 1987 until in or about September 2001, defendant FERGUSON was the Chief Executive Officer ("CEO") of Gen Re.  He thereafter served as a non-executive Chairman until June 2002, and as a consultant to the company until June 2005.

4.      Defendant CHRISTOPHER P. GARAND was employed as a Senior Vice President and the Head and Chief Underwriter of Gen Re's finite reinsurance operations in the United States from in or about 1994 until in or about August of 2005.  GARAND also was a member of the Board of Directors of CRD.

5.      Defendant ROBERT D. GRAHAM was employed as legal counsel at Gen Re from in or about 1986 until in or about October 2005.  GRAHAM was also a Senior Vice President of Gen Re from in or about early 2000 until in or about October 2005.

6.      Defendant CHRISTIAN M. MILTON was AIG's Vice President of Reinsurance from in or about April 1982 until in or about March 2005.

7.      Defendant ELIZABETH A. MONRAD was a Certified Public Accountant and was employed in various senior executive positions at Gen Re from in or about 1992 until in or about July 2003.  MONRAD was the Chief Financial Officer ("CFO") of Gen Re from in or about June 2000 until in or about July 2003.

Co-Conspirators

8.      John Houldsworth, a co-conspirator not named as a defendant herein, was the

3

Chief Executive Officer at CRD from approximately May 1990 until approximately June 2001.

Additionally, Houldsworth was the Chief Underwriter of a Gen Re business unit called

Alternative Solutions from approximately 1998 until approximately 2004.

9.     Richard Napier, a co-conspirator not named as a defendant herein, was employed

at Gen Re since 1977.  Since 1990, he was employed as a Senior Vice President at Gen Re's

Stamford, Connecticut headquarters and his job responsibilities included managing relations with

AIG, one of Gen Re's largest clients.

10.     Additional co-conspirators, not named as defendants herein, included senior level

executives at AIG and Gen Re.

<u>Codes of Conduct</u>

11.     In 1998, FERGUSON distributed a revised version of the Gen Re Code of

Business Conduct, that he drafted and signed, to GARAND, GRAHAM, MONRAD and other

Gen Re employees.  In the section entitled "Fraud," FERGUSON wrote that:

> Employees are expected to deal honestly and fairly with clients.  Fraud or
> misrepresentation will not be tolerated.  Such behavior is unethical, harms the
> Company's reputation, and may result in prosecution.  Employees also may not
> engage in any activity that would aid or abet any person or entity seeking to
> engage in illegal or unethical conduct.

In the section entitled "Reporting Integrity and Company Records," FERGUSON wrote that:

> All Company financial reports, accounting records, sales reports, expense
> accounts and other documents must accurately reflect the relevant facts or the true
> nature of the particular transaction.   Improper or fraudulent reporting is contrary
> to Company policy and may be in violation of applicable laws.  The Company
> expects that its books and records accurately reflect the business transactions of
> the Company.

4

12. In 1998 and in subsequent years, FERGUSON, GARAND, GRAHAM, and MONRAD each signed acknowledgment forms certifying that they had received the Gen Re Code of Business Conduct and would abide by the policies set forth therein.

13. On January 5, 2000, AIG distributed its 2000 AIG Code of Conduct to MILTON and other AIG employees.   In the section entitled "Introduction," employees were advised that:

> It is key to the proper functioning of, and maintenance of public confidence in, American International Group, Inc. and its subsidiaries worldwide (collectively "AIG") that every officer and employee perform his or her own duties with honesty and integrity.

In the section entitled "Compensating Others," employees were advised that:

> No kickbacks, bribes or other payments (except for normal compensation) in any form whatsoever, whether or not such payment is secret or illegal, shall ever be made under any circumstances to obtain a benefit for AIG, its insured, or the employee.

In the section entitled "Accurate Books and Records," employees were advised that:

> AIG business records must always be prepared accurately and reliably.  They are of critical importance in AIG's upholding its financial, legal, and management obligations.  Records are to be kept in accordance with accepted accounting rules and controls at all times, fully and accurately reflecting the transactions.

14. On January 24, 2001, MILTON signed an acknowledgment form certifying that he read and understood the 2000 AIG Code of Conduct and attesting that he was not aware, in connection with any business transactions for AIG, of any conduct, improper, unethical, illegal, or otherwise.

### The SEC and Publicly Traded Companies

15. The United States Securities and Exchange Commission ("SEC") was an

independent agency of the United States government that was charged by law with preserving honest and efficient markets in securities.  The federal securities laws, rules, and regulations were designed to ensure that the financial information of publicly traded companies was accurately recorded and disclosed to the investing public.

16.    AIG disclosed its financial information to the public through various means, including public earnings reports, conference calls with stock analysts, and the electronic filing of quarterly reports (SEC Forms 10-Q) and annual reports (SEC Forms 10-K) with the SEC.

17.    Under the federal securities laws, rules, and regulations, AIG was required, among other things: (i) to make and keep books, records, and accounts that accurately and fairly reflected the company's business transactions; and (ii) to file with the SEC and distribute to the investing public quarterly and annual reports that included accurate and reliable financial statements prepared in accordance with generally accepted accounting principles ("GAAP").

The Insurance Industry

18.    Insurance companies charged clients premiums and, in return, promised to pay clients' claims in the event of losses resulting from specified insured events, like accidents or catastrophes.  The central feature of any insurance policy was the transfer of risk from the client to the insurance company.

19.    Insurance companies set aside a portion of each dollar of premiums received as "loss reserves" or "reserves."  The amount set aside was an estimate of the amount of money that insurance companies expected to pay out for losses on the policies they wrote.  Insurance companies accounted for loss reserves as liabilities on their balance sheets and as expenses which reduced earnings on their income statements.  In its financial statements filed with the SEC, a

publicly traded insurance company, like AIG, was required to report loss reserves in an amount equal to losses that were probable and reasonably estimable.

20.     Insurance companies sometimes spread their risk by purchasing reinsurance from other insurance companies.  Reinsurance was insurance for insurance companies.  A reinsurance contract was like other insurance contracts in that one insurance company paid a premium to transfer certain risks to another insurance company.  The company that paid another company to take on risk was usually called a "ceding company," "cedant," or "reinsured," and the company that assumed the risk was usually called a "reinsurer" or "assuming company."

21.      To report loss reserves associated with a reinsurance contract, the contract must have transferred risk.  If the reinsurance contract did not transfer risk, then the reinsurer could not add loss reserves to its financial statements.  Instead, the reinsurer should have applied deposit accounting and treated the liabilities associated with the contract as "deposits."  A deposit was an amount of money one company owed to another.  Deposit accounting had no effect on a company's loss reserves or its earnings.

22.     When parties to a reinsurance contract reached the same conclusion regarding the existence of risk transfer and whether a transaction should be accounted for as reinsurance or under the deposit method, they employed what was known as "symmetrical" or "mirror image" accounting.

### Stock Market Analysts' Evaluations of AIG

23.     Stock market analysts issued reports and other investment guidance on AIG, including buy, sell, and hold recommendations, to clients and shareholders.  Certain analysts who reported on AIG focused on reported loss reserves as a key indicator of AIG's financial health.

When an insurance company, like AIG, was growing, the insurance company generally reported increased premiums for new policies along with increased loss reserves to cover future claims on those new policies.  A decrease in loss reserves relative to premiums could have indicated to analysts that the insurer was not obtaining new business or was reducing its loss reserves in order to artificially increase its earnings.  Certain analysts referred to this latter practice as "releasing reserves."

AIG's Reserve Reduction

24.     On October 26, 2000, AIG publicly reported that, during the third quarter of 2000, its loss reserves decreased by approximately $59 million compared to the prior quarter.  The third quarter decrease in loss reserves occurred during a period of premium growth.  That day, AIG's stock price dropped significantly.  Subsequently, certain analysts downgraded AIG's stock.  One analyst expressed concern that AIG had been "releasing reserves to make its numbers."  Another wrote that "a steady trend of unexplained [reserve] releases during a period of premium growth" would be a cause for concern.

The Purported Reinsurance Contracts

25.     Shortly after AIG's stock price drop and the negative analyst reports, defendants FERGUSON, GARAND, GRAHAM, MILTON, MONRAD and others negotiated and structured two purported reinsurance contracts between AIG and Gen Re.  The nominal parties to the contracts were NUFIC (on behalf of AIG) and CRD (on behalf of Gen Re).  The first contract was dated December 1, 2000.  The second contract was dated March 31, 2001.  Together, on their face, the contracts made it appear as if AIG was reinsuring Gen Re for up to $600 million in limit of liability and Gen Re was paying AIG $500 million in premiums.  The difference between

8

limit of liability and expected premiums made it appear as if AIG had assumed a risk of $100 million in losses.

26.     Under "Appendix A" to the contracts, Gen Re appeared to associate approximately $500 million in reserves with the underlying contracts that it was ceding or giving to AIG.

27.     Of the $500 million premiums set forth in the contracts, Gen Re was entitled to withhold $490 million in an "experience account" (an account used to pay claims as they came due).  In other words, Gen Re was obligated to pay AIG no more than $10 million premiums in cash - called a "loss transfer payment" - under the contracts.

28.     The contracts contained a unilateral "commutation" - or termination - provision that allowed only Gen Re to cancel the contracts.  Upon termination, Gen Re was entitled to retain any remaining portion of the withheld premiums.

AIG Reported Increased Loss Reserves

29.     Consistent with the appearance of risk transfer in the written contracts, AIG applied reinsurance accounting to the transaction.  In the fourth quarter of 2000, AIG booked $250 million in loss reserves, reflecting the first contract.  As a result, AIG reported a $106 million increase in loss reserves for the fourth quarter of 2000.  But for the inclusion of the $250 million, AIG would have reported a reduction in loss reserves of approximately $144 million for the fourth quarter of 2000.

Stock Analysts' Response

30.     Stock analysts immediately noticed the fact that AIG increased its loss reserves.

On or about February 9, 2001, one analyst wrote, "AIG put to rest a minor controversy from last [third] quarter [2000] by adding 106 million to reserves . . . ."

31.     In the first quarter of 2001, AIG booked an additional $250 million in loss reserves, reflecting the second contract.  As a result, AIG reported a $63 million increase in loss reserves for the first quarter of 2001.  But for the inclusion of the additional $250 million, AIG would have reported a reduction in loss reserves of approximately $187 million for the first quarter of 2001.

32.     Again, stock analysts took note.  On or about April 26, 2001, one analyst wrote, "net loss reserves increased by $63 million.  Given the renewed premium growth we would expect reserves to continue rising at an accelerating pace."

<u>AIG Reported the Additional Reserves for Nearly Four Years</u>

33.     The purported reinsurance contracts remained in effect for almost four years. During those nearly four years, AIG continued to report $500 million in additional reserves on its financial statements filed with the SEC.  In November 2004, the first $250 million transaction was terminated at the suggestion of AIG.  The second contract was terminated on August 1, 2005.

<u>AIG's Restatement</u>

34.     On or about March 30, 2005, AIG issued a press release stating that the accounting for the transaction was improper "in light of the lack of evidence of risk transfer."

35.     On or about May 31, 2005, AIG filed its 2004 Form 10-K with the SEC which included the following statement concerning the transaction: "AIG has concluded that the transaction was done to accomplish a desired accounting result and did not entail sufficient

qualifying risk transfer.  As a result, AIG has determined that the transaction should not have

been recorded as insurance.  AIG's restated financial statements recharacterize the transaction as

a deposit rather than as insurance."

## COUNT ONE

(Conspiracy to Violate the Federal Securities Laws and to Commit Mail Fraud)

### THE CONSPIRACY

36.     The allegations set forth in paragraphs 1 through 35 of this Indictment are realleged and incorporated as though set forth in full herein.

37.     In or about and between October 2000 and January 2005, both dates being approximate and inclusive, within the District of Connecticut and elsewhere, defendants

> RONALD E. FERGUSON,
> CHRISTOPHER P. GARAND,
> ROBERT D. GRAHAM,
> CHRISTIAN M. MILTON and
> ELIZABETH MONRAD,

did unlawfully, knowingly and intentionally combine, conspire, confederate, and agree with others, both known and unknown, to commit offenses against the United States, namely:

a.     Knowingly and willfully, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly use and employ manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 ("Rule 10b-5") in connection with the purchase and sale of AIG securities, by (i) employing devices, schemes, and artifices to defraud holders of AIG securities and other members of the investing public; (ii) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit

on holders of AIG securities and other members of the investing public, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a) and Rule 10b-5;

b.    Willfully make and cause to be made untrue, false and misleading statements of material fact in reports and documents required to be filed by AIG under the Securities Exchange Act of 1934 and the rules and regulations thereunder, and failing to provide such further material information as was necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading, in violation of Title 15, United States Code, Sections 78m(a) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-1 and 240.13a-13;

c.    Willfully falsify and cause to be falsified books, records and accounts of AIG, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-1;

d.    Having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice to defraud and attempting to do so, did knowingly: (i) place in any post office and authorized depository for mail matter, any matter and thing whatever to be sent and delivered by the Postal Service; (ii) deposit and cause to be deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier; and (iii) cause to be delivered by mail and private and commercial interstate carrier, according to the direction thereon, any such matter and thing, in violation of Title 18, United States Code, Section 1341.

## PURPOSE

38.    A purpose of the conspiracy was to mislead stock market analysts, AIG shareholders and the investing public into believing that AIG's loss reserves were growing in order fraudulently to maintain and increase the market price of AIG's stock.

## MANNER AND MEANS

Defendants FERGUSON, GARAND, GRAHAM, MILTON, MONRAD and their co-conspirators employed various manner and means in furtherance of the conspiracy, including that:

39.    The defendants and their co-conspirators did structure a sham reinsurance transaction that allowed AIG fraudulently to book and report approximately $500 million in loss reserves in order to mislead AIG shareholders, stock market analysts, and the investing public after AIG had reported a reserve reduction of approximately $59 million in the third quarter of 2000.

40.    The defendants and their co-conspirators did draft two sham reinsurance contracts and a fake offer letter that made it appear that: (i) Gen Re had transferred approximately $100 million in insurance risk (the difference between the $600 million limit of liability and the $500 million in premiums) to AIG when, in fact, no real insurance risk had been transferred; (ii) Gen Re was paying AIG $10 million in cash "premiums" when, in fact, Gen Re never would be out any cash on the transaction; and (iii) Gen Re had offered the transaction to AIG when, in fact, AIG offered the transaction to Gen Re.

41.    The defendants and their co-conspirators did enter into a secret, unwritten side deal whereby: (i) Gen Re agreed not to transfer real insurance risk to AIG; (ii) AIG agreed to pay

Gen Re approximately $10 million to advance or "pre-fund" the cash "premium" payment; and (iii) AIG additionally agreed to pay Gen Re approximately $5 million as a fee to induce Gen Re to participate in a transaction that otherwise was of no economic value to Gen Re.

42.     The defendants and their co-conspirators did use financial intermediaries or "go-betweens" to conceal the above secret side payments.  To make it difficult to connect the secret side payments to the sham reinsurance transaction, AIG used an unrelated subsidiary, HSB (rather than the party to the sham reinsurance contracts, NUFIC) to pay Gen Re (rather than the party to the sham contracts, CRD) the approximate $15 million.

43.     The defendants and their co-conspirators did use an offshore Gen Re subsidiary, CRD, as a party to the sham reinsurance contracts, instead of Gen Re or a domestic subsidiary. Because CRD was not subject to United States regulatory oversight and the same financial reporting requirements as Gen Re and its domestic subsidiaries, using CRD as a party further helped conceal the secret, unwritten side agreement.

**OVERT ACTS**

44.     In furtherance of the conspiracy and to effect the objects thereof, within the District of Connecticut and elsewhere, defendants FERGUSON, GARAND, GRAHAM, MILTON, MONRAD, and others did commit and cause to be committed the following overt acts, among others:

15

<u>The Sham Reinsurance Transaction Proposal</u>

a.      On or about October 31, 2000, FERGUSON told Napier the details of a

conversation FERGUSON had earlier that day with an unindicted co-conspirator at AIG ("AIG

unindicted co-conspirator #1") during which AIG unindicted co-conspirator #1 asked

FERGUSON if Gen Re would lend AIG up to $500 million in loss reserves on a short-term basis.

FERGUSON warned Napier that "due diligence is important, make certain we do not create

(reporting) problems of our own."

b.      On or about October 31, 2000, Napier discussed with an unindicted co-conspirator

at Gen Re ("Gen Re unindicted co-conspirator #1") using an offshore Gen Re subsidiary, CRD,

as a party to the transaction in order to "stay away from [the] U.S."  Using an offshore entity like

CRD addressed what the defendants and their co-conspirators referred to as the "North American

problem."

c.      On or about November 1, 2000, Napier notified FERGUSON that Napier had

confirmed with MILTON that AIG "only want[ed] reserve impact" and was seeking this

transaction to address criticism from stock market analysts.

d.      On or about November 6, 2000, Napier emailed FERGUSON and MONRAD to

inform them that MILTON had told Napier that AIG wanted the duration of the deal to be

twenty-four months.

e.      In response to Napier's November 6, 2000 email, on or about November 7, 2000,

FERGUSON sent an email to Napier and MONRAD in which he stated: "Thanks, please keep

me posted.  Please do not make any pricing commitments or even pricing suggestions without

talking to me."

f.      On or about November 7, 2000, Napier responded to FERGUSON's email, copying MONRAD, and stated: "Understood . . . Betsy [MONRAD] has agreed to be our Group Finance point person . . . The next step will be to meet with AIG representatives to discuss with them the details of the structures."

g.      In or about November 2000, MONRAD and Napier discussed the structure of the transaction, specifically, in substance and in part, that it would be a "non-risk deal" and that CRD would give "deposit liabilities" to AIG.  Further, MONRAD and Napier discussed, in substance and in part, that CRD did not "report to anyone" which addressed the "NA [North American] problem" regarding "regulators" and disclosures on "Sch[edule] F" of Gen Re's statutory filings in the United States.

<u>Discussions of AIG's Motivations</u>

h.      On or about November 7, 2000, Napier sent a cover memo with an attached stock market analyst's report of AIG to FERGUSON and MONRAD.  The report addressed AIG's recent reserve reductions.  The analyst wrote in part that "The market was disturbed by AIG's net reserve decrease of $59 million. . . We do care a lot about reserves, and if we saw a steady trend of unexplained releases during a period of premium growth, we'd definitely be concerned.  But that's not the case here."   In his cover memo, Napier wrote "[b]ased upon [the analyst's] numbers, AIG reduced reserves $59m.  It will be interesting to understand more about the $500m figure they have been using for the portfolio.  Perhaps they are planning for further releases in Q[uarter] 4 and are seeking a means to offset the cosmetic impact."

i.      On or about November 13, 2000, MONRAD had a telephone conversation with CRD's CEO, Houldsworth, and told him about the request from AIG unindicted co-conspirator #1.

j.      On or about November 13, 2000, MONRAD emailed FERGUSON and wrote, "If we proceed with the AIG LPT transaction, we may have non-mirror image accounting, as AIG probably wants to book the premium and more importantly to them, the losses through underwriting, but we wouldn't want to lose $500 million of net premiums and losses incurred, even if P&L neutral – it hurts combined ratios and has other distortions if the transaction runs through underwriting."

k.      On or about November 14, 2000, Houldsworth had a telephone conversation with an unindicted co-conspirator at Cologne Re (Cologne Re unindicted co-conspirator #1) and recounted his discussion with MONRAD.  Houldsworth stated, in substance and in part, that MONRAD had told him that AIG has "taken down some reserves, and now they've realized, you know, to protect their third quarter results . . . we're [AIG] gonna get spotted at the end of the year.  How do we avoid that?  Oh well, let's just take in some more reserves and some more premium and we'll do a bit of, you know, fancy accounting work . . . ."

l.      On or about November 14, 2000, Houldsworth had a telephone conversation with GARAND and further recounted his discussion with MONRAD.  Houldsworth advised, in substance and in part, that MONRAD had told him that AIG unindicted co-conspirator #1 called FERGUSON and stated "Ron, um, I need your help . . .  we've reduced our reserves by 500 million so as to boost our third quarter results, um, but we've now realized that come the end of the year . . . the fact that we've taken down those old year reserves is gonna be fairly apparent to

anybody studying our group and we don't like what's gonna happen in terms of stock market reaction or analyst reaction or whatever . . . we want to borrow 500 million of reserves off you for a couple of years."  Houldsworth further explained, in substance and in part, that MONRAD had told him that "they [AIG] just want to be able to book 500 million of reserves" and that MONRAD was looking for a Gen Re subsidiary that had "500 million in reserves outside of the States, uh, without too much regulatory oversight that would cause, you know, those sort . . . of problems."

The Sham Transaction is Structured

m.      On or about November 14, 2000, MONRAD had a telephone conversation with Houldsworth.  MONRAD warned Houldsworth, in substance and in part, that "clearly this is a confidential transaction . . . so, I'm telling you, this is being handled at the highest levels in AIG."  MONRAD stated, in substance and in part, that "the two people at AIG who are involved are [AIG unindicted co-conspirator #1] and Chris MILTON.  And on our side it's been Ron [FERGUSON]. . . plus Rick [Napier] and myself."  MONRAD explained, in substance and in part, that "they're [AIG] not really looking to take risks."  Houldsworth replied, in substance and in part, that "if there's enough pressure on at their end, they'll. . . find ways to cook their books won't they?" and then said, in substance and in part, "it's up to them. . . we won't help them do that too much.  We won't -- we'll do nothing illegal," at which MONRAD laughed.  MONRAD told Houldsworth in substance that AIG would pay Gen Re for the transaction and that AIG was not to get any economic benefit.  MONRAD again reminded Houldsworth, in substance and in part, that the transaction was "highly confidential. . . it's the kind of thing in the market that if we, if we ever talked about it, our name would be mud with AIG."  MONRAD asked

19

Houldsworth if the deal would "show up in any kind of public document" in Ireland.
Houldsworth replied, in substance and in part, "absolutely not."

n.      On or about November 14, 2000, Houldsworth had a telephone conversation with
an unindicted co-conspirator at Cologne Re ("Cologne Re unindicted co-conspirator #2") and
recounted his conversations with MONRAD.  Houldsworth advised in substance that MONRAD
had told him that AIG was taking down old year reserves and they did not want everybody
knowing that they were taking down old year reserves.  Houldsworth explained in substance that
MONRAD had told him that AIG unindicted co-conspirator #1 had asked to borrow $500 million
in reserves from Gen Re for the next couple of years.  Houldsworth related in substance that
MONRAD had asked if there was any possibility that CRD could give AIG $500 million in
reserves, not cash, on a deposit back basis.  Houldsworth explained, in substance and in part, that
Gen Re "can't do anything in Stamford [Connecticut] because anything they do would be the
opposite of what AIG would have [done]."

o.      On or about November 15, 2000, Houldsworth emailed to MONRAD, GARAND,
and Napier a draft "slip," or contract term sheet, for the deal and a cover email that summarized
the proposed transaction as "can CRD provide a retrocession contract transferring approx $500M
of reserves on a funds w/held basis to the client with the intention that no real risk is transferred."
The email noted that, "Clearly there are a number of massive pitfalls in how the client [AIG]
manages to deal with the accounting, tax and regulatory issues but for the time being we have
followed Betsy's [MONRAD] instructions and ignored these problems."  The email also noted
that, "Given that we will not transfer any losses under this deal it will be necessary for [AIG] to

repay any fee [the $10 million in cash "premiums" paid by CRD] plus the margin they give us for entering this deal." FERGUSON received a hard copy of this email.

p.     On or about November 15, 2000, MONRAD and Napier spoke with Houldsworth about his email and draft slip. During this conversation, the conspirators discussed, in substance and in part, that: (i) there was no risk for AIG in the transaction; (ii) the risk for Gen Re was reputational; (iii) the transaction would show AIG getting paid $10 million up front so that AIG could mislead its auditors, but that AIG would repay that $10 million to Gen Re, plus pay a fee; (iv) it was AIG who had the "accounting problem;" (v) the contract would appear to credit interest to AIG so that it could pass the auditor's "smell test;" (vi) it was irrelevant whether the contract had $500 million, $600 million, or $700 million in stated risk because Gen Re was never going to bill AIG for any losses; and (vii) CRD could terminate the transaction at any time. During the conversation, MONRAD mentioned previously discussing an offshore structure for the deal with GRAHAM. MONRAD commented at one point, in substance and in part, that "these deals are a little bit like morphine. It's very hard to come off of them."

q.     On or about November 15 or November 16, 2000, Napier and MONRAD briefed FERGUSON on the details of the structure of the transaction being worked out with CRD so that he could finalize terms with AIG.

r.     On or about November 16, 2000, FERGUSON spoke with AIG unindicted co-conspirator #1 and explained the proposed structure of the transaction with CRD. FERGUSON and AIG unindicted co-conspirator #1 agreed in substance that: (i) Gen Re would receive a 1% fee, or $5 million; (ii) the transaction would be completed in two installments, or tranches, one in 2000 for $250 million and another in 2001 for $250 million; (iii) they still needed to work out

21

how Gen Re would get the [$10 million] in purported premiums back that it would appear to be

paying AIG; and (iv) AIG would "not bear real risk" in the transaction.

s.      On or about November 17, 2000, FERGUSON told Napier about the details of

his conversation with AIG unindicted co-conspirator #1.

t.      On or about November 17, 2000, Napier sent an email to FERGUSON and

MONRAD explaining that he had spoken to MILTON and updated him on FERGUSON's

conversation with AIG unindicted co-conspirator #1.  Napier wrote, "Among the details to be

worked out is how to recover the [$10 million] fee we advance (Chris [MILTON] immediately

suggested adjusting [a commission on an unrelated deal])."

<u>The Request for Secrecy and Additional Structuring</u>

u.      On or about November 17, 2000, FERGUSON responded to Napier's email, with

a copy to MONRAD.  FERGUSON stated, "Note to all – let's keep the circle of people involved

in this as tight as possible."

v.      On or about November 17, 2000, Napier emailed MILTON and MONRAD,

attaching the draft slip.  In his email entitled "Project A," Napier wrote, "As I mentioned this

afternoon, Ron's [FERGUSON] discussions with [AIG unindicted co-conspirator #1] established

the following points:

> "-The Dublin [CRD] structure outlined below [in attached slip] appears workable.
> - You may want to divide the transaction in two parts – one for 2000 and one for 2001.
> - The fee to [Gen Re] will be 1% or $5 m[illion].
> - We need to work out a mechanism for [Gen Re] to recover the 2% fee [the $10 million] advanced to AIG under the agreement.
> - You [MILTON], [an AIG senior executive], Betsy MONRAD and I have been appointed to work out the details.

A point that may not be sufficiently clear in the discussion document is the term of the agreement.  In accordance with our conversations, we anticipate terminating the agreement at 24 months via a commutation."

w.      On or about November 20, 2000, Napier forwarded to GARAND his November 17, 2000 email to MILTON and MONRAD, including the draft slip.  In the email, Napier stated, "Chris, here is the overview.  See you at 11:00 at Betsy's [MONRAD's].  Rick."

x.      In or about mid-November, 2000, FERGUSON, MONRAD, GARAND, and Napier discussed the reputational risk of Gen Re engaging in the transaction.

<u>Gen Re Advised AIG it is Deposit Accounting</u>

y.      On or about November 20, 2000, MONRAD, GARAND, GRAHAM, Napier, and a Gen Re senior executive held a conference call with MILTON to discuss the structure and accounting for the transaction.  Regarding the structure, the participants discussed, among other things, the fact that AIG would pay Gen Re a fee and that Gen Re would not be out any cash on the transaction.  Regarding the accounting, MONRAD told MILTON, among other things, that Gen Re would apply deposit accounting to the transaction.

z.      On or about November 20, 2000, GRAHAM emailed GARAND, MONRAD and Napier and proposed structuring the transaction using offshore entities so that "any reviewer of the AIG US entity's statements wouldn't be able to connect the dots to CRD and beyond."

aa.     On or about November 21, 2000, Napier sent Houldsworth an email discussing the November 20, 2000 conference call and wrote that the "accounting does not appear to be an issue for AIG."

<u>AIG Agreed to Terms</u>

bb.     On or about December 7, 2000, Napier sent an email to FERGUSON, GARAND,

23

MONRAD, and Houldsworth informing them that MILTON had agreed that AIG would proceed as outlined in the draft slip and in accord with the conversations between AIG unindicted co-conspirator #1 and FERGUSON.

cc.     On or about December 8, 2000, Houldsworth emailed a list of questions to GARAND, MONRAD and Napier which Houldsworth described as "the messy part."  Three of the questions were: (i) "Do we [CRD] need to produce a paper trail offering the transaction to the client?"; (ii) "Payback leg – have they [AIG] started considering the other arrangements to make us whole? . . .  Hopefully, we get back the fee to them [the $10 million cash "premiums"] plus our margin [the $5 million fee] upfront"; (iii) "Do A[IG] expect our CRD financial statements to reflect the Loss Portfolio Transfer and the deposit back, hopefully not!"

dd.     On or about December 8, 2000, Houldsworth had a telephone conversation with MONRAD and Napier.  The conversation included: (i) Houldsworth stating, in substance and in part, that only internal lawyers review the deal because "I really wouldn't be comfortable going to external lawyers . . . I know they're meant to keep secrets but . . . if someone says they want it kept confidential . . . It's just one more person we can't control"; (ii) Houldsworth discussing, in substance and in part, whether AIG needed an "offer letter" "to make it look like a piece of risk business . . . because clearly they're not gonna have any supporting documentation, they're not gonna have any actuarial records . . . how many people book reserves based entirely on what the client tells them and survive for very long?"; (iii) MONRAD stating, in substance and in part, that "for paper trail purposes . . . you need to have a wire that shows . . . 10 million at some point left your account . . . and we need them to give us 10 million back . . . and we need five on top of that . . . for doing this"; (iv) MONRAD stating, in substance and in part, that AIG would pay Gen

24

Re back the $10 million through another contract that AIG would "enrich"; (v) MONRAD

stating, in substance and in part, that she would like the funding to go "round trip . . . through

different bank accounts"; (vi) Houldsworth asking, in substance and in part, "is somebody gonna

get upset" if the accounts in Dublin did not reflect a $500 million funds withheld transaction; and

(vii) MONRAD stating, in substance and in part, that "we told AIG that there would not be

symmetrical accounting here . . . we told them that was one . . . of the aspects of the deal they had

to digest."

<u>Sham Contract is Drafted</u>

ee.     On or about December 8, 2000, Napier emailed GRAHAM, MONRAD, and

Houldsworth.  Napier wrote, "Rob, here is an electronic version of the term sheet I sent to Chris

[MILTON]."  As part of the email, Napier forwarded his November 17, 2000 email to MILTON

and MONRAD that referenced the "need to work out a mechanism for [Gen Re] to recover the

2% fee advanced to AIG under the agreement" and the $5 million fee due to Gen Re.  In the

December 8, 2000 email, Napier stated that: (i) the first transaction needed to be effective that

month; (ii) CRD would use deposit accounting; (iii) MILTON "felt we should establish a

traditional paper trail" for the transaction; and (iv) GRAHAM advised that they should "be

careful with inter-company transfers" because "a curious outside party could deduce that there is

a link between the transactions."

ff.     On or about December 8, 2000, Napier emailed FERGUSON that "the reserve

transfer is on track.  Rob GRAHAM is drafting the agreement."  FERGUSON replied, "Thanks,

Rick."

25

<u>The Fake Offer Letter</u>

gg.     On or about December 11, 2000, Napier had a telephone conversation with Houldsworth during which Napier stated that AIG wanted an offer letter as part of a paper trail.

hh.     On or about December 11, 2000, Houldsworth began drafting a false offer letter that made it appear that Gen Re had approached AIG to reinsure Gen Re and that Gen Re was entering into the transaction for its own legitimate business purposes.

ii.     On or about December 11, 2000, Houldsworth emailed GRAHAM some sample CRD contracts and noted, "due to the confidentiality requested b[y] Ron [FERGUSON] no one else over here is working on this and all correspondence should be addressed to myself."

jj.     On or about December 11, 2000, Houldsworth had a telephone conversation with GARAND during which Houldsworth stated, in substance and in part, that "[t]he only other question I've got left open is do they need a paper trail . . . where we basically offer them the contract . . . and all that sort of. . . stuff just to put on the file. . . We're gonna ask [a Gen Re senior executive] and Ron [FERGUSON] to sign off on the reputational risk.  I think it's Ron's [FERGUSON's] deal so he, he's the one that ought to. . . ."  GARAND replied, "Yep . . . Make them sign in blood."

kk.     On or about December 12, 2000, Napier reviewed the fake offer letter and forwarded it to GRAHAM and MONRAD.

ll.     On or about December 15, 2000, GRAHAM reviewed the fake offer letter and sent an email to Houldsworth and Napier with some suggested changes and wrote, "Overall it's fine."

mm.     On or about December 15, 2000, Houldsworth emailed the fake offer letter, which he had revised to incorporate GRAHAM's comments, to GRAHAM, MONRAD and Napier.

nn.     On or about December 18, 2000, Houldsworth faxed a signed copy of the fake offer letter to MILTON.

oo.     On or about December 19, 2000, MILTON faxed the signed copy of the fake offer letter he received from Houldsworth to another AIG senior executive.  On the fax, MILTON wrote, "This is the General Re Deal that [AIG unindicted co-conspirator #1] talked to me about."

Sham Contract Finalized

pp.     On or about December 20, 2000, MILTON had a telephone conversation with an AIG actuary.  During the conversation, the AIG actuary requested to see documentation related to the underlying business that CRD (Gen Re) was giving to NUFIC (AIG) to reinsure.  MILTON replied, in substance and in part, that MILTON was not allowed to keep the documentation.  In truth and in fact, MILTON never requested or received such documentation.

qq.     On or about December 22, 2000, GRAHAM emailed FERGUSON, GARAND, MONRAD, Napier, and Houldsworth a copy of the sham contract between NUFIC and CRD for their review.  The sham contract omitted any reference to the secret, unwritten side agreement whereby AIG would advance Gen Re the $10 million in cash "premiums" and pay Gen Re a $5 million fee for participating in the transaction.

rr.     On or about December 22, 2000, GRAHAM emailed an unindicted co-conspirator at Gen Re ("Gen Re Unindicted Co-Conspirator #2") with an update on the status of the AIG transaction.  In the email, GRAHAM wrote, "our group will book the transaction as a deposit. How AIG books it is between them, their accountants and God; there is no undertaking by them

to have the transaction reviewed by their regulators.  Ron [FERGUSON] et al have been advised of, and have accepted, the potential reputational risk that US regulators (insurance and securities) may attack the transaction and our part in it."

ss.     On or about December 22, 2000, FERGUSON emailed GARAND, GRAHAM, MONRAD, Napier, and Houldsworth.  FERGUSON stated, "Thank you all for working on this matter – it seems to be very very high profile at AIG and is much appreciated."

tt.     On or about December 27, 2000, Houldsworth had a telephone conversation with GRAHAM.  During the conversation, Houldsworth asked GRAHAM who should send the contract and offer letter to AIG -- Gen Re or CRD.  GRAHAM replied, in substance and in part, "I think the answer is you [CRD] need to send [the contract and offer letter].  What you want is for all of the deal correspondence on this thing really to come from you because it's your company that's doing the deal . . . it's perfectly okay for our guys [at Gen Re in Stamford] to have meetings and conversations but any paper trail ought to really lead to Dublin."

uu.     On or about December 27, 2000, Houldsworth faxed a copy of the sham contract to MILTON with another cover letter suggesting that CRD (Gen Re), not AIG, had solicited the transaction.

vv.     On or about December 28, 2000, Houldsworth had a telephone conversation with Napier and MILTON.  During the conversation, MILTON acknowledged receiving Houldsworth's December 27, 2000 fax and stated in substance that he did not need any further documentation in order for AIG to book the first half of the transaction by year-end 2000.  Napier stated, in substance and in part, that once MILTON sent his reply email agreeing to the deal, "that will . . complete the paper trail I guess."  Further, the conspirators discussed, in substance

and in part, the need to adjust the commission on an unrelated deal in order to get Gen Re's "fees back."

AIG Confirmed Participation

ww.     On or about December 28, 2000, to complete the fake paper trail, MILTON sent Houldsworth an email confirming AIG's participation in the first half of the transaction even though MILTON had not sought or received any documentation or information concerning the composition of the underlying business – or the claims experience for that business –  that CRD (Gen Re) was giving NUFIC (AIG) purportedly to reinsure.

xx.     On or about December 28, 2000, Houldsworth had a telephone conversation with GARAND.  Houldsworth asked, "on AIG, I mean, . . . how much of this sort of stuff do they do? I mean, how much cooking goes on in there?"  GARAND responded, in substance and in part, "they'll do whatever they need to make their numbers look right . . . they're very meticulous about managing their numbers."  Later, Houldsworth asked GARAND, in substance and in part, if "on deals like this" Gen Re has a "locked drawer policy . . . that people just can't see them." GARAND replied, in substance and in part, that "We haven't mentioned [that deal] to any of the finite people here  . . .."  Houldsworth stated, in substance and in part, "we've never had one we've considered to be that . . . certainly that confidential because Ron [FERGUSON] says it is . . . And this one I think we might have to introduce . . . some sort of locked door policy."

yy.     On or about December 29, 2000, Houldsworth emailed MONRAD, GRAHAM, and Napier to inform them that MILTON had confirmed AIG's participation and asked MONRAD whether she had "any more thoughts on the transfer back to Dublin?"

zz.     On or about December 29, 2000, Napier forwarded Houldsworth's December 29,

29

2000 email to FERGUSON, MONRAD, GARAND and GRAHAM.  Napier stated, "Thanks everyone for your role in completing this transaction.  This is a very unique solution to a special need for an important client."

aaa.    On or about January 4, 2001, Napier emailed MILTON stating "we need to discuss the structure for recouping the premium and fee."

bbb.    On or about January 8, 2001, FERGUSON emailed Napier and asked whether the AIG transaction was "on track" and "Did we work out the fee recoveries etc?"

### AIG Fraudulently Reported Increased Reserves in Q4 2000 Earnings Release

ccc.    On or about February 8, 2001, defendants FERGUSON, GARAND, GRAHAM, MILTON, MONRAD, and their co-conspirators caused AIG to issue a false and fraudulent fourth quarter 2000 earnings release to the investing public.  In that release, AIG's CEO stated: "AIG had a very good quarter and year . . . We added $106 million to AIG's general insurance net loss and loss adjustment reserves for the quarter . . . ."  The loss adjustment reserve figures cited in the earnings release included $250 million in phony reserves from the sham reinsurance transaction between AIG (NUFIC) and Gen Re (CRD).

ddd.    On or about February 16, 2001, MONRAD told Houldsworth that she had spoken with an AIG Senior Executive and, based on the conversation, MONRAD believed that AIG had booked the first half of the transaction in 2000.

### Pre-Funding of Fees and Payments to Gen Re

eee.    On or about February 16, 2001, Napier emailed Houldsworth and MONRAD that an AIG senior executive and MILTON had decided that the most efficient way to transfer funds for the transaction to Gen Re would be to commute – or terminate – an unrelated

transaction between Gen Re and HSB (an unrelated AIG subsidiary) in order to leave Gen Re with $15 million extra.  The email also noted that it was important to AIG to book the second part of the reinsurance transaction in the first quarter of 2001.

      fff.    On or about February 21, 2001, Napier notified FERGUSON that the unrelated HSB commutation transaction would be used to fund the payments due under the reinsurance transaction, that MILTON wanted to book the second part of that transaction in the first quarter of 2001, and that no money had yet changed hands.

      ggg.    On or about March 7, 2001, GRAHAM and Houldsworth had a telephone conversation about the AIG transaction.  Houldsworth explained, in substance and in part, that "we aren't gonna pay them the [$10 million] fee yet . . . we don't intend to pay them until we get the cash."  Houldsworth warned "if they turn around and start . . . kicking up a fuss, I don't think they really want this made public, this transaction."  GRAHAM replied, in substance and in part, that "I think it's likely that it will go through as planned, because they [AIG] need the relief." GRAHAM further stated, in substance and in part, that "this is gray area stuff, uh, for large zeroes."  Houldsworth replied, "yes, it's quite shocking actually."  Houldsworth explained, in substance and in part, "to be quite frank, this . . . doesn't make a difference to our account.  You know, there's no risk transfer in it.  It's deposit accounted."  GRAHAM replied, in substance and in part, "their [AIG's] organizational approach to compliance issues has always been 'pay the speeding ticket,' so, which is different than our organizational approach to compliance.  So I'm pretty comfortable that our own skirts are clean but that they, ah, they [AIG] have issues."

      hhh.    On or about March 8, 2001, Houldsworth sent MILTON a signed copy of the

sham contract for the first half of the reserve transaction, effective December 1, 2000.  The sham

contract, by its false terms, provided that CRD (Gen Re) would pay NUFIC (AIG) a 2% [$5

million] "loss transfer payment" or cash "premium," representing one-half of the $10 million

total cash "premiums" due to AIG under the express contract terms.

  iii. On or about March 8, 2001, Houldsworth sent an email to MONRAD,

GRAHAM, and Napier informing them that he had sent MILTON a signed copy of the contract

for the first half of the reserve transaction.  Further, Houldsworth advised that CRD would not

pay AIG for the contract – despite the contractual terms requiring CRD to do so – until an

agreement had been reached with AIG on how AIG would pre-fund the $10 million in cash

"premiums" and pay Gen Re its $5 million fee.

  jjj. On or about March 29, 2001, Houldsworth emailed GRAHAM, MONRAD, and

Napier and asked GRAHAM to review a draft copy of a contract prepared for the second half of

the reserve transaction.  Houldsworth asked GRAHAM, "Rob, could you give this your review to

see if you feel it is acceptable or whether more needs doing, bear in mind my lack of legal

knowledge and the fact we have tried to avoid any lawyers being involved elsewhere to keep the

circle to a minimum?"

AIG Fraudulently Reported Increased Reserves for Q4 2000

  kkk. On or about April 2, 2001, defendants  FERGUSON, GARAND, GRAHAM,

MILTON, MONRAD, and their co-conspirators caused AIG electronically to file its false and

fraudulent SEC Form 10-K for the period ended December 31, 2000, with the SEC.  AIG

financial statements contained its Form 10-K included $250 million in phony loss reserves from

the first part of the sham reinsurance transaction with Gen Re.

lll.    On or about April 6, 2001, defendants FERGUSON, GARAND, GRAHAM, MILTON, MONRAD, and their co-conspirators caused AIG to distribute to AIG's shareholders and the investing public a false and fraudulent AIG Annual Report for the fiscal year ending December 31, 2000.  The report overstated AIG's loss reserves by $250 million as a result of the first part of the sham reinsurance transaction.

<u>AIG Fraudulently Reported Increased Reserves for Q1 2001</u>

mmm.  On or about April 26, 2001, defendants FERGUSON, GARAND, GRAHAM, MILTON, MONRAD, and their co-conspirators caused AIG to issue a false and fraudulent first quarter 2001 earnings release to the investing public.  In that release, AIG's CEO stated, "We added $63 million to AIG's general insurance net loss and loss adjustment reserves for the quarter . . . ."  The loss adjustment reserve figures cited in the earnings release included an additional $250 million in phony reserves from the second part of the sham reinsurance transaction with Gen Re.

nnn.    On or about May 15, 2001, defendants  FERGUSON, GARAND, GRAHAM, MILTON, MONRAD, and their co-conspirators caused AIG electronically to file a false and fraudulent SEC Form 10-Q for the period ended March 31, 2001 with the SEC.  AIG's financial statements contained in its Form 10-Q included an additional $250 million in phony reserves from the second part of the sham reinsurance transaction with Gen Re.

ooo.    On or about July 20, 2001, Napier informed FERGUSON that Gen Re was winding up – or terminating – a reinsurance contract with HSB and intended to use the proceeds to fund the AIG-Gen Re transaction.  Napier further informed FERGUSON that documents had been drafted and were on MILTON's desk.

ppp. On or about August 21, 2001, Napier sent a letter to MILTON noting that the two-stage reserve transfer had been completed and the only remaining issue was the transfer of funds.

qqq.    On or about August 28, 2001, MILTON sent Houldsworth a signed copy of the contract for the first half of the sham reinsurance transaction.

rrr.    On or about September 6, 2001, Houldsworth caused a signed copy of the contract for the second half of the sham reinsurance transaction, effective March 31, 2001, to be sent to MILTON.  By its false terms, the sham contract provided that CRD (Gen Re) would pay NUFIC (AIG) a two percent [$5 million] "loss transfer payment" or cash "premium," representing the second half of the total $10 million total cash "premiums" due to AIG under the express contract terms.

sss.    On or about October 2, 2001, MILTON sent a CRD employee a signed copy of the contract for the second half of the sham reinsurance transaction.

ttt.    On or about October 24, 2001, the CRD employee to whom MILTON sent a signed copy of the sham contract on or about October 2, 2001, emailed Houldsworth a memo entitled "Project Alpha," which stated that "[s]pecific guidance has been received from Ron FERGUSON that this contract is to be kept confidential and consequently it will be kept locked in [a CRD senior executive's] desk at all times."

The Round Trip of Cash

uuu.    On or about December 18, 2001, GARAND sent an email to MONRAD, Houldsworth, and Napier summarizing how the funds from the HSB deal would be used for "locking in our $5mm intended economics on the accommodation cover CRD wrote for AIG, on which we were to take a $10mm hit."  According to the email, Gen Re would: (i)  pay HSB and

NUFIC approximately $15.2 million less than Gen Re was holding for HSB; (ii) use $10 million

of the $15.2 million to pay the cash "premiums" due NUFIC on the two halves of the sham

reinsurance transaction; and (iii) split the remaining $5.2 million between Gen Re and CRD

(representing Gen Re's $5 million fee for doing the deal plus $.2 million in interest).

vvv.    On or about December 21, 2001, defendants FERGUSON, GARAND,

GRAHAM, MILTON, MONRAD, and their co-conspirators caused Gen Re to terminate a pre-

existing contract with HSB (AIG) to fund the AIG-Gen Re transaction.  Under the termination

agreement, Gen Re agreed to pay HSB $7.5 million rather than the approximately $31.7 million

due HSB.

www.  On or about December 27, 2001, defendants FERGUSON, GARAND,

GRAHAM, MILTON, MONRAD, and their co-conspirators caused Gen Re to execute a

reinsurance contract with NUFIC.  Under the contract, NUFIC agreed to reinsure Gen Re for any

losses Gen Re was obligated to pay HSB under the HSB contract that had been terminated six

days earlier.  Because the contract had been terminated, there could be no losses under that

contract.  Despite this fact, Gen Re paid NUFIC approximately $9.1 million in premiums.  As a

result, Gen Re was left with a balance of approximately $15.2 million of the HSB money.  This

$15.2 million represented: (i) Gen Re's $5 million fee (plus $200,000 in interest) for doing the

deal; and (ii) the first leg of the "round trip" of the $10 million in cash "premiums" from AIG

(HSB) to Gen Re (CRD) back to AIG (NUFIC).

xxx.    On or about December 27, 2001, defendants  FERGUSON, GARAND,

GRAHAM, MILTON, MONRAD, and their co-conspirators caused Gen Re to enter into another

reinsurance contract with CRD.  Under the contract, CRD agreed to pay Gen Re $400,000 in

premiums.  In return, Gen Re agreed to assume $13 million in known losses that CRD already

had incurred.  The result was to transfer approximately $12.6 million from Gen Re to CRD and

leave Gen Re with a balance of approximately $2.6 million of the HSB (AIG) money.  This

represented the second leg of the "round trip" of the $10 million cash "premiums" from AIG

(HSB) to Gen Re (CRD) back to AIG (NUFIC).

  yyy. On or about December 28, 2001, defendants FERGUSON, GARAND,

GRAHAM, MILTON, MONRAD, and their co-conspirators caused CRD to transfer

approximately $10 million to NUFIC due under the express terms of the sham reinsurance

contracts, thereby completing the "round trip" of the $10 million cash "premiums" from AIG

(HSB) to Gen Re (CRD) back to AIG (NUFIC) and leaving CRD with its one-half share of the

remaining $2.6 million of the HSB (AIG) money.

<u>AIG Fraudulently Reported Increased Reserves for 2001</u>

  zzz. On or about April 1, 2002, defendants  FERGUSON, GARAND, GRAHAM,

MILTON, MONRAD, and their co-conspirators caused AIG electronically to file a false and

fraudulent SEC Form 10-K for the period ended December 31, 2001, with the SEC.  AIG's

financial statements contained in its Form 10-K included $500 million in phony reserves from

both parts of the sham reinsurance transaction with Gen Re.

  aaaa.  On or about April 5, 2002, defendants FERGUSON, GARAND, GRAHAM,

MILTON, MONRAD, and their co-conspirators caused AIG to distribute to AIG's shareholders

and the investing public a false and fraudulent AIG Annual Report for the fiscal year ending

December 31, 2001.  In the report, AIG's loss reserves for that year were overstated by $500

million as a result of the sham reinsurance transactions with Gen Re.

36

AIG Continued to Fraudulently Report Increased Reserves

bbbb.   On or about July 24, 2002, MILTON sent AIG unindicted co-conspirator #1 a memorandum discussing the sham reinsurance transaction with Gen Re.  In the memorandum, MILTON wrote in substance and in part that: (i) Gen Re had requested that the transaction with AIG be terminated; (ii) the transaction was giving Gen Re "some cause for concern"; (iii) the termination of the deal "would reduce [AIG's] GAAP loss reserves by $500 million"; (iv) "[d]o you want to do this over two quarters as we did with the incoming portfolio?" and (v) "[t]here should not be any cash implications as all funds are withheld."

cccc.   On or about March 31, 2003, defendants FERGUSON, GARAND, GRAHAM, MILTON, MONRAD, and their co-conspirators caused AIG electronically to file a false and fraudulent SEC Form 10-K for the period ended December 31, 2002, with the SEC.  AIG's financial statements contained in its Form 10-K included $500 million in phony loss reserves from both parts of the sham reinsurance transaction with Gen Re.

dddd.   On or about March 15, 2004, defendants FERGUSON, GARAND, GRAHAM, MILTON, MONRAD, and their co-conspirators caused AIG electronically to file a false and fraudulent SEC Form 10-K for the period ended December 31, 2003, with the SEC.  AIG's financial statements contained in its Form 10-K included $500 million in phony loss reserves from both parts of the sham reinsurance transaction with Gen Re.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH FIVE

(Securities Fraud)

1.     The allegations set forth in paragraphs 1 through 10, 15 through 18, 20, 22, and 24 through 33 of the General Allegations, paragraphs 38 through 43, and paragraphs 44.a through 44.v, 44.y through 44.gg, 44.ii through 44.ll, 44.nn through 44.qq, 44.ss through 44.bbb, 44.ddd through 44.jjj, 44.ooo through 44.yyy, and 44.bbbb of Count One of this Indictment are hereby realleged and incorporated as though set forth in full herein.

2.     On or about the dates set forth below, each such date constituting a separate count of this Indictment, within the District of Connecticut and elsewhere, defendants

> RONALD E. FERGUSON,
> ROBERT D. GRAHAM,
> CHRISTIAN M. MILTON and
> ELIZABETH MONRAD

and others, in documents filed with the SEC and disseminated to the investing public, as described below, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances and directly and indirectly: (i) employ devices, schemes, and artifices to defraud; (ii) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with the purchases and sales of AIG securities and by the use and of the instruments of communication in interstate commerce and the mails.

| Count | Date | Report |
|---|---|---|
| 2 | February 8, 2001 | AIG's Earnings Report for Fourth Quarter 2000 |
| 3 | April 2, 2001 | AIG's Form 10-K for Fiscal Year 2000 |
| 4 | April 26, 2001 | AIG's Earnings Report for First Quarter 2001 |
| 5 | May 15, 2001 | AIG's Form 10-Q for First Quarter 2001 |

In violation of Title 17, Code of Federal Regulations, Section 240.10b-5; Title 15, United States Code, Sections 78j(b) and 78ff; and Title 18, United States Code, Section 2.

## COUNTS SIX AND SEVEN

(False Statements to the SEC)

1.      The allegations set forth in paragraphs 1 through 10, 15 through 18, 20, 22, and 24 through 33 of the General Allegations, paragraphs 38 through 43, and paragraphs 44.a through 44.v, 44.y through 44.gg, 44.ii through 44.ll, 44.nn through 44.qq, 44.ss through 44.bbb, 44.ddd through 44.jjj, 44.ooo through 44.yyy, and 44.bbbb of Count One of this Indictment are hereby realleged and incorporated as though set forth in full herein.

2.      On or about the dates set forth below, each such date constituting a separate count of this Indictment, within the District of Connecticut and elsewhere, defendants

RONALD E. FERGUSON,
ROBERT D. GRAHAM,
CHRISTIAN M. MILTON and
ELIZABETH MONRAD

and others, did willfully and knowingly, make and cause to be made untrue, false and misleading statements of material fact in reports and documents required to be filed by AIG under the Securities Exchange Act of 1934 and the rules and regulations thereunder, and failing to provide such further material information as was necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading.

| Count | Date | Report |
|-------|------|--------|
| 6 | April 2, 2001 | AIG's Form 10-K for Fiscal Year 2000 |
| 7 | May 15, 2001 | AIG's Form 10-Q for First Quarter 2001 |

40

In violation of Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-1 and 240.13a-13, and Title 18, United States Code, Section 2.

## COUNTS EIGHT THROUGH TEN

(Securities Fraud)

1.      The allegations set forth in paragraphs 1 through 35 of the General Allegations, paragraphs 38 through 43, and paragraphs 44.a through 44.dddd of Count One of this Indictment are hereby realleged and incorporated as though set forth in full herein.

2.      On or about the dates set forth below, each such date constituting a separate count of this Indictment, within the District of Connecticut and elsewhere, defendants

> RONALD E. FERGUSON,
> CHRISTOPHER P. GARAND,
> ROBERT D. GRAHAM,
> CHRISTIAN M. MILTON and
> ELIZABETH MONRAD

and others, in documents filed with the SEC and disseminated to the investing public, as described below, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances and directly and indirectly: (i) employ devices, schemes, and artifices to defraud; (ii) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with the purchases and sales of AIG securities and by the use and of the instruments of communication in interstate commerce and the mails.

| Count | Date | Report |
|-------|------|--------|
| 8 | April 1, 2002 | AIG's Form 10-K for Fiscal Year 2001 |
| 9 | March 31, 2003 | AIG's Form 10-K for Fiscal Year 2002 |

| 10 | March 15, 2004 | AIG's Form 10-K for Fiscal Year 2003 |

In violation of Title 17, Code of Federal Regulations, Section 240.10b-5; Title 15, United States Code, Sections 78j(b) and 78ff; and Title 18, United States Code, Section 2.

## COUNTS ELEVEN THROUGH THIRTEEN

(False Statements to the SEC)

1.      The allegations set forth in paragraphs 1 through 35 of the General Allegations,

paragraphs 38 through 43, and paragraphs 44.a through 44.dddd of Count One of this Indictment

are hereby realleged and incorporated as though set forth in full herein.

2.      On or about the dates set forth below, each such date constituting a separate count

of this Indictment, within the District of Connecticut and elsewhere, defendants

> RONALD E. FERGUSON,
> CHRISTOPHER P. GARAND,
> ROBERT D. GRAHAM,
> CHRISTIAN M. MILTON and
> ELIZABETH MONRAD

and others, did willfully and knowingly, make and cause to be made untrue, false and misleading

statements of material fact - namely the inflated loss reserves cited above - in reports and

documents required to be filed by AIG under the Securities Exchange Act of 1934 and the rules

and regulations thereunder, and failing to provide such further material information as was

necessary to make the statements made therein, in light of the circumstances in which they were

made, not misleading.

| Count | Date | Report |
|---|---|---|
| 11 | April 1, 2002 | AIG's Form 10-K for Fiscal Year 2001 |
| 12 | March 31, 2003 | AIG's Form 10-K for Fiscal Year 2002 |
| 13 | March 15, 2004 | AIG's Form 10-K for Fiscal Year 2003 |

44

In violation of Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-1 and 240.13a-13, and Title 18, United States Code, Section 2.

## COUNTS FOURTEEN THROUGH SIXTEEN

(Mail Fraud)

1.	The allegations set forth in paragraphs 1 through 35 of the General Allegations, paragraphs 38 through 43, and paragraphs 44.a through 44.dddd of Count One of this Indictment are hereby realleged and incorporated as though set forth in full herein.

2.	On or about the respective dates shown below, each such date constituting a separate count of this Indictment, within the District of Connecticut and elsewhere, defendants

> RONALD E. FERGUSON,
> CHRISTOPHER P. GARAND
> ROBERT D. GRAHAM,
> CHRISTIAN M. MILTON and
> ELIZABETH MONRAD

and others, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice to defraud and attempting to do so, did knowingly: (i) place in any post office and authorized depository for mail matter, any matter or thing whatever to be sent and delivered by the Postal Service; (ii) deposit and cause to be deposited any matter an thing whatever to be sent and delivered by any private and commercial interstate carrier; and (iii) cause to be delivered by mail and private and commercial interstate carrier, according to the direction thereon, the following:

| Count | Date | Mailing |
|-------|------|---------|
| 14 | April 5, 2002 | AIG's Annual Report for 2001 |
| 15 | April 4, 2003 | AIG's Annual Report for 2002 |
| 16 | April 5, 2004 | AIG's Annual Report for 2003 |

(In violation of Title 18, United States Code, Sections 1341 and 2.)

<u>Forfeiture</u>

If convicted of any of Counts 1 through 16 of this Indictment, each defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the counts of conviction.  This property includes, but is not limited to, $5,000,000, representing the fraudulent fee received by co-conspirator and co-schemer Gen Re, and for which amount each convicted defendant shall be jointly and severally liable.

If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without
            difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above.

In accordance with Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461.

A TRUE BILL


_____/s/_____
FOREPERSON


_____/s/_____
KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


_____/s/_____
ANTHONY E. KAPLAN
SUPERVISORY ASSISTANT U.S. ATTORNEY


_____/s/_____
ERIC J. GLOVER
ASSISTANT UNITED STATES ATTORNEY


___/s/_____
RAYMOND E. PATRICCO JR.
ASSISTANT UNITED STATES ATTORNEY


___/s/_____
ADAM SAFWAT
TRIAL ATTORNEY, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE


___/s/_____
EVA SAKETKOO
SPECIAL ATTORNEY, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE