# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,      :
                                 :  Criminal Number:  3:06CR137 (CFD)

      v.                       :
                                 :

RONALD E. FERGUSON,       :
CHRISTOPHER P. GARAND,  :
ROBERT D. GRAHAM,        :
CHRISTIAN M. MILTON, and  :
ELIZABETH A. MONRAD     :
                                 :

## RULING ON MOTIONS RELATING TO THE SUPERSEDING INDICTMENT AND DISCOVERY

On September 20, 2006, a federal grand jury in the District of Connecticut returned a

sixteen count Superseding Indictment charging the defendants, Ronald E. Ferguson, Christopher

P. Garand, Robert D. Graham, Christian M. Milton, and Elizabeth A. Monrad, with conspiracy,

securities fraud, mail fraud, and making false statements to the Securities and Exchange

Commission ("SEC").  Since their indictment, the defendants filed ten motions on matters

relating to the indictment and discovery.  Defendant Graham also moved for a severance.  For the

reasons stated below, these motions are granted in part and denied in part.

## 1.      Background

The Superseding Indictment ("Indictment") stems from an allegedly fraudulent

reinsurance transaction between American International Group ("AIG") and General Reinsurance

Corporation ("Gen Re")[1] initiated in late 2000.  At that time, Ferguson was the chief executive

officer ("CEO") of Gen Re; Garand was a senior vice president and the chief underwriter of Gen

---

[1]Gen Re is a subsidiary of Berkshire Hathaway, Inc.

Re's finite reinsurance operations; Graham was legal counsel and a senior vice president at Gen

Re; Milton was AIG's vice-president of reinsurance; and Monrad was the chief financial officer

("CFO") of Gen Re.  The indictment recounts that on October 26, 2000 AIG publicly reported

that its year 2000 third quarter loss reserves declined $59 million from the previous quarter; after

this news AIG's stock price decreased and some outside stock analysts downgraded AIG's stock.

The indictment alleges that soon after this stock price drop, the defendants created a two-stage

sham reinsurance transaction between AIG and Gen Re, which had the effect of boosting AIG's

loss reserves by $250 million in the fourth quarter of 2000 and by $250 million in the first

quarter of 2001.  Under the implementing contracts, AIG appeared to agree to reinsure Gen Re

for $600 million of liability in exchange for $500 million in premiums; as a result, AIG appeared

to assume $100 million in risk and gain $500 million in loss reserves.  The indictment alleges,

however, that pursuant to a secret side agreement, (1) the transactions did not actually transfer

any risk from Gen Re to AIG, (2) AIG paid Gen Re $10 million to fund the first and only

premium payment on the contracts, and (3) AIG paid Gen Re a $5 million fee to do the

transactions because there were no other economic incentives for Gen Re.  Despite the terms of

this side agreement, the indictment alleges, AIG reported the additional $500 million in loss

reserves in its mandatory SEC filings from 2001 until 2005.  Further, allegedly because AIG

reported increased enhanced loss reserves in both the fourth quarter of 2000 and the first quarter

of 2001, stock analysts positively changed their assessment of AIG's economic health.

**2.      Motions Related to the Indictment:**

The defendants filed five motions relating to the indictment: a motion for a bill of

particulars, a motion to dismiss the mail fraud and securities fraud counts, a motion to strike

surplusage, a motion to strike multiplicitous counts, and a motion to strike certain language. Defendant Garand also moved separately for a bill of particulars.  For the reasons that follow, these motions are denied.

### A.      Defendants' Motion for a Bill of Particulars [docket # 203]

Defendant Milton, joined by all of the other defendants, moved for a bill of particulars. The motion asks the Court to require the government to: (i) specify the allegedly false or misleading statements, the schemes or artifices to defraud, and the false entries in books and records alleged in the indictment, and (ii) identify the unnamed co-conspirators and other relevant parties.  The government opposes the motion on both points.  The government states that it has provided the defendants with adequate information about the defendants' alleged false statements and fraudulent scheme through significant detail in the indictment and through its rule 16 disclosure materials, which are electronically and readily searchable.  The government also claims that it has provided sufficient information so that the defendants can determine the identities of the unindicted co-conspirators referenced in the indictment.

A defendant is entitled to a bill of particulars when the indictment does not indicate which of his acts are allegedly criminal.  United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990).  The bill enables the defendant to defend the initial charge properly and to avoid double jeopardy.  A bill of particulars avoids impermissibly shifting the burden of proving criminal liability from the government to the defendant.  United States v. Bortnovsky, 820 F.2d 572, 575 (2d Cir. 1987).  Information that is necessary to give the defendant enough specificity about his allegedly criminal conduct must be disclosed by the government even if it reveals the government's evidence or theories of the case.  United States v. Barnes, 158 F.3d 662, 665 (2d

3

Cir. 1998).  However, a bill of particulars should only be granted when the particulars sought are necessary for the defendant to prepare his case, not in cases where the information would merely be helpful.  United States v. Young & Rubicam, 741 F. Supp. 334, 349 (D. Conn. 1990).  The defendant bears the burden of showing that the information requested is necessary and that he will be prejudiced without it so as to justify granting a bill of particulars.  Barnes, 158 F.3d at 666.  A mere statement that the defendant will be prejudiced without the bill is insufficient.  See id.  Even if the indictment does not fully give notice of the charges, a bill of particulars is still not necessary if the government provides the required notice in "some acceptable alternate form."  Bortnovsky, 820 F.2d at 574; see United States v. Kaplan, 91 F. Supp. 2d 565, 572 (S.D.N.Y. 2000).  Granting a bill of particulars is within the sound discretion of the district court and will be reviewed only for abuse of discretion.  United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999); Barnes, 158 F.3d at 665-66.

> (i)      Particulars of alleged false statements and fraudulent scheme

The defendants claim that they are faced with a lengthy indictment alleging false statements, false documents, and a fraudulent scheme, but they are left with insufficient guidance through the government's 3.5 million page document production to specifically identify those false statements, false documents, and the fraudulent scheme.  The defendants rely on Bortnovsky, an insurance fraud case where particulars were required by the trial court after the government produced 4,000 documents to the defendants without identifying the specific documents that were allegedly fraudulent.  See 820 F.2d at 574-75.  The defendants here argue that, like in that case, "the government did not fulfill its obligation merely by providing mountains of documents to defense counsel."  Id. at 575.

4

The government argues that the motion should be denied because the indictment and the government's document production went far beyond the "mountains of documents" found insufficient in <u>Bortnovsky</u>.  The indictment describes in detail the allegedly fraudulent transactions, including sections containing extensive general allegations, an explanation of the manner and means of the alleged fraud, and eighty-two overt acts allegedly committed in furtherance of the conspiracy.  The indictment further identifies the documents containing false statements to be the false offer letter, the contracts between AIG and Gen Re, and AIG's earnings reports, Forms 10-K and 10-Q, and annual statements.  The government concedes that it did produce a large quantity of documents pursuant to Fed. R. Crim. P. 16, but they were given to the defendants in the exact same electronically searchable format that the government is currently using.  <u>See</u> Government's Memorandum in Opposition to Defendants' Motion for Bill of Particulars, at 5.  Finally, at the defendants' arraignments, the government provided them with 1,350 pages of "hot documents"[2] culled from the rule 16 production materials.  The government identified these documents as the most relevant documents to the transaction at issue in the case and stated its intention to use these documents in its case-in-chief.  Given the degree to which the government has explained the alleged fraud and false statements in the indictment and identified the most relevant documents in its production, the government argues that the defendants have not proven that a bill of particulars is necessary.

The Court concludes that the decisions cited by the defendants in favor of their motion, in which courts ordered bills of particulars, concerned very different settings.  The defendants in this case are neither left to speculate as to which documents are allegedly fraudulent, nor are they

---

[2]This set of documents will be referenced as "hot docs."

charged with unspecified incidents of alleged fraud; here there is one fraudulent transaction (in two stages) alleged and the related false documents are identified in the indictment.  See United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988) (indictment alleged unspecified offenses "including but not limited to" those charged in indictment); Bortnovsky, 820 F.2d at 574-75 (indictment alleged four fabricated insurance claims but did not specify which four out of twelve identified claims were fraudulent); United States v. Mango, No. 96-CR-327, 1997 U.S. Dist. LEXIS 6145, at *37 (N.D.N.Y. May 1, 1997) (indictment did not specify where along 370 mile natural gas pipeline numerous alleged violations of Clean Water Act occurred).  The defendants are also not left unguided with a "mountain" of unorganized discovery documents; here the defendants have all of the government's rule 16 materials in electronically searchable databases as well as a list of the government's "most relevant" documents.  See Bortnovsky, 820 F.2d at 574-75 (4,000 pages of documents given to defense counsel without guidance as to their contents only four days prior to trial); United States v. Nachamie, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000) (government produced 200,000 documents relating to 2,000 Medicare claims but did not identify which claims were allegedly false and in what way they were false); United States v. Upton, 865 F. Supp. 727, 747-48 (E.D.N.Y. 1994) (government produced thousands of pages but did not identify documents upon which it would rely at trial).  Just as the government cannot merely produce unlimited documents in lieu of providing sufficient detail as to the charges, the defendants cannot "use the vastness or complexity of the alleged conspiracy and its attendant documentary evidence as a sword against the government when the Indictment, discovery, and other information provided by the government adequately notify the Defendants of the charges against them."  United States v. Rigas, 258 F. Supp. 2d 299, 305 (S.D.N.Y. 2003).  Given the

degree of detail in the indictment and the government's provision of searchable discovery databases and a list of its key documents, the defendants have not proven that they require more particularization to adequately prepare their defenses, avoid prejudicial surprise at trial, and protect against future double jeopardy.

(ii)    Identities of unindicted co-conspirators and other relevant parties

The defendants request that the government disclose the identities of the unindicted conspirators and others involved with the allegedly fraudulent transaction referenced in the Indictment.  The government opposes this request because there is only one fraudulent transaction at issue in this case, and the number of alleged co-conspirators is small and their identities are apparent, so it is unlikely the defendants will suffer prejudicial surprise.

At oral argument, the government stated that any mention of co-conspirators in the indictment refers only to twelve people.  This includes the five defendants, two named co-conspirators (John Houldsworth and Richard Napier), and five additional people.  Responding to this, defense counsel conceded that it could identify the remaining five co-conspirators.  The government asserted that if other witnesses' status changed from 'witness' to 'co-conspirator,' it would alert defense counsel.  Finally, at a previous hearing, the government maintained that it there will not be another superseding indictment in this case.  In light of these representations, there is no need for the Court to order that the government reveal the identities of the remaining five conspirators.

Accordingly, both aspects of the defendants' motion for a bill of particulars are denied.

**B.    Defendant Garand's Motion for a Bill of Particulars [docket # 333]**

In addition to joining the other defendants' motion for a bill of particulars, Garand makes

his own motion for a bill of particulars with respect to counts one (conspiracy), eight through ten (securities fraud), eleven through thirteen (false statements to the SEC), and fourteen through sixteen (mail fraud).  With regard to count one (conspiracy), Garand argues that he is only mentioned in twenty-seven of the eighty-two overt acts, and none of these twenty-seven allegations alleges that he knowingly joined the conspiracy or that he committed an overt act in furtherance of it.  Since these are elements of the federal conspiracy statute that the government must prove at trial, he argues that the government must give particulars as to how his conduct violated it.

Garand's motion for particulars is denied.  The showing required of a defendant seeking a bill of particulars is discussed supra.  With regard to Garand, the indictment does allege all of the elements to include him in the alleged conspiracy: it alleges that Garand served as the head of Gen Re's reinsurance operations at the time of the allegedly fraudulent transaction, and that he was kept apprised of the transaction by co-defendants and co-conspirators from the transaction's initial stages through its completion.  Indictment, at ¶¶ 4, 44l, 44o, 44v-z, 44cc, 44dd, 44jj, 44qq, 44xx, 44uuu.  Then, as Garand admits in his brief, the indictment alleges that he had two phone conversations with co-conspirator John Houldsworth in which the details of the allegedly fraudulent transaction and the means by which to conceal it were discussed.  Indictment, at ¶¶ 44jj (alleging conversation discussing alleged paper trail to cover up the fraudulent transaction) & 44xx (alleging conversation discussing AIG's improper accounting practices and the means by which to cover up the allegedly fraudulent transaction in Gen Re's files).  Garand also sent an email to defendant Monrad and co-conspirators Houldsworth and Napier that explained the mechanics of the "off-the-books" side transaction used to finance the underlying reinsurance

transaction.  Indictment, at 44uuu (describing the email).  This participation is sufficient to allege Garand intentionally participated in the conspiracy and that he took actions in furtherance of it.

Additionally, even if the indictment were insufficient, a bill of particulars is not necessary where the government's production provides the defendant with the details of his allegedly criminal conduct.  In addition to joining the other defendants' argument on this issue, Garand separately urges the Court to order a bill of particulars because, he claims, the volume of the government's production renders it useless.  As explained above, while the government cannot substitute detail as to the charges with overwhelming quantities of documents, the defense similarly cannot use the complexity of the case against the government in this fashion.  See Rigas, 258 F. Supp. 2d at 305.  Two months prior to Garand's indictment, the government provided him with 1,350 pages of "hot docs" and its electronically searchable rule 16 production, and Gen Re gave him copies of all of the documents from his Gen Re files relating to the allegedly fraudulent transaction.  Government's Response to Defendant Garand's Motion for Bill of Particulars, at 2-3.  This extensive production, given to him even before he was indicted, provides him with significant details as to the government's case against him.[3]  Garand's separate motion for a bill of particulars is denied.[4]

---

[3]The government notes that after it produced Garand its rule 16 evidence and after he was indicted, Garand submitted a 35 page Wells response to dissuade the SEC from filing a civil suit against him for the transaction issue.  This further indicates that the indictment and the government's production adequately informed Garand of his alleged role in the transaction at issue in this case.

[4]Garand argues that counts eight through ten (securities fraud), eleven through thirteen (false statements to the SEC), and fourteen through sixteen (mail fraud) are deficient because they incorporate the insufficient specific acts allegations from count one (conspiracy); as a result, these other counts also fail to sufficiently identify Garand's allegedly criminal acts.  Since his motion for these particulars incorporates the same arguments he uses to justify particulars for

### C.      Motion to Dismiss Counts from the Indictment [docket # 266]

All of the defendants moved to dismiss counts eight through ten (securities fraud), fourteen through sixteen (mail fraud), and the mail fraud conspiracy allegations in count one from the indictment pursuant to Fed. R. Crim. P. 12(b)(3)(B).  The defendants argue that these charges should be dismissed because they fail to allege a necessary element of the offenses. Specifically, the defendants claim that the mail fraud counts should be dismissed for failure to allege an intent to harm, and the mail fraud and securities fraud counts should be dismissed for failure to allege mailings in furtherance of the alleged scheme to defraud.  The defendants' argument is not that the indictment should be amended, but rather that the government will not, as a matter of law, be able to prove the offenses alleged, and so the charges must be dismissed. The government opposes dismissal on the ground that the defendants' arguments improperly focus on the sufficiency of the government's proof rather than the sufficiency of the indictment; it also argues that the charges in the superseding indictment properly allege all elements of both mail fraud and securities fraud, thereby satisfying Fed. R. Crim. P. 7(c).

### (i)      Use of the mail and instruments of interstate commerce to establish mail fraud and securities fraud

With regards to the securities fraud and mail fraud charges, the defendants claim that the mailing of AIG's Forms 10-K to the SEC and the general distribution of AIG's Annual Reports to investors are too disconnected from the underlying alleged fraudulent transaction to sustain a conviction for these crimes.  Securities fraud requires a connection to interstate communication (including the mail), and mail fraud requires the use of the mail system.  Since the underlying

_____

count one, it is denied for the same reasons.

allegedly fraudulent transaction was completed when AIG announced its inaccurate loss reserves to the public on March 15, 2001, they argue, these subsequent mailings are irrelevant to the fraud and do not satisfy the mailing element of the crime necessary to sustain a conviction.

The defendants argument fails in light of Supreme Court precedent on the requisite connection between fraud and use of the mail.  "To be part of the execution of the fraud, . . . the use of the mails need not be an essential element of the scheme."  United States v. Schmuck, 489 U.S. 705, 710 (1989).  To the contrary, "[i]t is sufficient for the mailing to be incident to an essential part of the scheme or a step in [the] plot."  Id. at 710-11 (citations omitted).  In Schmuck, the Supreme Court explained that if mailings are a key element in carrying out the fraud, then they are connected enough to the fraud to fall within the mail fraud statute.  Id. at 712. The defendant in Schmuck sold used cars with their odometers illegally rolled back to defraud customers into overpaying for the vehicles.  Id. at 707.  To complete the sales, Schmuck mailed title forms for the cars that contained the false information regarding the cars' mileage.  Id.  In upholding Schmuck's conviction for mail fraud, the Court distinguished between cases in which a mailing helps perpetuate the fraud and cases in which a mailing is merely incidental to the fraud, where it is not enough to trigger the mail fraud statute.  Id. at 712-14.  In a prior case, United States v. Maze, the defendant stole his roommate's credit card and used it to take a vacation.  414 U.S. 395 (1974).  Maze was charged with mail fraud, with the mailing element of the fraud supplied by the fact that each time he used the credit card an invoice would be mailed to the bank that issued the card.  Id. at 399.  In Maze, the Supreme Court held that such "post-fraud accounting among the potential victims" of the fraud was insufficient to establish mail fraud.  Schmuck, 489 U.S. at 714 (discussing Maze).  In Maze, unlike in Schmuck, "the success

of [the defendant's] scheme in no way depended on the mailings;" to the contrary, the mailings ultimately uncovered the fraud once the bank received the unauthorized charges.  Id.; see Maze, 414 U.S. at 402 ("Indeed, from [the defendant's] point of view, he probably would have preferred to have the invoices misplaced . . . and never mailed at all.").

Here, the defendants argue that the allegedly false re-insurance transaction is the full extent of the fraud, and, as a result, subsequent mailings merely containing the inaccurate loss reserves are too remote to satisfy the mailing element of the mail fraud and securities fraud statutes.  However, the alleged fraud on the shareholders—that no one knew the truth as to AIG's loss reserves in 2000 and 2001—continued until AIG's 2005 accounting restatements revealed the prior inaccuracies.  AIG's mailings to shareholders and the SEC were crucial pieces of the alleged fraud because they lulled the SEC and investors into complacency until 2005.  See United States v. Lane, 474 U.S. 438, 452-53 (1986) (mailings lulled insurer into believing claims were legitimate).  The mailings here are more similar to those in Schmuck, rather than those in Maze; the success of the allegedly fraudulent reinsurance transaction depended on AIG sending out its annual reports and mandatory SEC filings without any seeming irregularities.  Without these mailings perpetuating the false loss reserves figures from 2000 and 2001, the value of the company would decline (the fear of which allegedly motivated the fraudulent transaction).  Given the connection between these mailings and the underlying fraud, the mailings were sufficiently part of the fraudulent scheme to satisfy those elements of the mail fraud and securities fraud statutes.  Consequently, the defendants' motion to dismiss counts eight through ten (securities fraud), fourteen through sixteen (mail fraud), and the portion of count one that alleges a conspiracy to commit mail fraud is denied.

(ii)      "Intent to harm" to establish mail fraud

The defendants also argue that the mail fraud counts should be dismissed because they do not allege that the defendants intended to harm analysts and investors by the allegedly fraudulent transaction.  The defendants' argument assumes that "intent to harm" is an essential element of mail fraud.  Their motion is denied because, while proof of an intent to harm can be used to establish one element of mail fraud—that the defendants intended to execute a scheme to defraud—the government is not required to use such proof to establish the offense.[5]

A valid conviction for mail fraud requires proof of three elements: "(1) a scheme to defraud victims of (2) money or property, through the (3) use of the mails." United States v. Walker, 191 F.3d 326, 334 (2d Cir. 1999).  The 'money or property' element "has been broadened by statute and caselaw to extend beyond tangible property." Id. at 335. "[G]iven the important role that information plays in the valuation of a corporation, the right to complete and accurate information is one of the most essential sticks in the bundle of rights that comprise a stockholder's property interest." United States v. Wallach, 925 F.2d 445, 463 (2d Cir. 1991). The superseding indictment alleges all three of these elements by alleging (1) a scheme to deceive AIG shareholders about its actual loss reserves that (2) deprived shareholders of their property right to accurate information about AIG by (3) disseminating false annual reports containing fraudulently inflated loss reserves.

The defendants' assertion that the government must also allege, and ultimately prove, an intent to harm is inaccurate.  The Second Circuit distinguishes between (a) defrauding a victim

---

[5]The Court denies this motion without prejudice to the motion being brought again as a motion addressing the sufficiency of the government's evidence on these charges.

and (b) merely deceiving someone in order to carry out a fraud against another victim.  See United States v. Starr, 816 F.2d 94, 98 (2d Cir. 1987).  The defendants are correct that "[m]isrepresentations amounting only to a deceit are insufficient to maintain a mail . . . fraud prosecution," and, to sustain a mail fraud prosecution in such cases "the deceit must be coupled with a contemplated harm to the [deceived person]."  Id.  In Starr, the Second Circuit determined that the defendant business-owners did not defraud their customers as alleged in the indictment; rather, they made misrepresentations to their customers for the purpose of defrauding the U.S. Postal Service.  Id. at 99.  Without an intent to harm the customers, the defendants' mere misrepresentations to them could not sustain a mail fraud conviction.  Id.  However, in cases where the indictment does allege a scheme to defraud, the indictment need not separately allege an intent to harm.  See  United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994) ("When the "necessary result" of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself.  Where the scheme does not cause injury to the alleged victim as its necessary result, the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent.").  Since the superseding indictment alleges a fraudulent scheme, not mere misrepresentations, as well as every other element of mail fraud, the defendants' motion is denied.[6]

_____

[6]At oral argument, defendants argued that the conduct underlying these charges, while perhaps a breach of fiduciary duty, was not illegal: AIG's inaccurate loss reserve data merely misled stock analysts, who have no proprietary right to information about the company.  The defendants' argument, however, takes too narrow a view of the alleged fraud.  Misleading stock analysts as to AIG's loss reserves would, in turn, mislead shareholders as well.  The context in which the transaction took place cannot be ignored when considering the scope of the alleged fraudulent scheme.

**D.      Motion to Strike Surplusage from the Indictment [docket # 265]**

All of the defendants except Garand move to strike two paragraphs from the superseding indictment, paragraphs 34 and 35 (the "restatement paragraphs"), as surplusage.  These paragraphs are part of the background information included in the first part of the superseding indictment.  The challenged paragraphs describe AIG's March 2005 press release and May 2005 revised 2004 SEC form 10-K that restated AIG's accounting of the allegedly fraudulent transaction.

At oral argument, both the defendants and the government agreed that this issue would be more appropriately resolved on a motion in limine.  The Court thus denies the motion without prejudice to its reassertion in a motion in limine.

**E.      Motion to Dismiss Multiplicitous Counts from the Indictment [docket # 268]**

All of the defendants move to dismiss counts six and seven (false statements to the SEC) and eleven through thirteen (false statements to the SEC) from the indictment on the ground that they are duplicative of other charges.  The defendants argue that these counts are subsumed by counts three, five, and eight through ten (securities fraud), and that convictions on the securities fraud and false statement counts would violate their rights under the Double Jeopardy Clause of the Fifth Amendment.  The government concedes that the underlying conduct is the same for all of these counts, but it argues that the securities fraud and the false statement counts constitute different offenses under United States v. Blockburger, 284 U.S. 299 (1932).

The Double Jeopardy Clause of the Fifth Amendment "protects against multiple punishments for the same offense."  United States v. Josephberg, 459 F.3d 350, 355 (2d Cir. 2006) (quoting Illinois v. Vitale, 447 U.S. 410, 415 (1980)).  Charged offenses do not violate the

Double Jeopardy Clause if "each of the offenses . . . requires proof of a different element."

Blockburger, 284 U.S. at 304.  "It is not determinative whether the same conduct underlies the

counts; rather, it is critical whether the 'offense'—in the legal sense, as defined by

Congress—complained of in one count is the same as that charged in another."  United States v.

Chacko, 169 F.3d 140, 146 (2d Cir. 1999).  This means that the Court must determine "whether

Congress intended the same conduct to be punishable under separate statutory provisions."

United States v. Avelino, 967 F.2d 815, 816 (2d Cir. 1992).

Regardless of whether charges in an indictment are multiplicitous, however, the Second

Circuit recently explained that "[w]here there has been no prior conviction or acquittal, the

Double Jeopardy clause does not protect against simultaneous prosecutions for the same offense,

so long as no more than one punishment is eventually imposed."  Josephberg, 459 F.3d at 355.

In Josephberg, the Court reversed as premature the district court's pre-trial dismissal of

multiplicitous counts from the indictment.  Id. at 352.  The Court explained that the defendant's

Double Jeopardy rights would only be violated if he were punished twice for the same offense,

not if he were prosecuted twice for the same offense or even convicted twice.  Id. at 355 ("Even

where the Double Jeopardy Clause would bar cumulative punishment for more than one such

offense, 'the Clause does not prohibit the State from prosecuting [the defendant] for such

multiple offenses in a single prosecution.'" (quoting Ohio v. Johnson, 467 U.S. 493, 500

(1984))); see Ball v. United States, 470 U.S. 856, 860 (1985) ("If, upon the trial, the district

judge is satisfied that there is sufficient proof to go to the jury on both counts, he should instruct

the jury as to the elements of each offense.").  Because of this, a defendant's Double Jeopardy

rights are only at risk after he is convicted on multiplicitous charges.  Josephberg, 459 F.3d at

355.  If this occurs, the proper remedy is for the district court to vacate one of the multiplicitous convictions.  Id. ("If the jury convicts on more than one multiplicitous count, the defendant's right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicitous counts.").  The Josephberg Court concluded that "[g]iven these principles, . . . the district court's dismissal of [the multiplicitous count] prior to trial was at best premature."  Id.

The defendants' motion is denied for two reasons.  First, it is premature under Josephberg.  Josephberg made clear that the defendants' Double Jeopardy rights are only at risk of violation after they are convicted of multiplicitous charges, not pre-trial.  Id.  Because of this, district courts should dismiss multiplicitous counts only if a defendant is convicted on multiplicitous counts.  Id.

Second, even if the motion were timely, it is denied because the securities fraud and false statement charges are not multiplicitous.  The elements of securities fraud, 15 U.S.C. § 78j(b), are:

> (1) in connection with the purchase or sale of stock, the defendant did any of the following:
> > (a) employed a device, scheme, or artifice to defraud, or
> > (b) made an untrue statement of material fact, or
> > (c) engaged in an act, practice, or course of business that operated as a fraud or deceit upon a purchaser or seller; and
> (2) the defendant acted willfully, knowingly, and with the intent to defraud; and
> (3) the defendant knowingly used interstate commerce in furtherance of the fraudulent scheme.

3-57 Modern Federal Jury Instructions–Criminal, Securities Exchange Act Fraud (2005).  The elements of making a false statement to the SEC, in violation of 15 U.S.C. § 78ff are:

> (1) the defendant made a false or misleading statement in any application, report, or

document required to be filed with the SEC; and
(2) the false or misleading statement was material; and
(3) the defendant made the material false or misleading statement knowingly and
willfully.

15 U.S.C. § 78ff(a).  The defendants correctly point out that in the Superseding Indictment, the

same conduct by the defendants underlies the securities fraud and false statement charges:

allegedly false statements in AIG's filings with the SEC.   The defendants argue that, given this

theory of the fraud, the false statement charges are subsumed by the securities fraud charges

because every element needed to prove the false statement charges will be established if the

government proves the securities fraud charges.  Under Blockburger, it is not enough if one of

two charged crimes has additional elements; all charged crimes must have at least one separate

element from the others to constitute separate offenses.  United States v. Ben Zvi, 168 F.3d 49,

57 (2d Cir. 1999) ("Blockburger is not satisfied where the elements of one charged offense are

subsumed within another charged offense.").  Here, the defendants argue, the government will

offer proof that the defendants engaged in securities fraud by making false statements to the SEC.

By proving securities fraud under this theory, the government will also inherently prove that the

defendants made a false statement to the SEC.  Because of this, they argue, the charges are

multiplicitous.

 The defendants' argument misconstrues the Blockburger test.  Blockburger focuses on the

means by which the elements of the crime could possibly be satisfied, not the proof the

government will offer at trial for each charge.  If one crime could be proven without necessarily

establishing the other, then there are two separate offenses.  See Chacko, 169 F.3d at 148 & n.6

(noting that "application of the Blockburger test to . . .  reveal[] that there is a way to violate

18

either section without violating the other" indicates a lack of multiplicity).  Here, to establish securities fraud, the government must prove that the defendants' allegedly fraudulent actions occurred in connection with the purchase or sale of stock and that the defendants used interstate commerce in furtherance of their fraudulent acts.  The false statement charges do not require proof of either of these elements.  At the same time, the false statement charges require the government to prove that the defendants made a material false statement to the SEC in a mandatory filing.  Although such a false statement could be used to establish securities fraud, it is not a required element to prove securities fraud; instead, the government could prove the defendants employed a scheme, device, or artifice to defraud or that they engaged in a fraudulent act, practice, or course of business.  Since each of these crimes can be proven without necessarily establishing the other, they are separate offenses under Blockburger, and the defendants' motion is denied.

### F.      Motion to Strike Certain Language from the Indictment [docket # 196]

Federal Rule of Criminal Procedure 7(d) provides that "[u]pon the defendant's motion, the court may strike surplusage from the indictment."  All of the defendants moved to strike the terms "sham," "fake," and "phony" from the indictment.  They claim that these terms are unnecessary and inflammatory, and so they should be removed pursuant to rule 7(d).  The government agreed to strike these terms from the portions of the indictment that related to the defendants' emails and telephone conversations because, in those parts of the indictment, the terms could have created the mis-impression that the defendants actually uttered or wrote those

words when, in fact, they did not.[7]  The government opposes removal of these terms from the rest of the indictment.

The law in the Second Circuit is clear on this issue.  "'Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial.'"  United States v. Mulder, 273 F.3d 91, 99 (2d Cir. 2001) (quoting United States v. Scarpa, 913 F.2d 993, 1913 (3d Cir. 1990)).  To prevail on the motion, then, the defendants must prove both that (1) the challenged language is not relevant to the crime charged, and also (2) that the terms are inflammatory and prejudicial; the language should not be struck only because it is inflammatory and/or prejudicial.  District courts within this circuit have interpreted relevance to include language that explains the crimes charged.  See, e.g., United States v. Stein, 429 F. Supp. 2d 633, 647 (S.D.N.Y. 2006) (refusing to strike the terms "tax haven," "phony," and "concoct" from the indictment and holding that "[w]hile defendants doubtless wish that the government had employed less colorful and prejudicial language, these terms are relevant to the conspiracy of which they stand accused").  If the language is relevant, it "may not be stricken, no matter how prejudicial it may be."  Scarpa, 913 F.2d at 1013.

The terms "phony," "fake," and "sham," are relevant here because they explain why the defendants' conduct was illegal.  At trial, the government claims it will prove that the reinsurance contracts and offer letter were a sham.  Given the nature of the charged crimes and the type of illegal conduct that the government must prove to win its case, the challenged language is

---

[7]In accordance with this agreement, these terms were not included in those specified portions of the Superseding Indictment.

20

relevant.  The decisions in which district courts have stricken language from the indictment do not involve language that explains why a certain charged act is criminal.  See, e.g., United States v. Carey, 152 F. Supp. 2d 415, 429-30 (S.D.N.Y. 2001) (striking references to "La Cosa Nostra" and organized crime that were included in the indictment only to give historical context and to explain the defendant's motive in committing the charged crimes);  United States v. Greer, No. 2:05-CR-72-01, 1997 U.S. Dist. LEXIS 2214, at *3-4 (D. Vt. Feb. 20, 1997) (striking the term "Greer-Hutchins International Drug Conspiracy" from headings in the indictment because it was irrelevant to the government's evidence and prejudicial to defendants Greer and Hutchins); United States v. Reyes, 922 F. Supp. 818, 838-40 (S.D.N.Y. 1996) (striking use in indictment of made-up term "Reyes Crew" to describe the alleged criminal conspiracy).  Since the defendants did not establish that the challenged terms in the indictment are irrelevant to the charged conduct, their motion is denied.

**3.      Motions Related to Discovery:**

The defendants filed three motions relating to discovery: a motion for disclosure of rough notes taken by government agents during witness interviews, a motion for disclosure of materials within the possession of the New York Attorney General ("NYAG"), and a motion for the release of Brady and Giglio materials.  Defendant Garand also moved separately for additional rule 16 discovery.

**A.      Motion for Discovery of Defendants' Interview Notes [docket # 201]**

All of the defendants moved for production of the rough notes taken by government agents while interviewing Ronald Ferguson, Elizabeth Monrad, and Robert Graham.  Agents from the U.S. Attorney's office, the Department of Justice Fraud Bureau ("DOJ"), and the

Federal Bureau of Investigation ("FBI") interviewed Graham on two occasions.  Ferguson was interviewed by agents from the SEC, the DOJ, the U.S. Postal Inspector's office, and the NYAG on one occasion.  Monrad was also interviewed once by agents from the SEC, the DOJ, the U.S. Postal Inspector's office, and the NYAG.  Each defendant was interviewed in the presence of counsel.  Ferguson and Graham's statements were subject to full use-immunity.  Monrad did not receive any immunity for her statements.  The government produced "final typewritten reports containing the substance of the defendants' statements."  Government's Memorandum in Opposition to Defendant Robert D. Graham's Motion for Production of Defendants' Interview Notes, at 1.  The government claims that these reports satisfy its disclosure obligations under Fed. R. Crim. P. 16.  The defendants argue that they are entitled to the agents' rough interview notes under rule 16(a)(1)(B)(ii).

Rule 16(a)(1)(B) provides:

Upon a defendant's request, the government must disclose to the defendant and make available for inspection, copying, or photographing . . . (ii) the portion of any written record containing the substance of any relevant oral statement made before or after arrest if the defendant made the statement in response to interrogation by a person the defendant knew was a government agent. . . .

The defendants claim that the language "the portion of any written record containing the substance of any relevant oral statement" made by the defendant to a government agent entitles them to the government agents' notes from their interviews of the defendants.  Although the most recent Second Circuit decision regarding the disclosure of agent interview notes under rule 16 held that the notes need not be produced, the Court decided this case before section (a)(1)(B)(ii) was added to the rule in 1991.  See United States v. Koskerides, 877 F.2d 1129, 1133 (2d Cir. 1989).  Prior to 1991, the rule only required that "the government must disclose . . . the substance

22

of any relevant oral statement made by the defendant. . . ."  Fed. R. Crim. P. 16(a)(1)(A).  The

defendants admit that this prior form of the rule did not require the production of interview notes,

and that a subsequent report of the interview notes would have been sufficient.  However, given

the changes to the rule in 1991, they argue, the full interview notes must be disclosed.

There is currently a split of authority as to whether rule 16(a)(1)(B)(ii) requires the

production of agents' interview notes, and the Second Circuit has not addressed the question

since the 1991 amendments to rule 16.  The Fifth and Seventh Circuits have held that defendants

are not entitled to agents' interview notes, but these holdings seem to consider only the

government's disclosure obligations under rule 16(a)(1)(A), not 16(a)(1)(B)(ii).  See United

States v. Brown, 303 F.3d 582, 590 (5th Cir. 2002) ("Rule 16(a)(1)(A) does not grant a criminal

defendant a right to preparatory interview notes where the content of those notes have been

accurately captured in a type-written report. . . that has been disclosed to the defendant.  The

government satisfies its obligation under the Rule when it discloses a 302 report that contains all

of the information contained in the interview notes."); United States v. Muhammad, 120 F.3d

688, 699 (7th Cir. 1997) (defendant "is not entitled to an agent's notes if the agent's report

contains all that was in the original notes").  By contrast, the courts that have analyzed rule

16(a)(1)(B)(ii) have concluded that the interview notes must be disclosed.  See United States v.

Stein, 424 F. Supp. 2d 720 (S.D.N.Y. 2006) ("[Koskerides] relied on an earlier version of Rule

16, which required production only of "the substance of any oral statement" made by defendant

during interrogation that the government intends to offer at trial.  The adoption of the current rule

in 1991 broadened the government's disclosure obligations and invalidated Koskerides in this

respect."); United States v. Vallee, 380 F. Supp. 2d 11, 14 (D. Mass. 2005) ("Rule 16 does not

23

command the production of "a" written record containing the substance of defendant's statements; it commands the production of "any" such record."); United States v. Almohandis, 307 F. Supp. 2d 253 (D. Mass 2004) ("The Rule requires production of "any written record of the substance of any relevant oral statement . . . . The notes are "a" written record. They may not be the only written record, but they certainly are "a" written record.").

The Advisory Committee notes to the 1991 amendment provide support both for and against disclosure of the rough notes. The defendants point out that the Advisory Committee explained that the addition of section (a)(1)(B)(ii) to rule 16 "expands slightly government disclosure to the defense of statements made by the defendant," which indicates that the government's pre-amendment disclosures are insufficient under the amended rule. Fed. R. Crim. P. 16, Advisory Committee Notes, 1991 Amendment. The advisory committee notes also explain that "[t]he record [of the defendant's statement to the government] need not be a transcription or summary of the defendant's statement but must only be some written reference" to be discoverable by the defendant. Id. This, the defendants argue, places agent interview notes within the required rule 16 disclosures.

At the same time, however, the Advisory Committee notes also explain the policy behind the rule changes, and they may be read to support non-disclosure in this case. The Advisory Committee explained that the addition of section (a)(1)(B)(ii) "recognizes that the defendant has some proprietary interest in statements made during interrogation regardless of the prosecution's intent to make any use of the statements." Id. Prior to the amendment, the rule required that the government disclose only a defendant's statements that the prosecution intended to use in its case in chief. The amendment ensures that defense counsel is aware of all of the defendant's

24

statements in the possession of the government, regardless of how the government will use them. The drafters' intent in making the change speaks to their concern about the defendant's proprietary rights in his own statements, not in any rights to agents' interview notes per se.  In this case, since the defendants' attorneys were present at all interviews, the drafters' concern that defense counsel would be unaware of the defendant's prior statements to the government is not implicated.  The rule's language, requiring disclosure only of "*the portion of* any written record containing the substance of any relevant oral statement [by the defendant]," further supports non-disclosure because it indicates that the agents' interview notes may be redacted to disclose only the portions containing the defendant's statements.  Fed. R. Crim. P. 16(a)(1)(B)(ii) (emphasis added).

Additionally, while the defendants cite the Advisory Committee's statement that the amendment "expands slightly government disclosure to the defense," this statement also could support non-disclosure, because a change to the rule that mandates the disclosure of such notes would significantly, not "slightly," change the government's disclosure obligations.

The Court concludes that while the Advisory Committee's intent when it enacted the 1991 amendment remains less than clear, the plain language of the rule requires disclosure of the interview notes.  Since Koskerides addressed disclosure under rule 16 prior to the 1991 amendment, its value as precedent on this question is limited.  As it is currently written, and as several other courts acknowledge, the rule requires disclosure of "any written record containing the substance of any relevant oral statement . . . [made to] a government agent," without exclusion.  Fed. R. Crim. P. 16(a)(1)(B)(ii).  Since the interview notes requested by the defendants are "a" written record within this category, they must be disclosed under the rule.

The defendants' motion for the disclosure of defendants' interview notes is granted.  The government must produce the notes taken by its agents during their interviews of the defendants.

## B.    Motion for Discovery of Materials in the Possession of the New York Attorney General's Office [docket # 200]

Pursuant to Brady v. Maryland, all of the defendants move the Court to order the government to produce materials in the physical possession of the New York Attorney General's Office ("NYAG").  The defendants argue that disclosure is required because, in the initial stages of its investigation, the government worked with the NYAG to investigate the alleged fraud.  The government opposes the motion on the ground that it did not conduct a joint investigation with the NYAG's office, and so it has no obligation (or ability) to produce the materials the defendants seek.

### (i)    Disclosure under _Brady v. Maryland_

In criminal prosecutions, the government must produce "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady v. Maryland, 373 U.S. 83, 87 (1963).  This obligation also includes evidence that can be used to impeach a government witness.  United States v. Giglio, 405 U.S. 150, 154-55 (1972).  The prosecutor's disclosure obligations, however, "extend[] only to material evidence . . . that is known to the prosecutor."  United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998).  A prosecutor is presumed to know all information gathered by his office in connection with an investigation of the case.  Id.  Further, a prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case."  Kyles v. Whitley, 514 U.S. 419, 437 (1995).  This duty is triggered by any

joint investigation conducted between federal, state, and local agencies or across different federal agencies.  See United States v. Paternina-Vergara, 749 F.2d 993, 997-998 (2d Cir. 1984).  At the same time, however, "knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor." Avellino, 136 F.3d at 255.

The Second Circuit has not precisely defined the degree of cooperation between agencies that rises to the level of a joint investigation.  Assessing whether a joint investigation occurred is a fact-specific inquiry that is best approached on a case-by-case basis.  See United States v. Antone, 603 F.2d 566, 570 (5th Cir. 1979) (finding appropriate "a case-by-case analysis of the extent of interaction and cooperation between two [investigations]" ).  Factors other courts consider include:  (1) whether one agency acts on behalf of or under the control of another; (2) the extent to which the two agencies are working as a team and are sharing resources; and (3) whether the agency charged with possession of evidence in the other agency's files had ready access to it.  United States v. Risha, 445 F.3d 298, 304 (3d Cir. 2006).  The "mere fact that the Government may have requested and received documents from [another agency] in the course of its investigation does not convert the investigation into a joint one."  United States v. Finnerty, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006).  Instead, "[t]he key to the analysis . . . is the level of involvement between the United States Attorney's Office and the other agencies."  United States v. Upton, 856 F. Supp. 727, 749 (E.D.N.Y. 1994).

The defendants argue that disclosure is required under Brady because the degree of collaboration between the government and the NYAG imputes full knowledge of the NYAG's investigation to the government.  In briefing subsequent to the December 5 hearing, the

27

defendants contend that, at the very least, an evidentiary hearing is necessary to determine whether the government is responsible for information within the NYAG files.[8]  As support for the need for further fact-finding on this issue the defendants cite January, 2005 testimony to the New York Assembly by Eliot Spitzer, then the New York Attorney General, in which he briefly mentioned a "joint investigation with the SEC" into the re-insurance industry, the close timing of similar subpoenas from the NYAG and the SEC, also in January, 2005, a representation that Gen Re's outside counsel had been informed that the SEC and NYAG were cooperating in their investigation, and deficiencies in the affidavits presented by the government here concerning this issue.

While the government concedes that during a two month period in 2005 it conducted some witness interviews with agents and lawyers from the NYAG, SEC, and the U.S. Postal Service Inspection Service ("USPIS"), it stresses that the purpose of the joint interviews was to spare the witnesses from the burden of multiple sessions with several different agencies. Declaration of James H. Tendick in Support of Government's Opposition to Defendants' Motion for Discovery of Materials in Possession of the New York Attorney General's Office, December 18, 2006, at ¶ 7 ("Tendick Decl.").  Only eleven witnesses were interviewed jointly.  Tendick Decl., at ¶ 3.  The declaration supporting the government's opposition to the defendants' motion states that DOJ and USPIS agents and lawyers never had access to the NYAG's files, interview summaries, notes, or other work product.  Tendick Decl., at ¶ 5.  The government and the NYAG also did not coordinate investigative decisions or charging decisions.  Tendick Decl., at ¶ 6.  In

---

[8]The Court notes that prior to the December 5 hearing the defendants asked the Court to decide this issue only on their pre-hearing papers.  November 29, 2006 Letter to the Court from Frederick P. Hafetz, at 2.

April 2005, two months after the DOJ's investigation commenced, the NYAG informed the DOJ that it would pursue its investigation independently, and the agencies shared no substantive information after that time.  Tendick Decl., at ¶¶ 4, 8.[9]  The government stressed in its briefs, and at oral argument, that it cannot produce any <u>Brady</u> material that may be in the NYAG's files because it has no access to these files.

Although the Court recognizes that the government did coordinate pieces of its investigation with the NYAG during two months in 2005, the Court concludes that this collaboration was not so extensive as to be "joint" to impute knowledge of the NYAG's investigation to the government.  <u>See</u> <u>United States v. Shakur</u>, 543 F. Supp. 1059, 1060 (S.D.N.Y. 1982) (ordering disclosure of <u>Brady</u> materials in District Attorney's possession where the Assistant United States Attorney "does not dispute that there has been and still is cooperative activity between him and the District Attorney").  The government stated in its briefs, and again asserted at oral argument, that it already disclosed all notes taken jointly with the NYAG in the defendants' joint interviews, and that it will again review its files to ensure disclosure of any notes taken in the other joint witness interviews.  Given the minimal connection between the two agency investigations, the Court agrees that these efforts will satisfy the government's <u>Brady</u> obligations.  <u>See</u> <u>Avellino</u>, 136 F.3d at 255 ("[T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately . . . condemn the prosecution of criminal cases to a state of

---

[9]Tendick stated in a supplemental affidavit that he had consulted with two DOJ attorneys involved in the relevant stage of the investigation in preparing his declaration here, and they confirmed his statements in that declaration.  Supplemental Declaration of James H. Tendick in Support of Government's Opposition to Defendants' Motion for Discovery of Materials in Possession of the New York Attorney General's Office, January 10, 2007.

paralysis."); <u>United States v. Locasio</u>, 6 F.3d 924, 949 (2d Cir. 1993) ("We will not infer the prosecutors' knowledge simply because some other government agents knew about the [information].").  To the extent that the defendants' motion seeks more from the government, their motion is denied.

The Court also finds that an evidentiary hearing is unnecessary based upon the supporting documents submitted with each side's briefs.  <u>See</u> <u>United States v. Guerrerio</u>, 670 F. Supp. 1215, 1219 n.4 (S.D.N.Y. 1987) (finding an evidentiary hearing unnecessary where the government countered a press statement mentioning a joint investigation with the affidavits of prosecutors with personal knowledge of the relationship between state and federal authorities).  The defendants presented no substantial information contradicting the Tendick declarations.  Rather than supporting the defendants' argument, the fact that the SEC and the NYAG separately sent the defendants similar subpoenas in January, 2005 indicates that the two agencies, while interested in the same transactions, were not actually sharing their files.  Given the lack of identified evidentiary issues, the Court concludes that there is no need for an evidentiary hearing.

(ii)     <u>Disclosure under the Jencks Act</u>

The defendants also argue that the government must produce NYAG materials under the Jencks Act.  The Jencks Act, 18 U.S.C. § 3500, provides that, after a government witness has testified on direct examination, the government must produce all material in its possession that is a statement made by the witness relating to the subject matter of the witness's testimony.  <u>See</u> <u>Paternina-Vergara</u>, 749 F.2d at 996.  Materials held by the state generally fall outside the Jencks Act "in the absence of a joint federal-state investigation."  <u>Id.</u> at 997; <u>see</u> <u>United States v. Bermudez</u>, 526 F.2d 89, 100 n.9 (2d Cir. 1975) (finding material in possession of state

authorities was not Jencks Act material because of "simultaneous separate investigations").  In identifying Jencks Act material, a cooperative investigation is not determinative, but "the fact of cooperation . . . makes the issue somewhat closer."  Paternina-Vergara, 749 F.2d at 998.  Since a Jencks Act determination is a question of fact, the district court's ruling will not be overturned unless clearly erroneous.  United States v. Covello, 410 F.2d 536, 546 (2d Cir. 1969).

The defendants' and the government's arguments on this issue parallel their arguments for the Brady portion of the motion.  Whether NYAG materials fall within the government's Jencks Act obligations rests on whether their investigations were sufficiently closely connected for the NYAG materials to be within the 'possession' of the government.  As the Court concluded above, the investigations are not sufficiently intertwined to require the government to procure materials within the NYAG files.  Because of this, the defendants' motion for Jencks Act materials within the NYAG's possession is denied.

## C.     Motion for Release of Brady Materials and Evidence Favorable to the Accused [docket # 202]

All of the defendants moved to compel the government to (a) identify the Brady and Giglio materials within the government's rule 16 document production, and (b) produce additional documents that the defendants believe fall within the government's Brady and Giglio obligations. The defendants claim that the government has not yet produced potentially exculpatory information including: accounting rules and principles; analysts' views; AIG's accountants, auditors, and counsel's opinions and knowledge; AIG internal deliberations; Gen Re accountants, auditors, and counsel's opinions and knowledge; Gen Re's internal deliberations; and other materials the defendants claim are favorable to them.  These "other materials" include:

information concerning prior bad acts of all government witnesses; plea agreements and cooperation agreements of potential government witnesses; and documents probative of these witnesses' bias.  The government opposes all of these requests on the ground that these requests extend far beyond the government's Brady and Giglio obligations.

In criminal prosecutions, the government must produce "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady v. Maryland, 373 U.S. 83, 87 (1963).  This obligation also includes evidence that may be used to impeach a government witness.  United States v. Giglio, 405 U.S. 150, 154-55 (1972).  The purpose of disclosing Brady materials is to ensure that defendants receive fair trials.  Brady, 373 U.S. at 87.  Because of this, Brady does not "create a broad, constitutionally required right of discovery."  United States v. Bagley, 473 U.S. 667, 675 n.7 (1985).  Rather, the prosecutor's disclosure obligations "extend[] only to material evidence . . . that is known to the prosecutor."  United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998).  For evidence to be 'material,' "a defendant needs to show only that the evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"  United States v. Schwartz, 259 F.3d 59, 64 (2d Cir. 2001) (quoting Kyles v. Whitley, 514 U.S. 419, 437 (1995)).  In evaluating a Brady claim, "a court must consider the cumulative effect of all material withheld by the Government."  Id. (emphasis in original).  All "Brady material must be disclosed in time for its effective use at trial."  United States v. Gil, 297 F.3d 93, 105 (2d Cir. 2002) (citations omitted).

(i)        Identifying *Brady* and *Giglio* materials already produced

The defendants argue that, with respect to documents already produced by the

32

government under rule 16, the government did not satisfy its <u>Brady</u> and <u>Giglio</u> obligations

because its voluminous rule 16 production amounted only to a "document dump."  The

defendants cite only one decision, from the Northern District of Georgia over thirty years ago, in

support of their argument that this fails to satisfy <u>Brady</u>.  The facts of that case, however, are

wholly dissimilar from those here.  <u>See</u> <u>Emmett v. Rickets</u>, 397 F. Supp. 1025, 1042 (N.D. Ga.

1975) (finding that, in addition other gross <u>Brady</u> violations, the prosecutor violated <u>Brady</u> by

improperly providing the court with large quantities of documents for an *in camera* review

without identifying the potential <u>Brady</u> material).  By contrast, in this case there are no

allegations of gross misconduct by the government: at arraignment, the government provided the

defendants with its "hot docs," and the government will also make its final <u>Brady</u> and <u>Giglio</u>

disclosures far in advance of trial.  Given these efforts by the government, coupled with the

searchable electronic format of its entire rule 16 production, the defendants motion for

identification of the <u>Brady</u> and <u>Giglio</u> material already disclosed is denied.

    <u>(ii)</u>    <u>Disclosure of additional evidence under *Brady/Giglio*</u>

    The defendants also argue that the Court should order the government "to search through

all the evidence available to it, including information provided to, or available to, the prosecution

team by other government agencies, self-regulatory organizations, consulting experts, or

witnesses [] regardless of whether they will be witnesses at trial."  Memorandum of Law in

Support of Defendants' Motion for the Production of Evidence Favorable to the Accused

Pursuant to <u>Brady</u>, <u>Giglio</u>, and their Progeny, at 10.  The defendants argue that the government is

required to disclose these materials as part of its duty "to learn of any favorable evidence known

to the others acting on the government's behalf."  <u>Kyles</u>, 514 U.S. at 437.

The defendants' motion is denied for two reasons.  First, the defendants overstate the government's <u>Brady</u> obligations.  The government must, under <u>Kyles v. Whitley</u>, search its investigative files for all evidence favorable to the defendants.  <u>Id.</u>  However, the government need not produce evidence that is otherwise available to the defendants.  <u>See</u> <u>United States v. Grossman</u>, 843 F.2d 78, 85 (2d Cir. 1988) ("Brady does not require the government to turn over exculpatory evidence if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence.") (citations omitted)).  To the extent that the defendants wish that the government identify and produce evidence that the government considers exculpatory, but which is also independently available to the defendants, the motion is denied.

Second, as far as the motion addresses the defendants' concern that the government is not fully producing <u>Brady</u> and <u>Giglio</u> material, it is denied without prejudice.  At the time of rule 16 production, <u>Kyles</u> imposes upon the prosecutor the task of assessing whether material must be disclosed under <u>Brady</u>.  514 U.S. at 437 ("[T]he prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached.").  The prosecutor is given adequate incentive to make these decisions appropriately (and conservatively) because he knows that a <u>Brady</u> violation can lead to the reversal of a conviction.  <u>Id.</u> at 439 ("This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence. . . . This is as it should be.").  Here, the defendants' motion claims that the government failed to meet its <u>Brady</u> and <u>Giglio</u> obligations several weeks before the deadline for the government's final <u>Brady</u> and <u>Giglio</u> disclosures.  Since it would be

premature at this time for the Court to decide whether the government has failed to satisfy these obligations, the motion is denied without prejudice.

### D.     Garand's Motion for Discovery under Fed. R. Crim. P. 16 [docket # 334]

In addition to joining the other defendants' motions for discovery, Garand also asks the Court to compel the government to identify the documents that it will use at trial in its case in chief under Fed. R. Crim. P. 16(a)(1)(E). This rule requires the government to permit the defendant to inspect and copy documents within the government's possession (a) that are material to preparing a defense, (b) that the government intends to use in its case in chief at trial, or (c) that the government obtained from (or that belong to) the defendant. Fed. R. Crim. P. 16(a)(1)(E). Garand argues that these obligations require the government to specifically identify the documents it will use in its case in chief. Garand's request parallels his arguments in favor of his motion for a bill of particulars: he claims that because the government produced over 3 million pages pursuant to rule 16, fairness requires the government to immediately disclose, as part of its rule 16 production, which documents will be used in its case in chief. The government opposes the motion on the grounds that it has no such obligation under the rule and governing case law; it argues that instead of identifying the documents it will use in its case in chief, it need only produce them.

Garand's motion is denied. Even many of the cases that Garand cites in support of his motion did not order the dramatic relief that he seeks; a majority of those courts only ordered the government to disclose its case in chief documents a given period of time before trial, not during the government's rule 16 production. See United States v. Giffen, 379 F. Supp. 2d 337, 344 (S.D.N.Y. 2004) (ordering government disclosure of trial exhibit list at least 30 days before trial);

United States v. McDonald, No. 01-CR-1168, 2002 U.S. Dist. LEXIS 21655, at * 7-9 (E.D.N.Y. Aug. 6, 2002) (ordering government to identify documents to be used at trial two months prior to trial); United States v. Lino, No. 00CR632, 2000 U.S. Dist. LEXIS 18753, at * 58 (S.D.N.Y. Jan. 2, 2001) (ordering government to identify documents to be used at trial two weeks prior to trial); United States v. Upton, 856 F. Supp. 727, 748 (E.D.N.Y. 1994) (in fraud case, ordering government to identify which of 4,000 documents it planned to prove to be fraudulent at trial); United States v. Turkish, 458 F. Supp. 874, 882 (S.D.N.Y. 1978) (granting motion where defendant was faced with a 25,000 document production under rule 16); see also United States v. Anderson, Crim. No. 05-0066, 2006 U.S. Dist. LEXIS 6692, at *7-10 (D.D.C. February 23, 2006) (granting such an order on the basis of voluminous rule 16 disclosures and the defendant's limited resources to review them); United States v. Poindexter, 727 F. Supp. 1470, 1484 (D.D.C. 1989) (ordering, without analysis, identification of rule 16 documents to be used in the government's case in chief).  In this case, the Court already ordered the government to adhere to disclosure deadlines in advance of trial.  See July 6, 2006 Scheduling Order, docket no. 184. Additionally, several more recent district court decisions have fully denied similar requests for such relief and have sharply criticized the prior decisions that granted it.  See United States v. Kaplan, No. 02CR883, 2003 U.S. Dist. LEXIS 21825, at * 62-64 (S.D.N.Y. December 5, 2003) (denying motion for identification of government's case in chief documents as not required under current version of rule 16 and criticizing Upton as based upon an outdated version of rule 16); United States v. Nachamie, 91 F. Supp. 2d 565, 568-70 (S.D.N.Y. 2000) (denying motion to identify case in chief documents as inappropriate given plain language of rule 16 and criticizing prior cases granting such an order as based on faulty reasoning).

Compared to the cases in which the district courts did grant this relief, the facts of this case counsel against granting Garand's motion. As the government pointed out in its opposition papers, although its rule 16 production was voluminous, over two months before Garand was indicted the government provided him with its "hot docs," a set of 1,350 pages of documents the government considers to be the most relevant to its case. The government also agreed to a scheduling order under which it would provide all defendants with its exhibit list two months before trial. Thus, if the government plans to use documents in its case in chief that are not included in the "hot docs," Garand will be notified two months prior to trial through the exhibit list. Finally, the government's entire production for this case was given to all defendants in databases that are text searchable; the government claims it has no better ability to search its own set of these databases. Garand is in an entirely different position than the defendants in Turkish and Upton who were faced with voluminous productions and no guidance as to which documents were of especial importance. Considering the scheduling concessions the government already made to assist all of the defendants, and the lack of precedent for granting the relief requested, the Court declines to significantly alter the government's rule 16 production obligations.[10] Garand's motion is denied.

**4.      Graham's Motion to Sever [docket # 210]:**

---

[10]Arguably, the Court does not have the power to grant Garand's motion. Although the district court's discretion on discovery matters is broad, the Second Circuit has not addressed the issue in this context or provided guidance as to the circumstances under which such a motion should be granted. See Fed. R. Crim. P. 16, Advisory Committee Notes, 1974 Amendment ("The rule is intended to prescribe the minimum amount of discovery to which the parties are entitled. It is not intended to limit the judge's discretion to order to broader discovery in appropriate cases."); United States v. Cannone, 528 F.2d 296, 298-99 (2d Cir. 1975) (discussing the discretion given to district courts under the Federal Rules of Criminal Procedure in the context of a motion to compel the government to identify its trial witnesses).

Robert Graham made a motion to sever his trial from the other defendants in this case pursuant to Fed. R. Crim. P. 14(a).  He claims that severance is necessary to preserve his right to a fair trial for two reasons: (a) his defense is antagonistic to the other defendants' likely defenses, and (b) a balance of other factors weighs in favor of a severance, namely (i) that he was significantly less involved with the alleged crimes than the other defendants, (ii) the case is too complex for the jury to understand which evidence is admissible against him or the other defendants, and (iii) the admission of defendant Monrad's statements to the government will result in prejudice to him.  The government argues that none of these arguments is enough to require severance in this case given well-settled precedent in the Second Circuit.  For the reasons that follow, Graham's motion is denied.

"There is a preference in the federal system for joint trials of defendants who are indicted together."  Zafiro v. United States, 506 U.S. 534, 537 (1993).  This preference "is particularly strong where . . . the defendants are alleged to have participated in a common plan or scheme."  United States v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998).  Although district courts have discretion to grant a severance under rule 14(a), they should only do so "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence."  Zafiro, 506 U.S. at 539.  The risk of prejudice is heightened in a complex case involving numerous criminal defendants.  Id. At the same time, however, "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials."  Id. at 540.  Instead, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice."  Id. at 539.  Rule 14(a) leaves the "tailoring of the relief to be granted, if any, to the district court's sound

38

discretion." Id. at 538-49.

## A.    Severance Due to Antagonistic Defenses

Severance may be appropriate if co-defendants' arguments are "so antagonistic or irreconcilable . . . that acceptance of one party's defense would tend to preclude the acquittal of the other." Salameh, 152 F.3d at 116.   To satisfy the burden of showing substantial prejudice due to a co-defendant's antagonistic defense, the movant must prove that "the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant." United States v. Villegas, 899 F.2d 1324, 1346 (2d Cir. 1990) (citation omitted).  The movant does not meet this burden due to "[t]he mere fact that co-defendants seek to place the blame on each other." Id.; see United States v. Ferrarini, 9 F. Supp. 2d 284, 295 (S.D.N.Y. 1998) (denying severance because "the jury need not necessarily conclude that one of [the co-defendants] is lying" regardless of their antagonistic defense arguments); see also United States v. Copeland, 336 F. Supp. 2d 223, 223 (E.D.N.Y. 2004) (granting severance where co-defendant offered neutral third party testimony implicating movant and exculpating himself).

The Court concludes that Graham did not establish that his defense theory is sufficiently antagonistic to his co-defendants' to require a severance.  Graham claims that his co-defendants will likely claim that they relied on Graham's expertise as a lawyer for Gen Re in assuming that the transactions in the indictment were legal and proper, and hence they lacked any scienter for the fraud charged.  Graham represents that his defense relies on the jury believing that he was left in the dark regarding the key factors that allegedly made the transaction fraudulent when he advised his co-defendants to proceed with it.  While the Court recognizes that Graham and his

co-defendants may attempt to shift some responsibility, the jury could logically believe both arguments at the same time: the jury could believe both that Graham was left in the dark and that his co-defendants assumed that he was fully aware of the transaction and still advised them of its legality.  Since the jury could believe both defenses, a separate trial for Graham is unnecessary on this ground.

### B.     Other Factors

Alternatively, Graham cites other factors in support of his motion for a severance. Graham argues that his lesser degree of involvement in the conspiracy, the complexity of the case, and the possibility of "spillover prejudice" against him due to the likely admission of prejudicial evidence against the other defendants requires a severance.  Considered separately or all together, however, these additional factors do not weigh in favor of granting Graham's motion.

### (i)     Lesser degree of involvement in the conspiracy

"Differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials."  United States v. Spinelli, 352 F.3d 48, 55 (2d Cir. 2003).  "Even 'joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible.'"  Id. (quoting United States v. Locascio, 6 F.3d 924, 947 (2d Cir. 1993)).  Although in some cases "the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant that a severance is required," a limiting instruction to the jury can usually remedy this problem instead of the drastic remedy of separate trials.  Id.   Substantial prejudice must be established by the moving party to justify a severance on this ground.  Id.

40

Here, the Indictment alleges that Graham played a significant role in the alleged conspiracy and fraud.  Graham allegedly drafted the contracts between AIG and Gen Re and knowingly omitted material side transactions from the documents which, if they had been included, would have revealed the contracts to be sham.  The indictment also alleges that Graham was responsible for a fake paper trail generated to cover up the fraud.  This involvement, if proven, is hardly minimal, and, in light of it, Graham has not demonstrated how he will be so prejudiced by a joint trial that severance is the appropriate remedy.  The U.S. Supreme Court stresses the efficacy of a limiting instruction to ensure that the jury only considers the evidence presented against a particular defendant in making its determination of his guilt or innocence. Zafiro, 506 U.S. at 540.  Since Graham has not demonstrated that such an instruction will be ineffectual, this factor weighs against granting his motion.

       (ii)      Complexity of the case

In United States v. Casamento, 887 F.2d 1141 (2d Cir. 1989), the Second Circuit stated that the complexity of the case "makes an especially compelling justification" for separate trials where the trial is more than four months and includes more than ten defendants.  Despite these guidelines, the Casamento Court held that the district court did not err in denying severance motions in a case involving a seventeen month trial and twenty one defendants.  Id. at 1149-50. This case, by contrast, involves only five defendants, one fraudulent transaction, and the total trial length is expected to be approximately two months.  Graham claims that the case will be too difficult for the jury to understand if all of the defendants are tried together because the alleged fraud involves a technically complicated reinsurance transaction and a sixteen count indictment. Although the Second Circuit has not yet ruled on whether a complex underlying transaction is, on

41

its own, a valid reason to grant a severance, other district courts within this circuit have already rejected this theory.  See United States v. Stein, 428 F. Supp. 2d 138, 145-46 (denying a severance in a fraud case involving complicated tax shelters, eighteen defendants, and a forty-six count indictment).  Finally, Graham has not explained how the jury would be any less confused by the complicated reinsurance transaction at issue in the case if he were tried separately, other than his unsupported claim that, if all defendants are tried together, the jury will be unable to compartmentalize the evidence against each defendant because its concentration will be fully occupied with trying to understand the allegedly fraudulent transaction.  Since the complexity of this case is well within the Casamento guidelines, this factor also does not support granting Graham's motion.

### (iii)     Spillover prejudice

Graham claims that the evidence admissible against his co-defendants—in particular Monrad's non-use-immunized statements to the government that Gen Re knew AIG did not want any risk from the transaction and that Gen Re's fee for the transaction was improper—renders a severance necessary because that evidence will undermine his defense strategy and unduly prejudice the jury against him.  "A defendant raising a claim of prejudicial spillover bears an extremely heavy burden."  United States v. Nerlinger, 862 F.2d 967, 974 (2d Cir. 1998).  When all defendants are charged with the same conspiracy, spillover prejudice is an "unlikely occurrence."  Salameh, 152 F.3d at 115.  As with all grounds for a severance, the defendant must show prejudice so severe that his constitutional right to a fair trial will be violated.  United States v. Blount, 291 F.3d 201, 209 (2d Cir. 2002).  The defendant must also show that a limiting instruction will be insufficient.  United States v. Diaz, 176 F.3d 52, 103 (2d Cir. 1999).

42

However, a limiting instruction can be the appropriate remedy even in cases where evidence is presented against one defendant that would not be admissible in a separate trial of a co-defendant.  Spinelli, 352 F.3d at 56 (quoting United States v. Carson, 702 F.2d 351, 367 (2d Cir. 1983)).  Graham provided no support that a limiting instruction would be insufficient for this purpose.  Graham also failed to rebut the fact that the Indictment alleges direct evidence admissible against him that would prove the content of Monrad's statements; if the government proves this evidence, Graham will suffer no unjust prejudice even if the jury hears Monrad's statements.  Since Graham's spillover prejudice argument also provides no basis for granting his motion, it cannot be granted on the alternative arguments he advanced.

**5.      Conclusion**

For the reasons explained above the following motions are denied: defendants' motion for a bill of particulars [docket # 203]; Garand's separate motion for a bill of particulars [docket # 333]; defendants' motion to dismiss counts from the indictment [docket # 266]; defendants' motion to dismiss multiplicitous counts from the indictment [docket # 268]; defendants' motion to strike language from the indictment [docket # 196]; defendants' motion for the discovery of materials in the possession of the NYAG [docket # 200]; Garand's motion for discovery under Fed. R. Crim. P. 16 [docket # 334]; and Graham's motion to sever [docket # 210].  The defendants' motion to strike surplusage from the indictment [docket # 265] and their motion for the release of Brady materials and evidence favorable to the accused [docket # 202] are denied

without prejudice.  The defendants' motion for the disclosure of rough interview notes [docket #

201] is granted.

SO ORDERED this 24th day of January, 2007, at Hartford, Connecticut.


    /s/ CFD
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**