UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Crim. No. 3:06CR137(CFD) |
| | : | |
| RONALD E. FERGUSON, | : | September 5, 2008 |
| CHRISTOPHER P. GARAND, | : | |
| ROBERT D. GRAHAM, | : | |
| CHRISTOPHER M. MILTON, and | : | |
| ELIZABETH M. MONRAD, | : | |
| | : | |
| Defendants. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

NORA R. DANNEHY
ACTING UNITED STATES ATTORNEY

ERIC J. GLOVER
RAYMOND E. PATRICCO, JR.
ASSISTANT UNITED STATES ATTORNEYS

PAUL E. PELLETIER, PRINCIPAL DEPUTY CHIEF
ADAM SAFWAT, TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

# TABLE OF CONTENTS

I.    Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  Indictment, Trial & Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    B.  Summary of Offense Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Sentencing Post-*Booker* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.  Sentencing Guidelines Calculations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.  Presentence Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B.  Government's Position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        1.  The Loss Exceeds $400 Million . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            a.  Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
            b.  Loss Reserves and AIG's Stock Price . . . . . . . . . . . . . . . . . . . . . 15
            c.  Mr. Davis' Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
            d.  Defense "Critiques" of the Government's Loss Event Study . . . . . . . . . . . . . 25
            e.  Alternative Loss Calculation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        2.  Sophisticated Means . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        3.  Number of Victims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        4.  Milton as Officer of a Public Company . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        5.  Role in the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

            a.  Defendant Ferguson as Organizer/Leader . . . . . . . . . . . . . . . . . . . 40
            b.  Defendant Monrad as Manager/Supervisor . . . . . . . . . . . . . . . . . . 44

        6.  Abuse of Position of Trust/Use of Special Skill . . . . . . . . . . . . . . . . . . . . 46

            a.  Defendant Monrad . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
            b.  Defendant Robert Graham . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

## TABLE OF AUTHORITIES

### <u>CASES</u>

*Davis v. USN Comme'ns, Inc.*,
   73 F. Supp. 2d 923 (N.D. Ill. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Fogarazzo v. Lehman Brothers, Inc.*,
   341 F. Supp. 2d 274 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Gall v. United States*,
   128 S. Ct. 586 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Kimbrough v. United States*,
   128 S. Ct. 558 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Rita v. United States*,
   127 S. Ct. 2456 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Swack v.Credit Suisse First Boston*,
   383 F. Supp. 2d 223 (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Beaulieau*,
   959 F.2d 375 (2d Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*United States v. Booker*,
   543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Burgos*,
   324 F.3d 88 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Crosby*,
   397 F.3d 103 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*United States v. Dowling*,
   297 F.3d 52 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47, 52, 53

*United States v. Ebbers*,
   458 F.3d 110 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14, 37

*United States v. Ferguson*,
   553 F. Supp. 2d 145 (D. Conn. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

ii

*United States v. Fernandez*,
   443 F.3d 19 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Fritzson*,
   979 F.2d 21 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47

*United States v. Garcia*,
   413 F.3d 201 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Greenfield*,
   44 F.3d 1141 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Harris*,
   38 F.3d 95 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Jiminez-Beltre*,
   440 F.3d 514 (1st Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Kaufman*,
   800 F. Supp. 648 (N.D. Ind. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Olis*,
   429 F.3d 540 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*United States v. Payne*,
   63 F.3d 1200 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Rattoballi*,
   452 F.3d 127 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Reich*,
   479 F.3d 179 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Rice*,
   52 F.3d 843 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Rosen*,
   409 F.3d 535 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Ross*,
   190 F.3d 446 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Rutkoske*,

iii

506 F.3d 170 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 19

**STATUTES**

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 53

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Crim. No. 3:06CR137(CFD) |
| | : | |
| RONALD E. FERGUSON, | : | September 5, 2008 |
| CHRISTOPHER P. GARAND, | : | |
| ROBERT D. GRAHAM, | : | |
| CHRISTIAN M. MILTON, and | : | |
| ELIZABETH A. MONRAD, | : | |
| | : | |
| Defendants. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The government respectfully submits this Sentencing Memorandum pursuant to the Court's Scheduling Order relating to sentencing entered on July 28, 2008 [Doc. #1088].

**I.    Statement of the Case**

**A.    Indictment, Trial & Verdict**

On September 20, 2006, a federal grand jury sitting in New Haven returned an indictment against Ronald E. Ferguson, Christopher Garand, Robert Graham, Christian Milton, and Elizabeth A. Monrad, charging them with conspiracy, securities fraud, making false statements to the SEC, and mail fraud.  On February 25, 2008, a jury found all five defendants guilty of every count with which he or she was charged.

**B.    Summary of Offense Conduct**

On October 26, 2000, AIG publicly reported that, during the third quarter of 2000, its loss reserves decreased by approximately $59 million compared to the prior quarter.  *See United States v. Ferguson*, 553 F. Supp.2d 145, 150 (D. Conn. 2008); *Govt. Ex. 1*.  The third quarter decrease in loss reserves occurred during a period of premium growth.  *Govt. Ex. 1*; Tr. at

419:11-22.  That day, AIG's stock price dropped significantly, by about 6%, even though AIG met earnings expectations.  Tr. at 421:10 - 422:6 (Vol. II, 1/8/08) (Schroeder); Tr. at 247:22 - 248:5 (Vol. II, 1/8/08) (Hamrah).  Analyst Alice Schroeder's clients were calling her that day about the reserve decrease, wanting to know if there was something wrong at AIG.  Tr. at 418:20 - 420:4 (Vol. II, 1/8/08).  Loss reserves were important to Schroeder and her clients, Tr. at 420:5-12, and Schroeder subsequently wrote in her earnings note that "a steady trend of unexplained [reserve] releases during a period of premium growth" would be a cause for concern.  *Govt. Ex. 4, 7*; Tr. at 429:3-16.

Shortly after AIG's stock price drop and the negative analyst reports, the defendants and others negotiated and structured two purported reinsurance contracts between AIG and Gen Re.  *See generally Ferguson*, 553 F. Supp.2d at 150-51.  The nominal parties to the contracts were NUFIC (on behalf of AIG) and CRD (on behalf of Gen Re).  *Govt. Ex. 171, 184.*  The first contract was dated December 1, 2000.  The second contract was dated March 31, 2001.  *Id.*  Together, on their face, the contracts made it appear as if AIG was reinsuring Gen Re for up to $600 million in limit of liability and Gen Re was paying AIG $500 million in premiums.  *Id.*; Tr. at 2143:22 - 2144:15 (Vol. X, 1/23/08).  The difference between limit of liability and expected premiums made it appear as if AIG had assumed a risk of $100 million in losses.  Tr. at 2144:14-15 (Vol. X, 1/23/08).

Under "Appendix A" to the contracts, Gen Re appeared to associate approximately $500 million in reserves with the underlying contracts that it was ceding or giving to AIG.  *Govt. Ex. 23, 171, 184*.

Of the $500 million premiums set forth in the contracts, Gen Re was entitled to withhold $490 million in an "experience account" (an account used to pay claims as they came due). *Id.* In other words, Gen Re was obligated to pay AIG no more than $10 million premiums in cash - called a "loss transfer payment" - under the contracts. *Govt. Ex. 23, 171, 184*; Tr. at 2144:4-9 (Vol. X, 1/23/08).

The contracts contained a unilateral "commutation" – or termination – provision that allowed only Gen Re to cancel the contracts. Upon termination, Gen Re was entitled to retain any remaining portion of the withheld premiums. *Govt. Ex. 23, 171, 184*.

Consistent with the appearance of risk transfer in the written contracts, AIG applied reinsurance accounting to the transaction. *See Ferguson*, 553 F. Supp.2d at 151; *Govt. Ex. 250* (Restatement Stipulation). In the fourth quarter of 2000, AIG booked $250 million in loss reserves, reflecting the first contract. *Govt. Ex. 250;* Tr. at 1928:5-16 (Vol. IX, 1/22/08) (Morrow); Tr. at 2047:4-12, 21-25 (Vol. IX, 1/22/08) (Golodner). As a result, AIG reported a $106 million increase in loss reserves for the fourth quarter of 2000. *Govt. Ex. 114; 300A;* Tr. at 1927:23 - 1928:7. But for the inclusion of the $250 million, AIG would have reported a reduction in loss reserves of approximately $144 million for the fourth quarter of 2000. *Govt. Ex. 300A*.

Stock analysts immediately noticed the fact that AIG increased its loss reserves. Tr. at 284:13 - 291:22 (Vol. II, 1/8/08) (Hamrah). On or about February 9, 2001, one analyst wrote, "AIG put to rest a minor controversy from last [third] quarter [2000] by adding 106 million to reserves . . . ." *Govt. Ex. 117;* Tr. at 470:1-14 (Vol. III, 1/9/08) (Schroeder).

3

In the first quarter of 2001, AIG booked an additional $250 million in loss reserves, reflecting the second contract. *Govt. Ex. 250;* Tr. at 1934:2 - 1936 (Vol. IX, 1/22/08) (Morrow): Tr. at 2059:22-25 (Vol. IX, 1/22/08) (Golodner). As a result, AIG reported a $63 million increase in loss reserves for the first quarter of 2001. *Govt. Ex. 153;* Tr. at 1934:2 - 1935:21 (Vol IX, 1/22/08) (Morrow). But for the inclusion of the additional $250 million, AIG would have reported a reduction in loss reserves of approximately $187 million for the first quarter of 2001. *Govt. Ex. 300A.*

Again, stock analysts took note. *Govt. Ex. 158A*; Tr. at 295:24 - 301:5 (Vol. II, 1/8/08) (Hamrah). On or about April 26, 2001, one analyst wrote, "net loss reserves increased by $63 million. Given the renewed premium growth we would expect reserves to continue rising at an accelerating pace." *Govt. Ex. 158A*; Tr. at 300:1-3 (Vol. II, 1/8/08) (Hamrah).

The purported reinsurance contracts remained in effect for almost four years. *See Ferguson*, 553 F. Supp.2d at 151; *Govt Ex. 250*; Tr. at 2618:10 - 2618:15 (Vol. XIII, 1/28/08) (Houldsworth). During those nearly four years, AIG continued to report $500 million in additional reserves on its financial statements filed with the SEC. *Govt. Ex. 250 (Restatement Stipulation)*; *Govt. Ex. 146 (2000 10-K); Govt. Ex. 224 (2001 10-K); Govt. Ex. 234 (2002 10-K); Govt. Ex. 239 (2003 10-K/Annual Report);* Tr. at 1925 - 1948 (Vol. IX, 1/22/08) (Morrow).

One of the purposes of the conspiracy was to mislead stock market analysts, AIG shareholders and the investing public into believing that AIG's loss reserves were growing in order fraudulently to maintain and increase the market price of AIG's stock. *See, e.g.*, *Govt. Ex. 18 & 18A at 12-13*; Tr. at 2139:5-6; 2180:2-8 (Vol. X, 1/23/08) (Houldsworth). In order to accomplish their goal, the defendants and their co-conspirators structured a sham reinsurance

transaction that allowed AIG fraudulently to book and report approximately $500 million in loss reserves (as well as $500 million in premium) in order to mislead AIG shareholders, stock market analysts, and the investing public after AIG had reported a reserve reduction of approximately $59 million in the third quarter of 2000.

The defendants and their co-conspirators drafted two sham reinsurance contracts and a fake offer letter that made it appear that: (I) Gen Re had transferred approximately $100 million in insurance risk (the difference between the $600 million limit of liability and the $500 million in premiums) to AIG when, in fact, no real insurance risk had been transferred; (ii) Gen Re was paying AIG $10 million in cash "premiums" when, in fact, Gen Re never would be out any cash on the transaction; and (iii) Gen Re had offered the transaction to AIG when, in fact, AIG offered the transaction to Gen Re. *Govt. Ex. 23, 24, 52, 54, 57, 171, 184*; Tr. at 2224:24 - 2225:8 (Vol. X, 1/23/08) (Houldsworth) (no risk); 2253:22 - 2254:18 ($10 million payment); 2256:16-20 (purpose of $600 million to give appearance of risk transfer); 2382:8 - 2384:22 (fake offer letter); Tr. at 733:3 - 829:19 (Vol. VI, 1/10/08) (Napier).

The defendants and their co-conspirators entered into a secret, unwritten side deal whereby: (I) Gen Re agreed not to transfer real insurance risk to AIG; (ii) AIG agreed to pay Gen Re approximately $10 million to advance or "pre-fund" the cash "premium" payment (*see, e.g.*, *Govt. Exs. 23, 24, 31, 33, 52, 54, 57, 195*; Houldsworth and Napier testimony, *passim*); and (iii) AIG additionally agreed to pay Gen Re approximately $5 million as a fee to induce Gen Re to participate in a transaction that otherwise was of no economic value to Gen Re. *Id.*; *see also* Tr. at 775:24 - 777:14 (Vol. IV, 1/10/08) (Napier testifying about the side deal); Tr. at 2144:16 - 2145:12 (Vol. X, 1/23/08) (Houldsworth testifying about the side deal).

The defendants and their co-conspirators used financial intermediaries or "go-betweens" to conceal the above secret side payments.  To make it difficult to connect the secret side payments to the sham reinsurance transaction, AIG used an unrelated subsidiary, HSB (rather than the party to the sham reinsurance contracts, NUFIC) to pay Gen Re (rather than the party to the sham contracts, CRD) the approximate $15 million.  *See, e.g.,* Tr. at 2253:18 - 2254:9 (Vol. X, 1/23/08) (Houldsworth); *Govt. Ex. 52; Govt. Ex. 54* (Monrad: "I'd like it if this could go, this funding could . . . go round trip . . . through different bank accounts") (Monrad: "We've taken care of that externally, meaning there's a contract that they will enrich . . . ."); *Govt. Ex. 137* (Robert Graham: "So it's [HSB's] unrelated, but overall we make out."); *Govt. Ex. 43* (Graham email in which he expresses concern about a "reviewer of the AIG US entity's statements" being able to "connect the dots to CRD and beyond").

The defendants and their co-conspirators used an offshore Gen Re subsidiary, CRD, as a party to the sham reinsurance contracts, instead of Gen Re or a domestic subsidiary.  Tr. at 2139:7-11 (Vol. X, 1/23/08) (Monrad stated to Houldsworth that she wanted CRD's assistance because there were "transparency" issues with Gen Re providing the transaction to AIG in the United States).  Because CRD was not subject to United States regulatory oversight and the same financial reporting requirements as Gen Re and its domestic subsidiaries, using CRD as a party further helped conceal the secret, unwritten side agreement.  *Id.*; Tr. at 2173:4 - 2174:5 (Vol. X, 1/2308) (Houldsworth); *Govt. Ex. 20 & 20A* (Monrad confirming in recorded conversation with Houldsworth that the LPT would not show up in any public filings in Ireland).

## II.        Sentencing Post-*Booker*

In *United States v. Crosby*, 397 F.3d 103, the Second Circuit explained that, in light of

*United States v. Booker*, 543 U.S. 220 (2005), district courts should engage in a three-step

sentencing procedure.  First, the district court must determine the applicable Guidelines range, and

in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make

relevant to the determination of a Guidelines sentence and all of the facts relevant to the

determination of a non-Guidelines sentence."  *Crosby*, 397 F.3d at 112.  Second, the district court

should consider whether a departure from that Guidelines range is appropriate.  *Id.* at 112.  Third,

the court must consider the Guidelines range, "along with all of the factors listed in section

3553(a)," and determine the sentence to impose.  *Id.* at 112-13.

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but

not greater than necessary, to comply with the purposes set forth in paragraph (2) of this

subsection," and then sets forth seven specific considerations:

> (1)     the nature and circumstances of the offense and the history and
> characteristics of the defendant;
> (2)     the need for the sentence imposed—
>> (A)     to reflect the seriousness of the offense, to promote respect
>> for the law, and to provide just punishment for the offense;
>> (B)     to afford adequate deterrence to criminal conduct;
>> (C)     to protect the public from further crimes of the defendant;
>> and
>> (D)     to provide the defendant with needed educational or vocational
>> training, medical care, or other correctional treatment in the most
>> effective manner;
> (3)     the kinds of sentences available;
> (4)     the kinds of sentence and the sentencing range established [in the
> Sentencing Guidelines];
> (5)     any pertinent policy statement [issued by the Sentencing Commission];
> (6)     the need to avoid unwarranted sentence disparities among defendants with
> similar records who have been found guilty of similar conduct; and
> (7)     the need to provide restitution to any victims of the offense.

7

The Second Circuit has instructed district judges to consider the Guidelines "faithfully" when sentencing. *Crosby*, 397 F.3d at 114. "*Booker* did not signal a return to wholly discretionary sentencing." *United States v. Rattoballi*, 452 F.3d 127, 132 (2d Cir. 2006) (citing *Crosby*, 397 F.3d at 113). The fact that the Sentencing Guidelines are no longer mandatory does not reduce them to "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *Crosby*, 397 F.3d at 113. Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596; *see also Rattoballi*, 452 F.3d at 133 (the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'") (quoting *United States v. Jiminez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc); *Kimbrough v. United States*, 128 S. Ct. 558, 574 (2007). The Second Circuit has "recognize[d] that in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough*, 128 S. Ct. at 574 ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'") (quoting *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007)); *Rattoballi*, 452 F.3d at 133 ("In calibrating our review for reasonableness, we will continue to seek guidance from the

considered judgment of the Sentencing Commission as expressed in the Sentencing Guidelines and authorized by Congress.").

## III.    Sentencing Guidelines Calculations

### A.    Presentence Report

The presentence report ("PSR") for each of the five defendants calculated the sentencing guidelines range as follows.  The PSRs begin with a base offense level of 7 under the applicable guideline, § 2B1.1(a)(1), and add 18 levels based on the gain to Gen Re of $5 million that resulted from the offense as an alternative measure of loss.  *See, e.g.*, PSR at ¶ 33-34 (Ferguson). The PSRs calculate that the offense involved relatively complex and intricate conduct, resulting in a 2 level increase for sophisticated means under § 2B1.1(b)(9)(C).  PSR at ¶ 35 (Ferguson). The PSRs also found that a 6 level increase was warranted pursuant to § 2B1.1(b)(2)(C) because there were over 250 victims, PSR at ¶ 36 (Ferguson), and that each defendant should receive a 2 level increase for abuse of position of trust under § 3B1.3, PSR at ¶ 37.

The PSRs accordingly calculated a total offense level of 35 for each of the five defendants, resulting in a sentencing guidelines range of 168 to 210 months of imprisonment for each defendant.  PSR at ¶ 42 (Ferguson); PSR at ¶ 50 (Garand); PSR at ¶ 43 (Graham); PSR at ¶ 43 (Milton); PSR at ¶ 42 (Monrad).

### B.    Government's Position

As set forth in greater detail below, it is the government's position that the loss in this case *can* reasonably be determined, and that a reasonable estimate of the loss exceeds $400 million, the highest loss level under U.S.S.G. § 2B1.1(b)(1).  The government therefore believes that the defendants' base offense level of 7 should be enhanced by 30 levels under

§ 2B1.1(b)(1)(P), and objects to the PSR's finding that the loss in this cannot reasonably be determined.

The government agrees with the PSRs that the defendants' offense levels should be increased by 2 levels for sophisticated means under § 2B1.1(b)(9)(C), and by 6 levels under § 2B1.1(b)(2)(C) because there were more than 250 victims.

Furthermore, the government objects to the absence of a 4 level increase in defendant Milton's offense level under § 2B1.1(b)(15)(A) for having been an officer of AIG, a publicly-traded company, during the securities fraud offense conduct for which he and the other four defendants were found guilty.

The government also objects to the absence of a 4 level enhancement in defendant Ferguson's offense level for having been a leader and organizer of the criminal conduct at issue under § 3B1.1(a), and objects to the absence of a 3 level enhancement for defendant Monrad for having been a manager and supervisor under § 3B1.1(b).

Finally, the government does not agree with the PSRs that each defendant should receive a 2 level increase for abuse of position of trust under § 3B1.3, but rather believes that only defendant Monrad and Graham should receive a 2 level increase under § 3B1.3 for use of a special skill.

### 1.      The Loss Exceeds $400 Million

The government agrees that the base offense level is 7, but does not agree that the loss cannot be reasonably be determined.  Rather, it is the government's position that each

defendant's offense level should be increased by 30 levels under § 2B1.1(b)(1) because the loss exceeds $400 million.

Loss reasonably can be determined, and even under the grossest calculation the loss in this case exceeds $400 million. *See* U.S.S.G. § 2B1.1(b)(1). The government's loss causation expert, Jeffry L. Davis, conducted two types of event studies to estimate loss: a modified event study that accounts for the gradual disclosure of the LPT fraud to the market during a month-long period in February and March of 2005 and a standard event study that accounts for the disclosure of the LPT fraud to the market on three statistically significant dates in February and March of 2005. Using the modified event study approach, Mr. Davis concluded that the fraud-related losses to AIG shareholders totaled between $1.2 billion and $1.4 billion. Using the standard event study approach, Mr. Davis concluded that the fraud related losses to AIG shareholders totaled between $543 million to $598 million. Both methodologies are reasonable, accepted by the relevant peer community, and supported by empirical evidence.

The defendants offer only a critique of Mr. Davis' event studies. *See* Ferguson PSR at ¶ 28. Indeed, the defendants' loss causation expert, Dr. Rene M. Stulz, does not conduct his own event study, but rather, in reliance only on his critiques of Mr. Davis' studies, concludes that the appropriate loss to AIG's shareholders as a result of the fraud for which defendants were convicted was zero. Stulz's conclusion is unsupportable, ignores the historical reaction of AIG's stock price to news regarding loss reserves, and is clearly results-oriented. Rather than trying to distill and quantify the effects of the disclosure of the LPT fraud on AIG's stock price, Stulz conveniently dismisses the event altogether and attributes all of the statistically significant movement in AIG's stock price to "confounding" news without any further analysis. For global

and diversified financial services companies, like AIG, that have significant daily news cycles, Stulz's myopic approach *always* would result in zero loss. Accordingly, this Court should reject Dr. Stulz's "findings" and credit the comprehensive and thoughtful studies of Mr. Davis.

Alternatively, should this Court disagree with the government and conclude that the loss cannot be reasonably be determined, it should apply the $495 million gain to co-schemer AIG that resulted from avoiding taking a reserve charge to earnings, not the $5 million gain to co-schemer Gen Re from AIG's cash payment. *See* U.S.S.G. § 2B1.1, Commentary, App. Note 3(B). Under either measure, loss or gain exceeds $400 million, the highest threshold under the Sentencing Guidelines fraud table. Alternatively, should the Court reject each of these measures, it can apply the $5 million gain to Gen Re as an alternative measure of loss.

### a.    Legal Standard

Pursuant to the Sentencing Guidelines, "[t]he court need only make a reasonable estimate of the loss" based on available information. U.S.S.G. § 2B1.1, Application Note 3(C). Even where the loss to victims is not easily quantifiable, "some estimate must be made for Guidelines purposes, or perpetrators of fraud would get a windfall." *United States v. Ebbers,* 458 F.3d 110, 127 (2d Cir. 2006); *see also United States v. Rutkoske,* 506 F.3d 170, 179 (2d Cir. 2007) (calculating loss in a securities fraud case "cannot be an exact science" and observing that the Second Circuit "acknowledged the complexities inherent in determining the loss amount"). Calculating loss requires determining whether the fraud, as opposed to other market factors, artificially inflated the share price over the fraud period, and if so, by how much. *See Ebbers,* 458 F.3d at 126-28; *Rutkoske,* 506 F.3d at 179-180. However, precision in filtering out other

causes is unnecessary where even "the grossest calculation" would exceed the highest
enhancement threshold.  *See Ebbers,* 458 F.3d at 128.

The underlying principle in calculating loss is that "[t]he loss must be the result of the
fraud . . . losses from causes other than the fraud must be excluded from the loss calculation." *Id.*
at 128; *see also* U.S.S.G. § 2B1.1, Application Note 3(A)(I)-(v) (requiring the government to
prove that the loss "resulted from the offense.").  In *Ebbers, Rutkoske,* and *United States v. Olis,*
429 F.3d 540 (5th Cir. 2006) (cited in *Rutkoske* and *Ebbers*), the district courts neglected this
basic principle.

For instance, in *Rutkoske*, a market manipulation case, the district court attributed the
"entire amount" of the decline in the price of the stock to the defendant's criminal conduct,
apparently without considering other factors that may or may not have caused the decline in
price.  *Rutkoske,* 506 F.3d at 178.  Moreover, the district court chose an ending date for the loss
period (the last date the parties had "blue sheets") that "had no particular relevance to the offense
conduct. . . ."  *Id.*  Accordingly, the Second Circuit remanded the case for resentencing because
of the district court's "basic failure at least to approximate the amount of the loss caused by the
fraud without even considering other factors relevant to a decline" in the stock price.  *Id.* at 180.

In *Ebbers,* the Second Circuit was concerned with the district court's application of the
"simplistic" market capitalization test for determining loss.  *Ebbers,* 458 F.3d at 127.  That  test
"take[s] the share price on the date of a fraudulent statement[,]" "subtract[s] it from the share
price after the fraud was revealed" and "multipl[ies] that amount by the number of outstanding
shares."  *Id.*  The Second Circuit criticized the approach primarily because it failed to
adequately consider alternative causes for the drop in the stock's price, like the bursting of the

dot-com bubble.  *Id.* at 127-28.  Notwithstanding, the Second Circuit did not remand the case for resentencing because, even accounting for these alternative causes, the loss exceeded $1 billion. *Id.* at 128.

Likewise, in *Olis,* the Fifth Circuit criticized the market capitalization approach relied upon by the district court because "two-thirds of the drop in Dynergy's [stock] price occurred either before the revelation of [the fraud] or more than a week after the announcement of the restatement of earnings cause by [the fraud]," and therefore counting the entire decline in price that occurred during the period as the loss amount "[did not] take into account the effect of extrinsic factors on the stock price."  *Olis,* 429 F.3d at 548.  Because the district considered only gross market capitalization loss rather than actual loss to shareholders, and refused to consider the defendant's expert report on other possible causes for the loss, the Fifth Circuit determined that the district court "overemphasized his discretion as factfinder at the expense of economic analysis" and remanded the case for resentencing.  *Id.*

As set forth more fully below, the government's loss causation expert applied two methodologies to calculate loss, both of which control for external factors that might have affected AIG's share price.  Both methodologies employed regression analyses that related the daily returns on AIG stock to the daily returns on a broad market index and on a relevant industry index.  The purpose of these analyses was to generate a predicted price for AIG stock (the price absent the fraud) that filtered out broad macroeconomic and more narrow industry-wide effects.  The resulting predicted price was compared to the actual inflated price to determine the amount of loss.  Moreover, both methodologies used an event window that preceded AIG's March 30, 2005 press release and May 31, 2005 restatement which disclosed

other accounting irregularities unrelated to the LPT fraud.  Because the methodologies account for external market conditions and AIG issues unrelated to the LPT fraud, they address the concerns cited by the courts in *Rutkoske, Ebbers,* and *Olis.*

### b.    Loss Reserves and AIG's Stock Price

There is little doubt that AIG's false financial statements - citing increases in loss reserves of $250 million and $500 million as a result of the LPT deal - caused AIG's share price to be artificially inflated.  Loss reserves are a significant indicator of an insurance company's financial health.  *See United States v. Ferguson*, 553 F. Supp.2d 145, 153-54 (D. Conn. 2008) (CFD) ("At trial, several witnesses testified about the importance AIG's investors placed upon the amount of the company's loss reserves, changes in the amount of the company's loss reserves, and the effect of declining loss reserves on earnings. . . ."); Attachment 1 (Tr. at 406-10; 417-20) (Schroeder testimony); Attachment 2 (Tr. at 3549-51; 3630-31) (Cohen testimony). When loss reserves decline relative to premiums, it may indicate that the company is under-reserved and might have to take a "reserve charge" (reduce its earnings) at a later time to make up the shortfall.  *See Ferguson,* 553 F. Supp.2d at 151; Attachment 3 (Tr. at 407-11, 420) (Schroeder); Attachment 4 (Tr. at 3549-50, 3630) (Cohen).  This negatively impacts the company's quality of earnings, which is of "considerable importance" to investors. *Ferguson,* 553 F. Supp.2d at 155; *see also* Attachment 5 (Tr. at 419-20) (Schroeder); Attachment 6 (Tr. at 3549-50) (Cohen).

For these reasons, historically, AIG's stock price has declined when AIG announced that its loss reserves declined during a period of premium growth.  *See* Attachment 7 (Gov't Ex. 4 at

2) (Schroeder Report) ("AIG has reduced reserves twice recently - in the second and fourth quarters of 1999 - and the market reacted badly then as well."); Attachment 8 (Tr. at 428) (Schroeder) ("in 1999 there had been two similar incidents, both times the stock had declined sharply"); Attachment 9 (Gov't Ex. 7) (attaching Merrill Lynch report of Jay Cohen) ("the market has reacted negatively to such trends [declining loss reserves] in the past") and (attaching October 27, 2000 Wasserstein, Perella report by Kenneth Zuckerberg) (". . . a decrease in reserves often raises a red flag"); *see also* Attachment 10 (Alice Schroeder Report, "Correction: Thoughts on the Reserve Charge," April 10, 2003) ("Investors have been focused, for many insurers, on whether companies were tardy in recognizing reserve additions . . .  If the market concludes that a company should have recognized losses earlier, the stock reacts sharply.  If a company could not have recognized losses earlier, and was simply mistaken, it still has a major effect, in our view.").

Indeed, the instant fraud was precipitated by a stock price decline as a result of a reduction in loss reserves.  On October 26, 2000, AIG announced its third quarter results: premiums rose by approximately 8 percent, but loss reserves declined by $59 million. Attachment 5 (Tr. at 419) (Schroeder); Attachment 11 (Tr. at 3557-58) (Cohen).  That day, AIG's stock price declined by approximately 6 percent, from $99 to $93.  The approximate $6 per share decrease resulted in a reduction of market capitalization of approximately $12 billion dollars.  Attachment 12 (Tr. at 422) (Schroeder); *see also* Attachment 7, (Gov't Ex. 4).  Financial analysts and the financial press attributed the stock price decline in large part to the loss reserve reduction.  *See* Attachment 13 (*Wall Street Journal,* "AIG Posts a Profit, But Investors Focus On Reserve Release" (October 27, 2000)) ("AIG posted third-quarter profit gains in line with

16

expectations, but investors fretted that a bit of the improvement stemmed from a small reduction in the company's property-casualty insurance claims reserves.  AIG shares fell 6.1 percent."); Attachment 17 (Tr. at 497) (Schroeder) ("there had been a decline of $59 million and the market had reacted negatively to that and the stock had actually declined 6 percent"); *see* Attachment 9 (Gov't Ex. 7) (attaching Bear Stearns report of Michael Smith) ("[T]he stock market reacted negatively to a disclosure that property-casualty loss reserves declined during the quarter"); *see also* Attachment 14 (*Wall Street Journal,* "Regulators Probe An AIG Pact with General Re" (February 18, 2005)) ("The [LPT] deal came not long after AIG's shares sank amid concern about the company's reserving practices. . . On October 26, 2000, AIG announced a 9% jump in net income for the just-ended third quarter, in line with expectations.  But the company's shares fell 6% because some investors were unnerved that two cents out of the per-share income for the quarter stemmed from a reduction in its reserves.").  On October 31, 2000, AIG's then-CEO Maurice R. Greenberg initiated the LPT transaction after receiving a memo from Charlene Hamrah attaching analyst reports discussing the loss reserve reduction.  Attachment 9 (Gov't Ex. 7) ("Enclosed are the First Call notes commenting on AIG's third quarter earnings report.  These notes are positive and a number of them address the issues raised on Thursday [October 26, 2000] when we reported earnings and the stock declined, that is, loss reserves and acquisition appetite.").

The instant fraud staved off a further decline in AIG's stock price by masking further reductions in AIG's loss reserves in subsequent quarters.  In the fourth quarter of 2000 and the first quarter of 2001, AIG reported an increase in loss reserves of $106 and $63 million, respectively.  *See* Attachment 15 (Gov't Ex. 300).  Absent the fraud, AIG's loss reserves would

have declined by $144 and $187 million, respectively, in those quarters, or AIG would had to have taken a charge to earnings to avoid the decline. *See Ferguson,* 553 F. Supp.2d at 154; ("If AIG had accurately reported its loss reserves for the fourth quarter of 2000 and the first quarter of 2001, AIG would have reported declines, not gains, in its loss reserves for those two quarters in addition to the decline in loss reserves that AIG accurately reported for the third quarter of 2000."); Attachment 16 (Gov't Ex. 300A).  Three consecutive quarters of declining loss reserves, in increasing magnitude from one quarter to the next, or a reduction of earnings of $250 or $500 million, no doubt would have caused AIG's stock price to decline even more than the 6 percent it did in the third quarter of 2000.  *See* Attachment 17 (Tr. at 497-503) (Schroeder) ("We would have said the [other] shoe would have dropped. . . .").  Simply put, investors who purchased AIG stock after February 8, 2001 – the date of AIG's fourth quarter 2000 earnings release wherein AIG first reported fraudulently inflated loss reserves – paid more than the stock was truly worth because they were deceived as to the true state of AIG's loss reserves.  Those shareholders who held AIG stock until the fraud was revealed, and the stock's inflated value dissipated, lost money.[1]

---

[1] In February of 2001, AIG had approximately 2.3 billion outstanding shares and its share price was approximately $86.  *See* Attachment 18 (Gov't Ex. 117).  Even if the instant fraud caused only a small inflation in the per-share price, and thus a small dissipation of value upon the disclosure of the fraud in 2005 (say $2 per share), and only a small percentage of shareholders who purchased the fraud period and who sold at a loss after the fraud period (say, selling 10 percent of shares outstanding), the total loss nonetheless would exceed $400 million ($460 million).

### c.     Mr. Davis' Methodology

Mr. Davis performed an econometric study to quantify the loss to AIG shareholders.  Mr. Davis applied two methodologies - the modified event study/leakage approach and the standard event study/non-leakage approach - widely accepted and applied by economists to determine the inflation of the stock price, and hence quantify the losses, resulting from securities fraud.[2]  Each of his methodologies are reasonable and establish that AIG's stock price was inflated by the LPT fraud, and not by other market conditions, and that the loss attributable to the fraud, by any of his conservative measures, exceeded $400 million.  *See* Attachment 19 (Expert Report of Jeffry Davis (April 21, 2008) (hereinafter "Davis Report")); *see also Rutkoske,* 506 F.3d at 180 ("Normally, expert opinion and *some consideration* of the market in general and relevant segments in particular will enable a sentencing judge to *approximate* the extent of loss caused by a defendant's fraud.") (emphasis added).

An event study is an examination of the relationship between news about a company and stock price movements.  The purpose of an event study is to estimate the amount of artificial inflation of the stock price - over the course of the fraud period - as a result of the fraud (and not other factors). The key factors that affect a company's stock's price, other than news specific to the company, are broad macroeconomic factors that affect every stock and narrower industry-wide factors that affect stocks of companies in the same industry. A broad market index (such as

---

[2] *See* Bhagat, Sanjai and Romano, Roberta, "Event Studies and the Law: Part II: Empirical Studies of Corporate Law," 4 *American Law and Economics Review* 380 (2002); Cornell, Bradford and Morgan, R. Gregory, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," 37 *UCLA Law Review* 883 (June 1990); Thorsen, Magde S., Kaplan, Richard A., and Hakala, Scott, "Rediscovering the Economics of Loss Causation," 6 *Journal of Business & Securities Law* 93 (2006).

the S&P 500 Index) is typically used in event studies in order to capture the broad macroeconomic factors, while an index based on the stock prices of companies in the same industry as the subject company is typically used to capture the narrower industry effects.

Mr. Davis conducted such an event study (in fact several alternative event studies) in the process of producing his estimates of the damages caused by the fraud. Initially, Mr. Davis identified the fraud period. The period spanned from February 9, 2001 (the day after AIG's first disclosure of fraudulently inflated loss reserves) to March 14, 2005 (the conclusion of an incremental, month-long disclosure of the LPT fraud culminating in AIG's announcement it would replace Greenberg as CEO). *See* Attachment 19 (Davis Report) at ¶16.

Next, Mr. Davis identified the relevant events comprising the corrective disclosure of the LPT fraud to the market. *See* Attachment 19 (Davis Report) at ¶¶ 10-15. Because the LPT fraud was disclosed to the market incrementally and not in a single corrective disclosure, like a restatement, Mr. Davis applied two event studies based on multiple event dates. One event study assumed there was leakage of information about the LPT fraud to the market over the course of the entire month from February 14, 2005 until March 15, 2005 and the other assumed there was no leakage and the LPT fraud was revealed on three distinct days during that period. Significantly, both event studies used events that preceded AIG's March 30, 2005 press release and May 31, 2005 restatement wherein AIG disclosed other accounting irregularities in addition to the LPT fraud. *See* Attachment 19 (Davis Report) at ¶ 15 ("I have not attempted to assess the effect of the restatement of the transaction with General Re because the restatement involved other transactions as well."); *see also* Attachment 20 (AIG Press Release, "AIG Delays Form 10-K Filing to Complete Review," (March 30, 2005)); Attachment 21 (AIG Form 10-K at 14-19 (May 31, 2005)).

20

The first event study (Mr. Davis' leakage approach or modified event study approach) adopted the reasonable assumption that information about the fraud began to be revealed to the market on February 14, 2005 and continued to be revealed gradually from that date through March 15, 2005. *See* Attachment 22 (Davis Rebuttal Report) at ¶ 7-8 (citing Cornell & Morgan, 4 *U.C.L.A. L. Rev* at 906) (". . . for a fraud which is revealed slowly over time, the event study approach is likely to significantly understate the true damages. One way to reduce this bias it so extend the observation window surrounding the disclosure date."); *see also* Thorsen, Kaplan, and Hakala, 6 *J. Bus. & Sec. L.* at 111-12 ("To address these situations [leakage], event studies may consider 'event windows' or several days over time, looking at joint statistical significance. . . A day where movement is not statistically significant may be part of a series of days which, taken together, are highly statistically significant. . . ."). From February 14, 2005 through March 15, 2005, the LPT fraud gradually was disclosed in AIG's public filings and news reports. During that month, reports of the LPT fraud dominated the news about AIG and investor interest in the news was high. *See* Attachment 23 (Tr. at 302-304; 371-72) (Hamrah) (investors called with increasing frequency about the Gen Re transaction over the "next few weeks" after February 14, 2005); Attachment 24 (Tr. at 3590-3611) (Cohen) (clients asked about SEC and NYAG subpoenas and news about the LPT in financial press from February 14 through March 14). Over the course of that month, AIG's stock price dropped by a statistically significant amount when compared to broader industry and market indices. *See* Attachment 19 (Davis Report) at ¶22-23; *see also Ferguson,* 553 F. Supp.2d at 156 ("The government presented evidence at trial that AIG's stock price declined in February and March of 2005 after it was publicly revealed that government regulators were investigating the LPT and that AIG and Gen Re's senior management had been involved with the deal.").

The second event study (Mr. Davis' non-leakage approach or standard event study approach) assumed that the fraud was revealed on three distinct days (February 14, 2005, March 14, 2005 and March 15, 2005) and there was no leakage of information. On each of these three days, new and significant information related to the fraud was disclosed. On February 14, 2005, AIG announced that it had received subpoenas from the New York Attorney General and from the Securities and Exchange Commission relating to investigations of various reinsurance transactions. *See* Attachment 25 (AIG Press Release "AIG Issues Statement Regarding Subpoenas" (February 14, 2005)); *see also* Attachment 19 (Davis Report) at ¶10. The LPT transaction was one of the subjects of the investigation. *See id.;* Attachment 26 (Stipulation, Gov't Ex. 243). On March 14, 2005, at approximately 10:01 p.m., and after growing speculation in the financial press that day, AIG formally announced that it would replace Greenberg as CEO. *See* Attachment 27 (AIG Press Release, "AIG Board Implements Succession Plan: Sullivan to Succeed Greenberg as CEO; Greenberg to Serve as Non-Executive Chairman; Kanak Elected Chief Operating Officer and Bensinger to Succeed Smith as CFO; Form 10-K to be Delayed" (March 14, 2005 10:01 p.m. EST)); *see also* Attachment 28 (Stulz Critique) at p. 17, n. 33; Attachment 22 (Davis Rebuttal) at ¶13. AIG also announced at that time that its Chief Financial Officer, Howie Smith, was taking leave, and that the filing of its 2004 Form 10-K would be delayed due to the management changes and the ongoing internal investigation of the accounting of certain transactions which commenced in connection with the regulatory inquiries announced on February 14, 2005. *See, supra,* Attachment 27 (AIG Press Release (March 14, 2005)). Both of these announcements were related to the LPT fraud, as was the negative response of credit rating agencies the next morning. *See* Attachment 22 (Davis Rebuttal) at ¶15. AIG also announced that, at 9:00 a.m. on March 15, 2005, it scheduled a conference call with the

investment community that was broadcasted live on the internet. *See, supra,* Attachment 27 (AIG Press Release (March 14, 2005)). On each of the aforementioned days, AIG's stock price dropped by a statistically significant amount. *See* Attachment 19 (Davis Report) at ¶30, n. 15.[3] Having identified relevant events comprising the corrective disclosure of the LPT fraud, Mr. Davis estimated the daily per-share inflation of AIG's stock price. He accomplished this by working backward from March 15, 2005 (the final relevant event date) to February 9, 2001 (the first day of the fraud period) and creating predicted daily prices for AIG stock had the full information about the LPT fraud been known to the market (the "full-information price"). *See* Attachment 19 (Davis Report) at ¶¶ 22-23. Over the course of the fraud period, this full-information price fell short of the actual price by a percentage equal to the inflation revealed on the event dates.[4] In other words, the difference between the predicted full-information price and the actual price is the amount of inflation (and hence, loss to shareholders) attributable to the LPT fraud.

Creating the predicted full-information price required Mr. Davis to perform several regression analyses. *See id.* at ¶¶ 17-18. The regression analyses estimated the relation between the daily returns on AIG stock and the daily returns on a broad market index and on an industry index over the course of a sample estimation period. *See id.* at ¶ 17. The purpose of this step was to filter out broad macroeconomic and more narrow industry-specific effects on AIG's stock

---

[3] The defendants' loss causation expert, Dr. Stulz, does not dispute that AIG's stock price decline on February 14, March 14, and March 15, 2005 was statistically significant. *See* Attachment 28 (Stulz Critique) at ¶ 32-40. He alleges only that the dates are irrelevant because no "new" news about the LPT transaction was reported.

[4] For example, if there is just one event date and the predicted return on that date is a positive 1% while the actual return is a negative 10%, then the revealed inflation due to the fraud is 11%, and every predicted price over the fraud period will be 11% less than the actual price.

price to create an accurate predicted full-information price. *See id.* at ¶18. The regression analyses also allowed Mr. Davis to accurately estimate the predicted full-information prices for the period from February 14, 2005 to March 15, 2005 during which the LPT fraud was being disclosed to the market. *See id.* at ¶22. Mr. Davis juxtaposed the predicted full-information price against the actual, inflated price in a graph that depicts the extent of the inflation due to the LPT fraud. *See id.* at p. 10.

The final step in Mr. Davis' analysis was to estimate the number of "damaged shares" during the fraud period. He used a conservative measure: those shares purchased during the fraud period and held until after the close of the fraud period.[5] This resulted in a total of just 416 institutional shareholders and a total of only 139,611,930 damaged shares. *See id.* at ¶ 28. Having identified a conservative estimate of damaged shares, he reasonably assumed that the purchases of damaged shares were distributed across the days of the fraud period in the same proportion as trading volume on those days. *See id.* at ¶ 29. Mr. Davis then multiplied the resulting number of estimated traded shares by the per-share daily inflation for each day of the fraud period, and summed the losses for all days. *Id.* On the basis of his modified event study/leakage approach, he estimated the loss as a result of the instant fraud at $1.2 to $1.4 billion. *See id.* at ¶ 30. Using the standard event study/non-leakage approach, Mr. Davis conservatively estimated the loss as a result of the fraud at $543 to $598 million. *Id.*[6] For his

---

[5] Mr. Davis did not include those shares sold *during* the fraud, but at prices that were less inflated than their purchase price. *See* Attachment 19 (Davis Report) at ¶ 24. He also restricted his estimate by considering the shares of AIG stock held by just three categories of institutional investors and ignoring entirely the holdings of individual investors.

[6] Mr. Davis concluded that reliance only on the standard event study/non-leakage approach does not capture the full injury to shareholders. "[F]or a fraud which is revealed slowly over time, the event study approach is likely to significantly understate the true damages" because it only captures the difference between the predicted and actual return on statistically

standard event study/non-leakage approach, Mr. Davis also provided alternative estimates of loss based on only two of the three relevant event dates. *See* Attachment 22 (Davis Rebuttal) at ¶ 16. The losses ranged from $344 to $420 million. *Id.*

Because his estimates of loss, and the methodology used to produce them, are reasonable and exclude losses from causes other than the LPT fraud, and both of his primary estimates exceed the highest rung on the guidelines fraud table, the Court should find that loss exceeds $400 million and apply a 30-level increase in the base offense level. *See* U.S.S.G. § 2B1.1, Commentary, App. Note 3(C) and 2B1.1(b)(1).

### d.    Defense "Critiques" of the Government's Loss Event Study

In stark contrast to Mr. Davis' comprehensive methodology, Dr. Stulz did not conduct an independent loss event study to reasonably calculate loss, but only critiqued Mr. Davis' report. Significantly, Stulz's critique does *not* find fault in (1) Mr. Davis' application of regression analyses[7]; (2) Mr. Davis' sample estimation windows to compare AIG's stock price to the market and industry indices; (3) the determination of the number of "damaged shares"; (4) or even the fact that the movement in the price of AIG's stock on February 14, 2005 and March 14 and 15, 2005, was statistically significant. Rather, Stulz levels two primary criticisms of Mr. Davis' methodology. First, he claims that Mr. Davis' standard event study/non-leakage approach relied on statistically-significant dates (February 14, 2005 and March 14 and 15, 2005) that were either irrelevant or on which no *new* news about the LPT was reported. Second, he claims that Mr. Davis' modified event study/leakage approach has no basis in the scientific peer

---

significant dates. Attachment 22 (Davis Rebuttal) at ¶ 7 (*quoting* Cornell & Morgan, 37 *UCLA L. Rev.* at 906).

[7]Stulz in fact attempts to replicate Mr. Davis' use of regression analysis. *See* Attachment 28 (Stulz Critique) at ¶ 6.

literature, that the disclosure window is too long, and that the analysis is fatally contaminated by "confounding" news.

Stulz's critiques fail to demonstrate that Mr. Davis' methodology is unreasonable. First, Stulz challenges Mr. Davis' standard event study/non leakage approach. Stulz is incorrect in his assertions that there was no LPT-related news on the three statistically significant dates cited by Mr. Davis. Stulz asserts there was no LPT news on February 14, 2005. Attachment 28 (Stulz Critique) at ¶ 25. As the defendants have already conceded, the SEC subpoena that AIG disclosed on February 14, 2005, was related to the LPT transaction. *See* Attachment 26 (Stipulation, Gov't Ex. 243). The fact that the market only learned of an inquiry into finite insurance transactions on that date does not mean the information is *unrelated* to the LPT, as Stulz asserts.

Stulz also asserts that there was no new LPT news on March 14, 2005. Attachment 28 (Stulz Critique) at ¶ 34. Stulz first claims that the market already had been apprised of Greenberg's role in the LPT transaction. Yet, AIG previously had not confirmed this fact. The March 14, 2005 reports of Greenberg's impending departure thus amounted to news because they were tantamount to AIG's first acknowledgment of the seriousness of the fraud allegations and Greenberg's central role in the fraud. *See* Attachment 22 (Davis Rebuttal) at ¶ 12. Stulz further argues that the market's reaction to Greenberg's resignation cannot be attributed to the LPT fraud. Significantly, Stulz does not (and cannot) claim that Greenberg was not significantly involved in the LPT fraud and that his personal involvement and refusal to cooperate in the government investigation of it prompted his resignation. *See, e.g.,* Attachment 29 (Zarb Memorandum of Interview, November 13, 2007) (citing Greenberg's decision to invoke his fifth amendment rights in connection with the Gen Re investigation as the reason for the Board's

26

recommendation that he be replaced as CEO). Stulz conveniently claims that the market was reacting simply to Greenberg's resignation and the void it left at AIG, not the cause of his resignation, which was a company decision. Attachment 28 (Stulz Critique) at ¶ 36-37 ("The negative abnormal return on that date could simply be an indication that investors believed that Mr. Greenberg, an insurance industry icon, should not have been forced out of the company."). While Stulz is free to speculate as to the market's collective motives, the fact remains that Greenberg's personal involvement in the LPT fraud prompted his resignation, and when his impending resignation was reported on March 14, 2005, AIG's stock price dropped significantly. Even if the speculation in which Stulz engages was appropriate, his conclusion is wrong. Rather than responding to the Greenberg void, it is far more likely that the market reacted because it lost faith in the integrity of the company's management and the accuracy of its past financial statements as a result of the reports that its CEO personally participated in the LPT fraud. This is especially likely given AIG's settlement of the PNC/Brightpoint investigation only four months earlier and Greenberg's characterization of the accounting irregularities related to it as a one-time event. *See* Attachment 30 (AIG Press Release, "AIG Announces Final Settlement with Securities and Exchange Commission and the U.S. Department of Justice on Brightpoint, Inc., and the PNC Financial Services Group, Inc." (November 30, 2004)) ("AIG Chairman M.R. Greenberg said, 'This comprehensive settlement brings finality to the claims raised by the SEC and the Department of Justice. . . We have always sought to adhere to the highest ethical standards and ensure that we are in compliance with the applicable laws and regulations that govern our businesses around the world. . . AIG has been forming a Complex Structured Finance Transaction Committee. . . This committee will help assure that no product we market. . . is sold to assist a counterparty or an insured to misrepresent either its income statement or balance

sheet.").  In other words, the market likely felt duped and no longer trusted that AIG was what it seemed to be.

Finally, Stulz asserts that there was no further market reaction on March 15, 2005, to the announcement of Greenberg's departure, because that information had been digested by March 14, 2005.  Attachment 28 (Stulz Critique) at ¶¶ 38-40.  To support his argument, Stulz cites a single Market Watch article on the morning of March 14, 2005 reporting that Greenberg stated he would depart.  Attachment 31 (Stulz Sur-Rebuttal Critique) at ¶ 27 (citing MarketWatch article at 9:42 a.m. EST that reported that Greenberg "told CNBC that he would step down.").  Yet, Stulz fails to address why articles later in the day did not treat Greenberg's departure as a *fait accompli*.  *See, e.g.,* Attachment 32 (Associated Press Financial Wire, "CEO Changes, Merger News Boosts Stocks" (March 14, 2005, 11:24 a.m. EST)) ("AIG lost $1.16 to $63.55 after The Wall Street Journal reported that Maurice "Hank" Greenberg *could be* stepping down *as early as this week*. . . [Greenberg] has been criticized for the insurance company's mounting regulatory troubles.") (emphasis added); Attachment 33 (Financial Times information, "Nightly Business Report" (March 14, 2005)) ("There are reports *tonight* that. . . Greenberg is stepping down as CEO.  Greenberg is *expected to resign* as chief executive tonight. . . Analysts say regulatory scrutiny is at the center of the change. . ..") (emphasis added).  Indeed, CNBC – the network cited in Stulz's lone MarketWatch article – reported at approximately 5 p.m. EST on the "Kudlow & Company" segment that "[m]eanwhile, Maurice "Hank" Greenberg *looks set to resign* from AIG."  Attachment 34 (CNBC News Transcripts, Kudlow & Company (March 14, 2005 at 5:00 p.m. EST)) (emphasis added).  Plainly, and contrary to Stulz's suggestions otherwise, the story concerning Greenberg's impending resignation was fluid, and hence relevant to the market, until AIG formally announced it at 10:01 p.m. EST on March 14 and the market

28

reacted to it on the next market day.  *See, supra,* Attachment 27 (AIG Press Release (March 14, 2005 10:01 p.m. EST)); *see also* Attachment 28 (Stulz Critique) at p. 17, n.33; Attachment 22 (Davis Rebuttal) at ¶13.[8]

Moreover, Stulz erroneously dismisses other LPT-related news that was relevant to the market's reaction on March 15, 2005.   He claims that AIG's announcement that CFO Howard Smith had taken leave, that AIG would delay the filing of its 2004 Form 10-K, and that rating agencies downgraded AIG were unrelated to the LPT fraud.  Attachment 28 (Stulz Critique) at ¶ 40.  He is mistaken.  As the trial evidence demonstrated, CFO Smith was intimately involved in the LPT fraud,[9] and ultimately was terminated by AIG because of his failure to cooperate in the government investigation into the LPT and other frauds.  *See* Attachment 22 (Davis Rebuttal) at ¶ 15 n. 12 (citing Insurance Journal article entitled "AIG's CFO, VP are Latest Victims of Spitzer Investigation" that reported that Smith was terminated for his refusal to cooperate with the government investigations of reinsurance transactions including the Gen Re transaction).  Moreover, AIG announced that the delay in filing its 10-K, in part, was the result of "the Company's ongoing review of the accounting for certain transactions, which review was commenced with previously announced regulatory activities."  *See, supra,* Attachment 27 (AIG

---

[8] Dr. Stulz concedes that news that occurs near or after the close of the markets can affect the price of the stock the next day.  Attachment 28 (Stulz Critique) at ¶ 12, n. 5 ("In certain circumstances it is necessary to look at the price movement on the trading day following the event.  This is true when the event occurs on a non-trading day or very close to or after the closing of the markets.").  Here, the market could not have fully digested the information about Greenberg's departure until March 15, 2005.

[9] *See, e.g.,* Attachment 35 (Gov't Ex. 31) ("Howie [Smith] and Chris [Milton] will be the point people at AIG"); Attachment 36 (Milton Ex. 8) ("The fee to GCR will be 1% or $5m. . . We need to work out a mechanism for GCR to recover the 2% fee advanced to AIG under the agreement.  You [Milton], Howie Smith, Betsy Monrad and I [Napier] have been appointed to work out the details"); Attachment 37 (Stipulation, Milton Ex. 93) (Milton Ex. 8 produced from Smith's files and handwriting thereon is Smith's).

Press Release (March 14, 2005)).  Again, as the defendants conceded, the LPT fraud was a subject of this review.  Gov't Ex. 243; *see also* Attachment 22 (Davis Rebuttal) at ¶ 15.  Finally, even articles cited by Stulz couple the rating downgrade and the LPT investigation.  *See id.* (citing BusinessWire article re Fitch downgrade) ("Today's rating action reflects Fitch's view that the 'AAA' rating. . . has been further pressured by the negative circumstances surrounding recent government investigations into select business practices of AIG and members of its management.").  Additionally, Stulz fails to address that AIG also scheduled a conference call with the investment community for 9:00 a.m. EST on March 15, 2005 that was broadcasted live on the internet, presumably to discuss the matters disclosed in the press release the night before.  *See supra,* Attachment 27 (AIG Press Release (March 14, 2005)).  Plainly, these significant LPT-related news items made the reaction of the market on March 15, 2005 relevant, and Stulz's convenient claims otherwise lack merit.

In addition to his critique of Mr. Davis' standard event study/non-leakage approach, Stulz also challenges Mr. Davis' modified event study/leakage approach.  Attachment 31 (Stulz Sur-Rebuttal Critique) at ¶¶ 6-21.  Stulz's critique betrays his fundamental misunderstanding of Mr. Davis' approach and mistakenly suggests that it is supported only by a single law review article.  *Id.* at ¶¶ 16-20.   Again, he is mistaken.  As used by Mr. Davis, the concept of leakage finds

significant support in peer literature.[10]  For instance, Dr. Hakala, a renowned economist and

financial analyst, and his co-authors observed:

> A full and complete revelation of the fraud, in a single blinding moment, is exceedingly rare. . . Dissipation [of an inflated stock price] often occurs as the market reacts to recurrent, partial revelations of [fraud]. . . This is known as leakage. . . Bits *and* pieces of reports or disclosures may have one meaning to investors initially, but that understanding may be significantly altered by third-party investigations, follow-up news reports, industry announcements, additional company disclosures, and other occurrences.  Thus, inflation in the price of a security may be dissipated over time as a result of a series of partial disclosures or occurrences up until the point that inflation is extinguished.

Thorsen, Kaplan, and Hakala, 6 *Journal of Business & Securities Law* at 102-03.  Likewise, the

courts have recognized the concept of leakage, as used by Mr. Davis.

> The point to be pled and proven is that the stock price declined as the market learned the truth; the amount of decline attributable to the market's change from deceived to knowing is the measure of the plaintiff's loss.  But the cases cited are perfectly consistent with the possibility that the market learned the truth gradually, and in advance of the defendant's eventual disclosure. . . The plaintiff must, indeed, plead that the price declined as the truth emerged, but she need not allege that it happened on a single day.

*Swack v.Credit Suisse First Boston,* 383 F. Supp. 2d 223, 243-44 (D. Mass. 2004); *see also*

*Fogarazzo v. Lehman Bros., Inc.,* 341 F. Supp. 2d 274, 292 (S.D.N.Y. 2004) ("plaintiffs here

have alleged a number of events that operated, essentially, as disclosures or market

corrections"); *Davis v. USN Communications, Inc.,* 73 F. Supp. 2d 923, 943 (N.D. Ill. 1999)

("the market responded to and 'corrected' the price of USN stock over the better part of a year as

---

[10] *See, supra,* Bhagat and Romano, 4 *American Law and Economics Review* at 380; Cornell and Morgan, 37 *UCLA Law Review* at 883; Thorsen, Kaplan, and Hakala, 6 *Journal of Business & Securities Law* at 93; *see also* Ragothanman, Srinivasum and Bublitz, Bruce, *An Empirical Analysis of the Impact of Asset Writedown Disclosures on Stockholder Wealth,* 35 Quarterly J. Bus. & Econ. 3, 32 (Jun. 1996) ("Specifying a date when information reaches the market is not always feasible; information can reach the market gradually through many sources. . . Thus, in all prior studies the precise identification of an event date is a problem; the market seems to have alternative sources of information.").

bits and pieces of negative information became available and it became apparent that USN was

not capable of performing as originally represented.").

     To address the problem of leakage, the peer literature suggests the modified event study

employed by Mr. Davis. *See* Thorsen, Kaplan, and Hakala, 6 *Journal of Business & Securities*

*Law* at 111-12 ("To address these situations [leakage], event studies may consider 'event

windows' of several days over time, looking at joint statistical significance. In other words, if

there are bits and pieces of bad news that cumulate over time, the aggregate effect will need to

be considered. A day where movement is not statistically significant may be part of a series of

days which, taken together, are highly statistically significant. . . Where these situations are

involved, the event study cannot reliably confine itself to whether the stock price dropped

significantly on one particular day."); Cornell & Morgan, 37 *UCLA Law Review* at 906 (When a

fraud is revealed slowly over time, the event study should "extend the observation window

surrounding the disclosure date. . . The window begins far enough in advance of the disclosure

for the analyst to be reasonably confident that no significant leakage has occurred. . . The

window ends at a date when the analyst feels confident that most of the information is publicly

available. . ..").

     Further, Stulz's factual critique of Mr. Davis' modified event study approach fails as

well. Attachment 31 (Stulz Sur-Rebuttal Critique) at ¶¶ 12-15. Primarily, Stulz argues there is

no evidence leakage occurred between February 14, 2005 and March 15, 2005, and that the

disclosure window should end by March 4, 2005 because all critical details of the LPT

transaction were public by that date. *Id.* at ¶ 14-15. As set forth in greater detail above, Stulz

ignores that new facts about the LPT investigation gradually emerged in the financial press

throughout the month and investors were not fully informed about the LPT transaction until

March 15, 2005.  *See, e.g.,* Attachment 38 (Gov't Ex. 244A); Attachment 39 (Gov't Ex. 245A).

That investors were not fully informed is supported by their increasingly frequent inquiries about

the LPT transaction for weeks after the disclosure of the subpoena on February 14, 2005.  *See*

Attachment 23 (Tr. at 302-304; 371-72) (Hamrah) (investors called with increasing frequency

about the Gen Re transaction over the "next few weeks" after February 14, 2005); Attachment 24

(Tr. at 3590-3611) (Cohen) (clients asked about SEC and NYAG subpoenas and news about the

LPT in financial press from February 14 through March 14); *see also* Attachment 40 (Gov't Ex.

305) (Cohen February 18, 2005 report discussing the lack of details about the structure of the

LPT transaction and the difficulty of conducting a full analysis).  Moreover, Greenberg's

personal involvement in the LPT transaction and AIG's public confirmation of that fact, one of

the most critical details of the LPT transaction, was not resolved by March 4, 2005; it was

resolved by March 15, 2005.  For the foregoing reasons, Mr. Davis properly considered the

entire event window from February 14, 2005, to March 15, 2005.

Finally, Stulz levels criticism that Mr. Davis failed to account for "confounding" AIG-

specific news during the month-long disclosure window.  Attachment 28 (Stulz Critique) at ¶¶

26-31.  Stulz identifies reports of a February 24, 2005 product recall in the United Kingdom, a

February 25, 2005 article about alleged self-dealing betwen C.V. Starr and AIG, a February 28,

2005 announcement of the investigation of Coral Re and C.V. Starr by the NYAG, and a March

2, 2005 article with additional details about the Coral Re investigation.  *Id.*  Yet, because Stulz

failed to perform his own event study, he makes no effort to quantify the alleged significance of

the so-called confounding news he cites.  Instead, he simply assumes that these events had some

significance to the market.  For any global financial services company, like AIG, there will be

multiple, daily news reports.  But much of it is insignificant to the market.  Indeed, much of the

33

"news" Stulz cites already had been digested by the market. *See* Attachment 22 (Davis Rebuttal) at ¶ 9 n. 8 ("Furthermore, the news on February 25, 2005, February 28, 2005, and March 2, 2005, dealing with Coral Re and C.V. Starr were not really news. The relationship between AIG and Coral Re and C.V. Starr had been previously investigated and had been discussed in the press in the 1990s.") (citing news articles). Even if it had not been digested by the market, such news paled in comparison to the significance of the news of the LPT investigation. It cannot be disputed that the LPT investigation was of primary and growing importance to investors and analysts over the course of the month. *See, supra,* Attachment 23 (Tr. at 302-304; 371-72) (Hamrah); Attachment 24 (Tr. at 3590-3611) (Cohen); Attachment 40 (Gov't Ex. 305). Notwithstanding, even excluding the four reports of confounding "news" Stulz cites (the only four over the course of an entire month), Mr. Davis still estimated the loss at between $630 and $891 million. *See* Attachment 22 (Davis Rebuttal) at ¶ 9. In sum, Stulz's criticisms -- while necessary for him to support his conclusion that the LPT fraud resulted in absolutely no loss to AIG shareholders -- are too convenient to be reliable and do little to undermine the reasonableness of Mr. Davis' methodology and conclusions.

### e.    Alternative Loss Calculation

Should the Court disagree with the government and conclude that there is a loss but it reasonably cannot be determined, the Court can apply gain as an alternative measure of loss. *See* U.S.S.G. ¶ 2B1.1, Commentary, App. Note 3(B) ("The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."). Ordinarily, however, using gain as an alternative to loss underestimates the full impact of the fraud. *See United States v. Rosen,* 409 F.3d 535, 550-51 (2d Cir. 2005) (observing

34

that "the court may instead measure loss by reference to the defendant's gains, although using gain as a basis 'ordinarily will underestimate the loss.'") (quoting U.S.S.G. § 2F1.1, Application Note 8 (Nov. 1995)).  Here, should the Court apply gain, the most appropriate measure of gain is the $495 million gain to AIG, the principal actor whose securities fraud on investors the defendants have been convicted of aiding and abetting.

As this Court observed, "if an insurance company's loss reserves are too low, in the future the company could have to take money away from profits to pay for claims it previously did not adequately account for."  *Ferguson,* 553 F. Supp.2d at 155 (citing Tr. at 407-11, 419-20 (Schroeder); 3549-50 (Cohen)).  In the fourth quarter of 2000 and the first quarter of 2001, AIG avoided taking an expense to income in the amount of $500 million for $500 in loss reserves because of the sham LPT.  Thus, by falsely booking $500 million in loss reserves and premium without actually expensing for it, AIG in essence realized an inappropriate financial gain of $500 million.  This amount, $500 million, minus the $5 million in cash AIG paid to Gen Re, for a total of $495 million, is AIG's actual gain from the fraud.  *See* Addenda to PSRs.  The $495 million gain to AIG is therefore the proper measure of alternative gain for guidelines purposes, not the lesser $5 million gain to Gen Re.  *See* U.S.S.G. § 1B1.1, Commentary, App. Note 5 ("Where two or more guideline provisions appear equally applicable, but the guidelines authorize the application of only one such provision, use the provision that results in the greater offense level."); U.S.S.G. § 2B1.1(b)(1) (Fraud Table) (for loss, "[a]pply the greatest").  Accordingly, and in the alternative to loss, the PSR should be amended to reflect a gain of greater than $400 million and a 30-level increase in the base offense level.  *See* U.S.S.G. § 2B1.1, Commentary, App. Note 3(B) and 2B1.1(b)(1).

The government anticipates that the defendants will argue that AIG did not actually gain

$495 million because the the LPT transaction resulted in no impact on net income in AIG's

financial statements and AIG did not actually receive $495 million in cash. Significantly,

however, the defendants' argument presumes the validity of what the evidence proved was a

sham LPT transaction. Neither the $500 million in revenue on AIG's books, nor the $500

million in corresponding loss reserves, can be credited in any way; they were false entries that

have no basis in fact. That they netted to zero, thus, is a red herring. The reality is that the LPT

fraud staved off a $500 million increase in AIG's loss reserves for over four years, an expense

which necessarily would have been deducted from AIG's bottom line. Contrary to the

defendants' suggestions, absent the LPT fraud, a $500 million increase in AIG's loss reserves

was a near certainty. There can be little doubt that, in the third quarter of 2000, the market

perceived AIG as having reduced its reserves to meet its earnings targets and that Maurice

Greenberg was extremely sensitive to the market's negative reaction. *See, supra,* Attachment 13

(*Wall Street Journal,* "AIG Posts a Profit, But Investors Focus On Reserve Release" (October

27, 2000)); Attachment 17 (Tr. at 497 (Schroeder)); *see also* Attachment 41 (Tr. at 244)

(Hamrah) (Greenberg had a "high interest" in AIG's daily stock price and "viewed it as a report

card for him."); Attachment 42 (Tr. at 249) (Hamrah) (Greenberg was "unhappy" when the stock

price declined by 6 percent after AIG disclosed its loss reserves numbers for the third quarter of

2000). Had Greenberg not initiated the LPT fraud, he certainly would not have tolerated a

second and third consecutive quarter of declining loss reserves (by an ever increasing

magnitude), and the resulting, further reduction in AIG's share price. Rather, he would have

been forced to "come to the confessional" and increase reserves by approximately $500 million

(to make up for the consecutive $59 million, $144 million and $186 million shortfalls in reserves

in the third quarter of 2000, the fourth quarter of 2000 and the first quarter of 2001,

36

respectively).  *See* Attachment 43 (Tr. at 415-16) (Schroeder).  As a result of the LPT fraud,

Greenberg and AIG avoided taking a charge to earnings and thereby gained $495 million.  That

AIG did not receive the $495 million in a cash transfer makes it no less of a gain to AIG.

Alternatively, should the Court not apply $495 million gain, it can apply the $5 million

gain to co-schemer, Gen Re, as the PSR did.  The defendants' critiques of the $5 million to the

probation officer gain are specious.  Primarily, they bootstrap Stulz's "finding" (unsupported by

his own event study) that there was zero loss (not that there was a loss but that it could not

reasonably be determined) and claim, thus, there can be no gain.  Circularly, they then reason

that the $5 million gain does not bear a logical relationship to the loss to AIG shareholders (a

loss which they claim does not exist).  Plainly, their arguments betray what they truly seek: a

complete windfall.  They are not entitled to it.  *See Ebbers,* 458 F.3d at 127.  The $5 million fee

to Gen Re was clearly a gain to co-schemer Gen Re.  *See Ferguson*, 553 F. Supp.2d at 151

("[T]hrough a separate, secret side deal, AIG paid Gen Re $5 million to undertake the

transaction and repaid Gen Re for the $10 million in premium it paid under the written

contracts.").  That the defendants and their co-conspirators used a series of contracts and wire

transfers to distribute the $5 million fee and $10 million premium payback back to Gen Re is of

no import, as this Court recognized in denying the defendants' Rule 29 motions.  *See Ferguson*,

553 F. Supp.2d at 160 (noting how the $5 million was paid to Gen Re and stating that the

evidence showed that "AIG paid Gen Re an additional $5 million for undertaking the

transaction").

**2.    Sophisticated Means**

The government agrees with the PSR that a two-level increase for sophisticated means is

appropriate under U.S.S.G. § 2B1.1(b)(9)(C).  PSR at ¶ 36 (Ferguson); PSR at ¶ 43 (Garand);

PSR at ¶ 36 (Graham); PSR at ¶ 36 (Milton); PSR at ¶ 35 (Monrad).


### 3.        Number of Victims

The government agrees with the PSR that a six-level increase for more than 250 victims

is appropriate under § 2B1.1(b)(2)(C).  PSR at ¶ 37 (Ferguson); PSR at ¶ 44 (Garand); PSR at

¶ 37 (Graham); PSR at ¶ 37 (Milton); PSR at ¶ 36 (Monrad).


### 4.        Milton as Officer of a Public Company

The government objects to the failure of the PSR to increase defendant Milton's offense

level by 4 levels under U.S.S.G. § 2B1.1(b)(15)(A) for having been an officer of AIG, a

publicly-traded company, during the securities fraud offense conduct for which he and the other

four defendants were found guilty.[11]

U.S.S.G. § 2B1.1(b)(15) provides in relevant part as follows:

> If the offense involved –
>
> (A)     a violation of securities law and, at the time of the offense, the
>         defendant was (i) an officer or a director of a publicly traded
>         company . . . .
>
> increase by 4 levels.

---

[11]  After the first disclosure of the PSR, the government objected to the PSR's failure to provide for the enhancement, and defendant Milton did not contest the application of the enhancement.  *See* Attachment 48 (Ltr., T. Sivitz to USPO Paul Collette, dated Aug. 4, 2008) (stating in response to the government's objection only that "should the final PSR contain this 4-level enhancement, the 2-level enhancement for abuse of position of trust pursuant to § 3B1.3 may not also be given.").  The addendum to the PSR, however, did not address the government's objection, but rather erroneously stated that government had objected to the lack of a role enhancement for defendant Milton.

The jury convicted defendant Milton and the other four defendants of conspiracy to commit securities fraud (Count 1) and seven substantive counts of securities fraud (Counts 2-5, 8-10), among other violations, and it is undisputable that at the time of the offenses defendant Milton was an officer of AIG, a publicly-traded company.  *See* Attachment 44 (Gov't Ex. 147, at p.135 (AIG 2000 Annual Report); Attachment 45 (Gov't Ex. 225, at p.153 (AIG 2001 Annual Report); Attachment 46 (Gov't Ex. 235, at p.169 (AIG 2002 Annual Report); Attachment 47 (Gov't Ex. 239, at p.55 (AIG 2003 Annual Report).  The PSR should have applied the enhancement and increased defendant Milton's offense level by 4 levels.[12]

### 5.    Role in the Offense

The government objects to the absence of any aggravating role enhancement for defendant Ferguson and defendant Monrad.  Defendant Ferguson was an organizer and leader of a criminal activity that involved five or more participants, and therefore his offense level should have been increased by 4 levels.  Defendant Monrad was a manager and supervisor of criminal activity that involved five or more participants, and therefore her offense level should have been increased by 3 levels.

### a.    Defendant Ferguson as Organizer/Leader

U.S.S.G. § 3B1.1, Aggravating Role, provides as follows:

---

[12]  The PSR for defendant Milton provides for a 2-level enhancement for abuse of position of trust.  *See* PSR at ¶ 38.  However, the government agrees with defendant Milton that the 2-level enhancement for abuse of trust may not also be given if the court finds that a four-level enhancement under § 2B1.1(b)(15)(A) applies.  *See* § 2B1.1, Application Note 14 (C) ("If subsection (b)(15) applies, do not apply § 3B1.3").

Based on defendant's role in the offense, increase the offense level as follows:

(a)    If the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b)    If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels. . . .

Here, it is clear that the criminal activity involved five or more participants, as five defendants were convicted of all counts charged against each of them in the Superseding Indictment, including conspiracy. There were also seven additional individuals named as unindicted co-conspirators.

It is equally clear that defendant Ferguson was a leader in the criminal activity. He was the Chief Executive Officer of General Reinsurance Corporation, and all three of the other Gen Re defendants were his subordinates within the Gen Re corporate structure, as were the two cooperating witnesses who pled guilty. *See* U.S.S.G. § 3B1.1, Application Note 4 (stating that "the degree of control and authority exercised over others" is a factor to be considered for role enhancement). But beyond the fact that Ferguson was the CEO and a leader within Gen Re, Ferguson was a leader of *this* criminal activity. *See United States v. Beaulieau*, 959 F.2d 375, 379-80 (2d Cir. 1992) ("Whether a defendant is considered a leader depends upon the degree of discretion exercised by him, the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy.").

This Court recognized Ferguson's leadership and organization role in its denial of defendant Ferguson's motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. This Court found that "Ferguson tasked [Napier] with coordinating the deal

40

at Gen Re." *Ferguson*, 553 F. Supp.2d at 156.  The Court also stated that the evidence showed

that "[a]fter Ferguson's conversation with Greenberg, Ferguson charged Napier with

coordinating a response to Greenberg's request."  *Id.* at 158.  As the Chief Executive Officer of

Gen Re, Ferguson was, after all, Napier's boss, as well as everyone else's at Gen Re.

There was an abundance of evidence at trial to show that Ferguson was a leader and

organizer of the criminal activity for which he and the other four defendants were convicted.  For

example, in an email dated November 7, 2000, Ferguson instructs Napier to "keep him posted"

and not "to make any pricing commitments or even pricing suggestions without talking to me."

Attachment 49 (Gov't Ex. 9).  As CEO, defendant Ferguson was also the head of the Gen Re

Executive Committee, or "EC," and thus had final authority as to whether the LPT deal would be

approved or not given its "reputation risk."  In a conference call on November 15, 2000,

Houldsworth and Monrad discuss as much:

| | |
|---|---|
| HOULDSWORTH: | The real risk, uh, Betsy, I think, is, uh, rep-, is clearly reputational in there, um, but, I mean, you guys can judge that because that's a U. S. reputational risk.  It's not over here. |
| MONRAD: | Yeah.  That's an EC decision. |
| HOULDSWORTH: | Yeah. |
| MONRAD: | I think (unintelligible) know what's on the table there. |

Attachment 50 (Gov't Ex. 24 at 7).  Richard Napier testified that on that same day (November

15, 2000), he, Monrad and Ferguson met about the LPT and discussed, among other things, the

reputational risk that Ferguson would have to consider:  "And then there was a further discussion

that the reputational risk again was something that Betsy brought up and said the reputational

risk is something we're putting on your [Ron's] desk because it's something that we can't opine

41

on." Napier testified that Ferguson "accepted the point." Attachment 51 (Tr. at 807 (Vol. IV)). *See* U.S.S.G. § 3B1.1, Application Note 4 (stating that "the exercise of decision making authority" is a factor to be considered for role enhancement).

Defendant Ferguson had all of the high-level, CEO-to-CEO discussions with then-AIG CEO Hank Greenberg about the LPT. Richard Napier kept Ferguson updated on the relevant developments about the deal that were occurring among those, such as Napier, whom Ferguson tasked with making the deal happen. *See, e.g.*, Attachment 52 (Gov't Ex. 31 (Napier email dated Nov. 17, 2000)); Attachment 53 (Tr. at 945 (Vol. V)) (Napier testimony about "keeping Ron in the loop of what our progress was"). Moreover, as the trial evidence showed, defendant Ferguson admonished individuals at Gen Re to keep the number of people involved in the fraudulent transaction limited: "Note to all – let's keep the circle of people involved in this as tight as possible." Attachment 52 (Gov't Ex. 31 (Ferguson email dated Nov. 17, 2000)). *See also* Attachment 54 (Tr. at 2140 (Vol. X)) (Houldsworth: "She [Monrad] specifically said that Ron had requested that the contract be kept as confidential as possible.").

That Ferguson was a leader of the criminal conspiracy is made plain by the fact that defendant Ferguson personally negotiated the terms of the fraudulent deal with then-AIG CEO Hank Greenberg, and he is the one who ultimately agreed to do the deal on behalf of Gen Re. As Napier stated to Houldsworth in a telephone call on December 8, 2000:

> NAPIER:    It's a done deal because Hank and, Hank and Ron talked and, uh, uh, although I had been making rumblings about ten million dollars for it, uh, you know, they, they talked about it and, uh, they came to terms at five million and, uh, predictably once Hank said yeah, that sounds like a good deal uh, there's no more negotiating –
>
> HOULDSWORTH:    Yeah. Okay.

Attachment 55 (Gov't Ex. 50A at 5).

42

In December 2000, when it was clear the LPT was going to get done and AIG was going to get what they wanted and needed – an artificial boost of their loss reserve numbers – it was defendant Ferguson who, as CEO and the leader of the criminal conspiracy within Gen Re, praised his subordinates for getting the deal done:  "Thank you all for working on this matter – it seems to be very very high profile at AIG and is much appreciated."  Attachment 56 (Gov't Ex. 85 (Ferguson email dated Dec. 22, 2000)).

Furthermore, it was defendant Ferguson who ultimately made the call that Gen Re would do the LPT deal notwithstanding the fact that it involved serious risk.  As defendant Robert Graham stated to his boss, Timothy McCaffrey, the General Counsel of Gen Re:

> Our group will book the transaction as a deposit.  How AIG books it is between them, their accountant, and God; there is no undertaking by them to have the transaction reviewed by their regulators.
>
> Ron et al have been advised of, and have accepted, the potential risk that US regulators (insurance and securities) may attack the transaction and our part in it.

Attachment 57 (Gov't Ex. 84).  Clearly, defendant Ferguson was a leader of the criminal conspiracy at the heart of this case, and his offense level should be increased by 4 levels as a result.

### b.    Defendant Monrad as Manager/Supervisor

As to defendant Monrad, the evidence shows that she acted as a manager and supervisor of the criminal activity.  The Second Circuit has stated that "[a] defendant may properly be considered a manager or supervisor if he 'exercised some degree of control over others involved in the commission of the offense . . . or played a significant role in the decision to recruit or to supervise lower-level participants.'"  *United States v. Garcia*, 413 F.3d 201, 223 (2d Cir. 2005)

(quoting *United States v. Burgos*, 324 F.3d 88, 92 (2d Cir. 2003)).

As this Court found in connection with its denial of the Rule 29 motions, defendant Monrad recruited John Houldsworth, who was junior to her (Attachment 58 (Tr. at 2167)), "to work on the deal." *Ferguson*, 553 F. Supp.2d at 155, 160 n.19 ("After being recruited to work on the deal by defendant Monrad, [Houldsworth] drafted the initial contract that ultimately became the LPT."); *see* U.S.S.G. § 3B1.1, Application Note 4 (stating that "recruitment of accomplices" is a factor to be considered). The Second Circuit has held that the recruitment of a single individual is sufficient for this enhancement to apply. *See Garcia*, 413 F.3d at 223 (finding recruitment of another alone sufficient to support adjustment); *United States v. Greenfield*, 44 F.3d 1141, 1147 (2d Cir. 1995) (considering recruitment of another confederate as evidence of supervisory role under § 3B1.1); *see also United States v. Payne*, 63 F.3d 1200, 1212 (2d Cir. 1995) (managing or supervising a single other participant is sufficient for enhancement to apply). As Chief Financial Officer, Monrad was a senior officer at Gen Re. Monrad told Houldsworth when she recruited him to work on the deal that defendant Ferguson was involved in the deal. Attachment 59 (Tr. at 2138-40 (Vol. X)). Houldsworth testified that he and others at Cologne Re – effectively the European operation of Gen Re – "wanted to do our best" and "to effectively respond positively to a request from senior management in Stamford." Attachment 60 (Tr. at 2704 (Vol. XIII)).

Monrad played a managerial and supervisory role in seeing that the LPT got done in accordance with CEO Ferguson's wishes and in the time frame needed by Greenberg, Milton and AIG. For instance, Monrad led the conference call that she, Garand, Graham and Napier had with Milton and AIG on November 20, 2000, in which Monrad stated that Gen Re would be deposit accounting for the transaction. Attachment 61 (Tr. at 890 (Vol. IV)).

44

Moreover, Monrad led the way in making sure that Gen Re would not be out any money in the transaction, including the $10 million that on paper was supposed to be the "premium" for the LPT. *See, e.g.*, Attachment 62 (Monrad Email to Houldsworth and Napier, Jan. 4, 2001) ("As we discussed, we need to resolve how we recover the LPT premium in addition to the fee."). And Monrad led the conspirators within Gen Re in not just making sure that Gen Re was not out $10 million, but that it looked like Gen Re paid a legitimate premium of $10 million:

> MONRAD:      I think for paper trail purposes we want to make all the gross cash
>                            flows, which, I presume, is what you'd, you expect too.
> HOULDSWORTH:   Yes.
> MONRAD:      I mean, you need to have a wire that shows --
> HOULDSWORTH:  Yep.  Yep.
> MONRAD:      -- ten million at some point left your account --
> HOULDSWORTH:  Yep.
> MONRAD:       -- and we need –
> NAPIER:          (Unintelligible).
> MONRAD:      -- them to give us ten million back.

Attachment 63(Gov't Ex. 54A at 10 (Dec. 8, 2000 recorded telephone conversation)).  Monrad was a manager and supervisor of the criminal conspiracy for which she and the other defendants were convicted and her offense level should be increased by 3 levels.

### 6.      Abuse of Position of Trust/Use of Special Skill

The government agrees with the PSR that the offense level for defendants Monrad and Graham should be increased by 2 levels under U.S.S.G. § 3B1.3.  As set forth below, it is the government's position that the basis for this enhancement is Monrad's and Graham's use of a

special skill.[13]

Section 3B1.3 of the Sentencing Guidelines provides for a two-level enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."  U.S.S.G. § 3B1.3.  The commentary to Section 3B1.3 defines "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training, or licensing.  Examples would include pilots, lawyers, doctors, accountants . . . ." *Id.*  Cmt. n. 4.  "In general, for § 3B1.3 to apply, the government must establish: (1) that the defendant possessed a special skill or occupied a position of trust, and (2) that he or she used this skill or position 'in a manner to significantly facilitate' the offense of conviction."  *United States v. Downing,* 297 F.3d 52, 64 (2d Cir. 2002); *see also United States v. Fritzson,* 979 F.2d 21, 22 (2d Cir. 1992) (holding that "[t]he fact that the same offenses could have been committed by a person without the defendant's special training is immaterial; a §3B1.3 adjustment is proper where the defendant's special skills increase his chances of succeeding or of avoiding detection.").  Pursuant to Section 3B1.3, the base offense level for defendants Monrad and Graham should be increased by two levels because they used a special skill that significantly facilitated and concealed the instant fraud.  U.S.S.G. § 3B1.3.[14]

---

[13]  However, as noted above, notwithstanding the PSR's finding to the contrary, the government does not believe that a two-level enhancement for abuse of position of trust can be supported for defendants Ferguson or Garand.

[14]  Should the Court impose a role enhancement for defendant Monrad under Section 3B1.1, as requested by the government, an enhancement under Section 3B1.3 would not apply. *See* U.S.S.G. §3B1.3 ("[I]f this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under §3B1.1.").

### a.    Defendant Monrad

Defendant Monrad is a certified public accountant and an experienced auditor.  After graduating from MIT with a Masters in Science, defendant Monrad became a Certified Public Accountant in 1982.  *See* Attachment 64 at 1 (Monrad 3/29/05 MOI).  From 1980 until 1992, defendant Monrad worked for Coopers & Lybrand as an auditor.  *Id.*  She was promoted from staff associate to junior partner to audit partner in 1988.  *Id.*  As an auditor, she was primarily responsible for the audits of insurance companies.  From 1986 to 1987, she taught auditing at Boston University.  *Id.*  Beginning in 1992, at Gen Re, she held several positions for which she had accounting responsibilities, including comptroller, Chief Financial Officer of the North American Operations Group, and ultimately Chief Financial Officer for all of Gen Re.  *Id.* at 1-2.

Defendant Monrad's specialized training and experience as an accountant and auditor significantly facilitated the commission and concealment of the LPT fraud and an enhancement under Section 3B1.3 is therefore warranted.  *See, e.g., Downing,* 297 F.3d at 64-64 (holding that district court properly applied § 3B1.3 to accountants who conspired to, but did not actually, use their accounting skills to falsify audit reports in stock manipulation scheme); *Fritzson,* 979 F.2d at 22-23 (district court did not abuse its discretion in applying special skill enhancement for accountant in tax fraud prosecution whose "knowledge of withholding process, including the roles of the claim and transmittal documents, and how an when to file them, exceeds the knowledge of the average person"); *United States v. Rice,* 52 F.3d 843 (10th Cir. 1995) (despite district court's failure to make a specific finding, district court did not abuse its discretion in applying special skill enhancement for accountant who created S corporations as part of scheme to obtain tax refunds); *United States v. Kaufman*, 800 F.Supp. 648 (N.D. Ind. 1992) (accountant's knowledge of bookkeeping system was a "special skill" that helped him avoid

detection for embezzling funds from accounting firm and succeed in his crime of making false statements on income tax returns). As an accountant, defendant Monrad understood AIG's purpose for the LPT transaction (to increase loss reserves without assuming risk) and how AIG intended to account for it (as a risk transaction that would increase both revenues and loss reserves). As a former auditor, she knew what documents and records auditors would scrutinize in connection with a purported risk transaction and how to make them appear legitimate, or not create them at all to conceal the fraudulent secret side deal. Her appreciation for these issues significantly helped the LPT fraud succeed and avoid detection by AIG's auditors and regulators.

For instance, on November 15, 2001, Mr. Houldsworth explained to defendant Monrad that CRD likely would deposit account for the transaction because there was "no risk transfer," effectively making the transaction "disappear" from both sides of CRD's balance sheet. *See* Attachment 65 (Gov't Ex. 24A at 3). Defendant Monrad recognized that a risk-free deal that CRD accounted for as a deposit might undermine AIG's intended accounting: "they may have a tough time getting the accounting they want . . . out of the deal they want to do." *Id.* at 4. To her, if CRD deposited accounted for the transaction and collapsed it on both sides of the balance sheet, the question was "can AIG get away with that [accounting for it differently as a risk deal]?" *Id.* at 5. She also understood that for AIG to get risk accounting treatment, the contracts had to make it appear as if AIG was assuming risk. So, she inquired about the limits of liability and observed, "[y]ou went up to 600 million. . . So that sounds like some risk." *Id.* at 12-13. Her appreciation for the necessity of the appearance of risk transfer, so AIG could achieve risk accounting, contributed to the creation of the sham contracts.

During the same call, defendant Monrad counseled her co-conspirators against using written letters to memorialize the side deal. Mr. Napier asked "is it totally inappropriate to have

any written documentation of what the [no-risk side] agreement is?" *Id.* at 21. Drawing on her accounting and auditing experience, defendant Monrad counseled against it: "Those always get a little tricky because sometimes firms - I don't know if AIG feels this way - they feel obliged to show their auditors them . . . and while it's not contractual . . . it works and sometimes it didn't. We had one client in the Midwest where the kind of side letter got to the auditors and it wasn't helpful . . . Uh, but on our side, the auditors didn't care." *Id.* at 22. The conspirators heeded her concerns and advice. That the $10 million rebate, the $5 million fee, and the no risk nature of the deal were not ultimately reduced to writing significantly facilitated concealing the LPT fraud from AIG's auditors and regulators.

Further, on December 8, 2001, defendant Monrad instructed co-conspirators Houldsworth and Napier on the creation of wire transfer records. *See* Attachment 63 (Gov't Ex. 54A at 9-10). She stated, "I'd like if this could go, this funding could almost be . . . go round trip . . . through different bank accounts . . . I think for *paper trail purposes* we want to make all the gross cash flows . . . I mean, you need to have a wire that *shows* . . . ten million at some point left your account . . . and we *need* . . . them to give us ten million back." *Id* (emphasis added). Based on her experience as an auditor, defendant Monrad understood that auditors would attempt to reconcile cash payments with the terms of the bogus written contracts and would be looking for a "paper trail" that "show[ed]" the outgoing $10 million cash premium payment from Gen Re to AIG. Conversely, while there was a "need" for AIG to rebate the $10 million to Gen Re through the CCA deal, there would be no paper trail showing the link between the two transactions. Ultimately, on December 28, 2001, the conspirators followed defendant Monrad's advice and wired $10 million in a "round trip" from HSB (AIG) to Gen Re to CRD and back to AIG for no other purpose than to mislead AIG's auditors. Her instructions on whether or not to

create records and documents had the cumulative effect of making it significantly more difficult for the LPT fraud to be detected.  Accordingly, she deserves a two-level enhancement under U.S.S.G. § 3B1.3 for use of a special skill.

### b.    Defendant Robert Graham

Defendant Graham has been a lawyer since 1973.  For six months in 1976, he was an Assistant Public Defender in Delaware.  He worked in private practice from 1976 to 1986 as a commercial lawyer, specializing in insurance.  Since 1986, he worked in the Gen Re General Counsel's office.  *See* Attachment 66 at 1 (Graham 3/22/05 FBI-302).  At Gen Re, defendant Graham was active with various insurance regulatory bodies, including work for the Accounting Practices and Procedures Task Force of the National Association of Insurance Commissioners. *Id.* at 2.  Defendant Graham also was responsible for SEC reporting for both Gen Re and its subsidiaries.  *Id.*  Graham was responsible for reviewing contracts for Gen Re's finite insurance department and providing advice on regulatory issues.  *Id.*  Indeed, he was the "resident expert" at Gen Re on legal matters pertaining to finite reinsurance.  *Id.*  In this role, defendant Graham once advised Gen Re employees (including defendants Garand and Monrad who received copies of the email) that they never should agree to unwritten side agreements.  *See* Attachment 67 (GR1 0126766-71; GR1_0126696-97).  Rather, he advised them that any non-contractual understandings should be in writing and explicitly state that they are unenforceable because "a properly worded letter of understanding presents no fraud or RICO problems.  So you won't go to jail." *Id.*

Defendant Graham used his training and experience as an insurance lawyer and regulatory expert to significantly facilitate and conceal the LPT fraud, and his base offense level should be enhanced under Section 3B1.3 as a result.  *See, e.g., United States v. Reich,* 479 F.3d

179 (2d Cir. 2007) (defendant used his special skills as a lawyer to create a forged judicial order that he faxed to counsel for brokerage firm that had brought action to enjoin defendant and others from arbitrating against it); *United States v. Harris,* 38 F.3d 95, 99 (2d Cir. 1994) (upholding enhancement for defendant who "used lawyering skill instrumental to his schemes"); *see also United States v. Ross,* 190 F.3d 446 (6th Cir. 1999) (defendant attorney provided legal assistance to co-conspirators; co-conspirators relied on defendant for assistance because he was an attorney).[15]  Specifically, defendant Graham drafted the bogus contracts, *see, e.g.,* Attachments 68 (Gov't Ex. 58), 69 (Gov't Ex. 83) and 70 (Gov't Ex. 89), and suggested edits to the fake offer letter that made it appear more legitimate.  Further, he counseled his co-conspirators on structures that would make the LPT transaction, and Gen Re's role in it, less visible to AIG's regulators.

For instance, after a November 20, 2000 conference call with defendant Milton, defendant Graham drew on knowledge of insurance regulations and his experience with insurance regulators and suggested to defendant Garand, defendant Monrad, and Mr. Napier using an offshore AIG entity to conceal CRD and Gen Re's involvement in the LPT transaction: "[t]he benefit of this approach would be that, since the AIG US entities would report the AIG non-US entity as cedants on Schedules F and P, any reviewer of the AIG US entity's statements wouldn't be able to connect the dots to CRD and beyond."  Attachment 71 (Gov't Ex. 43). Plainly, he intended his legal advice to help conceal the LPT transaction.[16]

---

[15]  *See also United States v. Rybicki,* 2002 WL 655214 at **5 (2d Cir. 2002) (unpublished summary order) (lawyers who represented personal injury clients in insurance fraud prosecution properly received special skill enhancement).

[16]  That AIG ultimately did not use an offshore entity as Graham suggested is immaterial. *See Downing,* 297 F.3d at 65 (enhancement under section 3B1.3 applies even to inchoate offenses, so long as the court "determines with reasonable certainty that the defendant actually

On December 8, 2000, defendant Graham applied his knowledge of holding company regulations and advised his co-conspirators to create a structure that would not implicate those regulations and trigger scrutiny: "since the fee rebate [$10 million from AIG to Gen Re] will be coming from the CCA commission. . . we should be careful with intercompany transfers.  If they are reportable under the holding company act, a curious outside party could deduce that there is a link between the transactions."  Attachment 72 (Gov't Ex. 57).  Again, defendant Graham's legal advice was directed at helping conceal the $10 million fee rebate from AIG's regulators.

Moreover, on December 15, 2000, defendant Graham provided advice to Houldsworth and Napier to make the fake offer letter appear legitimate.  *See* Attachment 73 (Gov't Ex. 68).  In particular, defendant Graham advised including a provision that would allow AIG to examine CRD's claim files (under a confidentiality agreement) because refusing such access would be "something that I would think would be difficult to swallow - I know I'd advise against any of our companies agreeing to such a provision . . . ."  *Id.*  The draft letter was amended to reflect defendant Graham's suggestion.  *See* Attachment 74 (Gov't Ex. 69).  The absence of a provision allowing a reinsurance company to verify claims would likely have raised a red flag for AIG's auditors and regulators.

Finally, in a telephone call on December 27, 2007, Houldsworth asked defendant Graham whether CRD or Gen Re should send the contract correspondence to AIG.  Defendant Graham, sensitive to creating paper trails as a result of his position as an attorney, advised Houldsworth that correspondence on the LPT deal should be between CRD and AIG, not Gen Re and AIG: "I think the answer is you need to send it . . . because it's your, your company . . . that's doing the

intended to use his or her special skill or position of trust.").

deal . . . .  It's perfectly okay for our guys to have meetings and conversations, but any paper trails ought really to lead to Dublin."  Attachment 75 (Gov't Ex. 87A at 5).  Thus, defendant Graham's advice had the effect of further concealing Gen Re's involvement in the deal.  Cumulatively, defendant Graham's advice had the effect of helping to legitimize the bogus documents and conceal the fraud by virtue of its structure, and accordingly, an enhancement under U.S.S.G. § 3B1.3 is warranted.

**<u>Conclusion</u>**

For the reasons set forth above, the Court should sentence the defendants to a substantial period of incarceration, taking into consideration the sentencing guidelines range and the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

NORA R. DANNEHY
ACTING UNITED STATES ATTORNEY

ERIC J. GLOVER
RAYMOND E. PATRICCO, JR.
ASSISTANT UNITED STATES ATTORNEYS

PAUL E. PELLETIER, PRINCIPAL DEPUTY CHIEF
ADAM SAFWAT, TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

<u>CERTIFICATION</u>

I hereby certify that on September 5, 2008, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


ERIC J. GLOVER
ASSISTANT U.S. ATTORNEY