# UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Crim. No. 3:06 CR 137 (CFD) |
| RONALD E. FERGUSON, | ) | |
| CHRISTOPHER P. GARAND, | ) | |
| ROBERT D. GRAHAM, | ) | |
| CHRISTIAN M. MILTON and | ) | |
| ELIZABETH A. MONRAD, | ) | |
| | ) | |
| *Defendants.* | ) | |

## DEFENDANT RONALD E. FERGUSON'S
## SUPPLEMENTAL SENTENCING MEMORANDUM

## [REDACTED]

Dated: November 21, 2008

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

POINT I      MR. FERGUSON'S EXCEPTIONAL HISTORY AND
CHARACTERISTICS WARRANT A LENIENT SENTENCE............................3

POINT II    MR. FERGUSON'S EXCEPTIONAL HISTORY AND
CHARACTERISTICS CANNOT LEGITIMATELY BE TAINTED BY
THE CORAL RE ▇▇▇▇▇▇ TRANSACTIONS ...................................................7

      A.     The Coral Re/ Astral Re Transaction.........................................................7

      B.     ▇▇▇▇▇▇▇▇▇▇▇▇▇▇.................................................................................10

POINT III   MR. FERGUSON'S INVOLVEMENT IN THE LPT DOES NOT
WARRANT AN AGGRAVATING ROLE ENHANCEMENT ..........................14

      A.     Mr. Ferguson Had No Motive for Personal Financial Gain or
Career Enhancement and Received No Personal Financial Gain or
Career Enhancement ................................................................................15

      B.     Mr. Ferguson Did Not Make Any Alleged Misstatements to the
Investing Public ......................................................................................17

      C.     Mr. Ferguson Was Not Present When the Idea of a No Risk
Transaction was Conceived .....................................................................18

      D.     John Houldsworth Was the Leader of the LPT..........................................20

      E.     Mr. Ferguson Took Steps to Involve Gatekeepers And Did Not
"Task" Any Subordinates with Carrying Out a Fraud ...............................21

      F.     Nine of the Sixteen Counts Were Based on Misstatements Issued
After Mr. Ferguson Was No Longer CEO..................................................22

      G.     Mr. Ferguson Was Not on Any of the Recorded Phone Calls and
Only a Few E-Mails .................................................................................23

POINT IV   ANYTHING MORE THAN A LENIENT SENTENCE WOULD
RESULT IN UNWARRANTED SENTENCE DISPARITIES ...........................24

      A.     Five of the Defendants In Cases Cited By the Prosecution Were
Involved in Massive Frauds Causing the Demise or Crippling of
Their Companies.......................................................................................26

      B.     The Remaining Defendants Cited by the Prosecution Were All
Involved in Frauds Motivated by Greed ...................................................27

POINT V    ANYTHING MORE THAN A LENIENT SENTENCE IS
UNNECESSARY TO ACHIEVE ADEQUATE DETERRENCE........................30

i

POINT VI    ANYTHING MORE THAN A LENIENT SENTENCE IS
UNWARRANTED IN LIGHT OF THE NATURE, CIRCUMSTANCES
AND SERIOUSNESS OF THE OFFENSE ..........................................................34

    A.    The Prosecution's Affirmative Arguments as to Why the Nature of
the LPT Was Especially Serious Should Be Rejected ..............................35

    B.    The Prosecution's Response to Mr. Ferguson's Arguments
Concerning the Nature, Circumstances and Seriousness of the LPT
Should Be Rejected ................................................................................35

CONCLUSION ....................................................................................................................39

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES:**

*Bennett v. United States*, 2006 U.S. Dist. LEXIS 12395 (S.D.N.Y. March 22, 2006)..................27

*Cushing v. United States*, 543 U.S. 1106 (2005) ..........................................................................24

*Gall v. United States*, 128 S. Ct. 586 (2007)..................................................................1, 2, 34

*Griffin v. Wisconsin*, 483 U.S. 868 (1987)..................................................................................2

*Kimbrough v. United States*, 128 S. Ct. 558 (2007) ....................................................................2

*Koon v. United States*, 518 U.S. 81 (1996)..................................................................................7

*New Hampshire v. Maine*, 532 U.S. 742 (2001)..........................................................................23

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) .......................................... passim

*United States v. Arthur ,*2006 U.S. Dist. LEXIS 93819 (E.D. Wis. Dec. 22, 2006).......................6

*United States v. Bifield*, 42. F. Supp. 2d 477 (M.D. Pa. 1999) ....................................................19

*United States v. Bennett*, 252 F.3d 559 (2d Cir. 2001) ................................................................27

*United States v. Bennett*, 2000 U.S. Dist. LEXIS 4928 (S.D.N.Y. Apr. 18, 2000) ......................27

*United States v. Booker*, 543 U.S. 220 (2005) ...............................................................................1

*United States v. Broderson*, 67 F.3d 452 (2d Cir. 1995) ..............................................................36

*United States v. Causey*, 2005 U.S. Dist. LEXIS 39619 (S.D. Tex. Dec. 28, 2005)....................26

*United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005)..................................................................2

*United States v. Cushing*, 99 Fed. Appx. 269 (2d Cir. 2004) ......................................................28

*United States v. Cushing*, 2002 U.S. Dist. LEXIS 10926 (S.D.N.Y. June 18, 2002)....................28

*United States v. Cutler*, 520 F.3d 136 (2d Cir. 2008) .......................................... 30, 35-36

*United States v. Earls*, 157 Fed. Appx. 421 (2d Cir. 2005) ........................................................28

*United States v. Earls*, 2004 U.S. Dist. LEXIS 12295 (S.D.N.Y. July 2, 2004) ..........................28

*United States v. Earls*, 2004 U.S. Dist. LEXIS 2758 (S.D.N.Y. Feb. 25, 2004)..........................28

*United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006) .................................................26

*United States v. Ferguson*, 553 F. Supp. 2d 145 (D. Conn. 2008) ..............................20

*United States v. Forbes*, 2007 WL 141952 (D. Conn. Jan. 17, 2007) .........................27

*United States v. Grabske*, 260 F. Supp. 2d 866 (N.D. Cal. 2002) ...............................29

*United States v. Hotte*, 1999 U.S. App. LEXIS 20142 (2d Cir. Aug. 20, 1999) .........28

*United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992) .................................................7

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) .....................................................2

*United States v. Jones*, 460 F.3d 191 (2d Cir. 2006) .................................................1, 2

*United States v. Knights*, 534 U.S. 112 (2001) ..............................................................2

*United States v. Martin*, 455 F.3d 1227 (11th Cir. 2006) ...........................................33

*United States v. McClatchey*, 316 F.3d 1122 (10th Cir. 2003) ....................................17

*United States v. Olis*, 2006 U.S. Dist. LEXIS 68281 (S.D. Tex. Sept. 22, 2006) .........28, 36

*United States v. Olis*, 429 F.3d 540 (5th Cir. 2005) .....................................................28

*United States v. Reyes*, 2007 U.S. Dist. LEXIS 66074 (N.D. Cal. Aug. 29, 2007) .....29

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) ...............................................24, 26

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007) ..............................................24

*United States v. Seacott*, 15 F.3d 1380 (7th Cir. 1994) ...............................................36

*United States v. Serafini*, 233 F.3d 758 (3d Cir. 2000) .................................................6

*United States v. Smith*, 951 F.2d 1164 (10th Cir. 1991) ..............................................22

*United States v. Sturgent*, 2006 U.S. Dist. LEXIS 62698 (E.D.N.Y. Sept. 1, 2006).....27

*United States v. Trupin*, 475 F.3d 71 (2d Cir. 2007) ...................................................34

*Wight v. BankAmerica Corp.*, 219 F.3d 79 (2d Cir. 2000) ...........................................23

## STATUTES & OTHER AUTHORITIES:

18 U.S.C. (Westlaw 2008)
    § 3553(a)(1)(B) ..................................................................................31
    § 3553(a)(2)(B) ..................................................................................31

iv

U.S.S.G.
§ 2A1.1 ..................................................................................................25
§ 2M1.1 .................................................................................................25
§ 2M6.1 .................................................................................................25
§ 3B1.1(a) .............................................................................................15
§ 3B1.1(a), App. Note 4 ........................................................................15

Securities Exchange Act of 1934, § 10A. ..................................................11

SEC Litigation Release No. 19159, *SEC Charges 7 Former Impath Executives with Financial Fraud*, March 29, 2005 ..........................................................27

SEC Litigation Release No. 17602, *United States v. Mitchell H. Cushing, S3 00-CR-1089* (WHP) (S.D.N.Y.), dated July 9, 2002 .....................................................28

Oliver August, *Cendant to cut 2000 jobs in US Shake-Up*, Times Newspapers (Oct. 13, 1998) ........................................................................................................27

Laurie Cohen, *Dynegy Ex-Lawyer Olis Gets Prison Term Cut to Six Years*, Wall St. J. (Sept. 23, 2006) ....................................................................................28

Chip Cummins, "*Dynegy Replaces Financial Chief*," Wall St. J. (Jun. 20, 2002) ........28

David Dankwa, *Future impact: the use of finite reinsurance is tied to federal guilty verdicts*, 108 A.M. Best Company, Inc. 12 (April 1, 2008) ....................................32

Richard Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005) ..........................32

Jamie L. Gustafson, *Cracking Down on White-Collar Crime: An Analysis of the Recent Trend of Severe Sentences for Corporate Officers*, 40 Suffolk U. L. Rev. 685 (2007) ..........34

*Metro News Briefs: New York; 30-Year Sentence Given for a Pyramid Scheme*, New York Times, Apr. 29, 2000 ......................................................................................27

*Monday Morning: Weekly Electronic Business Update for Health Industry Executives*, No. 305, Nov. 23, 1998 ..................................................................................28

C. O'Connell, *Contract Certainty: A Market Driven Approach*, (6/21/06) ..................32

Dionne Searcey, et al., *Ebbers is Sentenced to 25 Years for $11 Billion WorldCom Fraud*, Wall St. J. (July 14, 2005) ..........................................................................26

*Sentence in Impath Fraud*, New York Times, May 31, 2006 .....................................27

Professor J. Kelly Strader, *White Collar Crime and Punishment: Reflections on Michael, Martha, and Milberg Weiss*, 15 Geo. Mason L. Rev. 45, 102 (2007) ....................33

*The Enron Verdicts*, Wall Street Journal (May 26, 2006) .........................................26

Defendant Ronald E. Ferguson, by his attorneys, respectfully submits this supplemental brief concerning his individual sentencing issues.

## PRELIMINARY STATEMENT

In January, Mr. Ferguson, a first-offender, will be 67 years old.  In those 67 years – as chronicled in the *379* individual letters submitted on his behalf, as well as the actuarial community letter signed by *225* actuaries – Mr. Ferguson has lived an exemplary life, in which he has demonstrated not only an abiding commitment to honesty, integrity, caring and kindness, but to cultivating those virtues in others.[1]

Now, Mr. Ferguson's life is literally in the hands of the Court.  The advisory U.S. Sentencing Guidelines (the "Guidelines") suggest that Mr. Ferguson – who did not have any personal financial or career-enhancement motive – should be given the same sentence as if he had committed first-degree murder: life imprisonment.  Clearly, this case represents yet another example where the Guidelines in a securities-fraud prosecution "have so run amok that they are patently absurd on their face." *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006).[2]

Fortunately, the Guidelines are no longer mandatory.  *See United States v. Booker*, 543 U.S. 220 (2005).  In fact, courts may "not presume that the Guidelines range is reasonable." *Gall v. United States*, 128 S. Ct. 586, 596-97 (2007).  On the contrary, courts have broad discretion, are free to apply their "own sense of what is a fair and just sentence under all circumstances" (*United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006)) and "may [even] vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines."

---

[1]   An additional seven individual letters of support have been received and submitted to the Probation Department since the initial submission of 372 individual letters for a total of 379 individual letters.

[2]   Mr. Ferguson incorporates by reference (i) the argument made in Elizabeth Monrad's Supplemental Sentencing Memorandum, filed today, that a lengthy sentence driven by the non-jury finding of loss violates the Sixth Amendment; and (ii) the arguments made in the other defendants' supplemental sentencing memoranda, filed today, that the offense level overstates the seriousness of the offense; and that a downward departure is warranted in light of substantially overlapping enhancements.

*Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007) (citation and alteration marks omitted); *accord United States v. Jones*, 531 F.3d 163, 172 (2d Cir. 2008).

The United States Supreme Court has made clear that a sentencing court "must make an individualized assessment" of Mr. Ferguson based on the § 3553(a) factors, which it is obligated to consider (including Mr. Ferguson's age, status as a first-offender, and extraordinary life). *Gall*, 128 S. Ct. at 597; *Kimbrough*, 128 S. Ct. at 570; *accord id.* at 577 (Scalia, J., concurring) ("the district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines"); *Jones*, 460 F.3d at 194 (Judge Newman stating that sentencing judges have an "obligation" to consider the § 3553(a) factors).[3]

In applying the § 3553(a) factors, Congress has made clear that a court must impose a sentence that is "sufficient" but not any "greater than necessary," to accomplish the goals of sentencing. 18 U.S.C. § 3553(a). Here, based on all of the § 3553(a) factors, we respectfully submit that a short sentence that includes community service, along with any other sanctions that the Court deems necessary, would be "sufficient" in this particular case. As Judge Rakoff noted in *Adelson*, 441 F. Supp. 2d at 514, there exists "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective "white collar' offenders."[4]

---

[3] The prosecution quotes cases pre-dating *Gall*, *Rita*, and *Kimbrough*, and then, citing *Crosby,* tells this Court that "[t]he Second Circuit has instructed district judges to consider the Guidelines 'faithfully' when sentencing. *See* Gov't Sent. Memo. [Dkt. # 1115]. In actuality, Judge Newman wrote in *Crosby* that sentencing judges were expected "faithfully to discharge their statutory obligation to 'consider' the Guidelines *and all of the other factors listed in section 3553(a).*" *United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005) (emphasis added).

[4] Indeed, the Supreme Court has repeatedly explained that even probationary sentences are significant sentences. For example, in *Gall*, the Court stated:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty . . .

128 S. Ct. at 595, citing *United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)); and Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957) ("Probation is not granted out of

Moreover, given the likely physical and psychological toll that imprisonment would take, anything beyond a very short sentence could well spell life imprisonment for Mr. Ferguson, a 67-year-old man who has suffered a near-fatal brain hemorrhage.  It would also extinguish Mr. Ferguson's hope and plan to serve society as an ordained minister.  Courts have frequently imposed reduced non-Guidelines sentences on elderly defendants to avoid extinguishing all hope and leaving them with nothing to look forward to beyond prison.  *See* Mr. Ferguson's Sent. Memo. [Dkt. # 1131] ("Initial Memo") at 91-93, n.51.

**POINT I**

**MR. FERGUSON'S EXCEPTIONAL HISTORY AND
CHARACTERISTICS WARRANT A LENIENT SENTENCE**

Mr. Ferguson not only has a record of distinguished and exceptional service to his country, his profession, his religious community and family, he has displayed an unwavering lifelong commitment to integrity, honesty, generosity, humility and faith.  Perhaps most extraordinary, he has promoted a culture of caring and charity at Gen Re and a culture of integrity at Gen Re, in the actuarial community and the insurance industry as a whole, as well as at every company on whose board he served.

The sheer number of individuals supporting Mr. Ferguson reflects the degree to which Mr. Ferguson touched so many lives in so many positive ways.  The prosecution seeks to trivialize this outpouring of support for Mr. Ferguson, by noting that "excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her."  Gov't Resp. to Mr. Ferguson's Sent. Memo. [Dkt. # 1143] ("Gov't Reply") at 9.  But what is completely "out of the ordinary" about the substance of the letters written by so many on Mr. Ferguson's behalf is the fact that he is not merely described as a good or even very good man, but as one of the very best, most honest, honorable, decent, caring, kind,

---

a spirit of leniency . . . .  As the Wickersham Commission said, probation is not merely 'letting an offender off easily'").

spiritual and ethical persons they have ever known. In the words of George Estes, a former Gen Re executive: "[I]n all my years in the insurance industry, I can count on one hand those who might even approach Ron Ferguson in terms of character and integrity." Initial Memo at 4.

In other words, the letters are not mere "excellent character references;" they explicitly compare Mr. Ferguson to many others in comparable positions and put him at the very top of the list. *See* Initial Memo at 5-7, 23-38. Moreover, they do more than laud Mr. Ferguson's personal characteristics or the way he comports himself; they describe Mr. Ferguson as someone who has inspired and guided countless others toward a more virtuous path, who consistently served as the "strongest moral compass" in every community or group of which he was a part. *Id.* at 17-20, 46-63.

In Mr. Ferguson's Initial Memo, his remarkable personal history and characteristics were revealed through the words of literally hundreds of individuals who actually know him. Although Mr. Ferguson is universally described by those who have known him (including Mr. Napier (*see* Tr. at 1618) and Ms. Rizzi (*see* Tr. at 1874-75)) as a man of uncommon humility and modesty, the prosecution, in its sentencing submission, portrays Mr. Ferguson as a "self-righteous" braggart who spent 88 pages "setting forth why he is 'one of the very best men to walk this earth.'"[5] Gov't Reply at 1, 27. The prosecution's personal attack is unwarranted.

The prosecution also attempts to diminish Mr. Ferguson's extraordinary good works by citing conclusory language from a series of inapposite pre-*Booker* cases to the effect that "white collar criminals . . . 'enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities.'" *Id.* at 22-23 (citations omitted). The fact that others in a comparable position have done good deeds surely does not mean that Mr. Ferguson's good works should not be taken into account for sentencing purposes. But more

---

[5]   Contrary to the prosecution's implication that Mr. Ferguson was describing himself in this way, these were the words of Tom Kellogg, as the Initial Memo expressly stated.

importantly, the facts indisputably reveal Mr. Ferguson's truly exceptional and lifelong dedication to helping others.

Surely, it is unusual for someone in Mr. Ferguson's position to have volunteered thousands of hours mentoring young professionals, fostering actuarial research, and serving on industry boards to promote ethics, education and responsible conduct in the industry. *See* Initial Memo at 46-76.  But what truly sets Mr. Ferguson apart from the typical CEO is that he:

- served as a role model to Gen Re "associates," family, friends, competitors, clients, actuaries and others, demonstrating by example how to lead an ethical, introspective and meaningful life (*id*. at 15-17, 22-63);

- passionately and successfully promoted a culture of integrity, respect, caring and education at Gen Re (*id*. at 12-13, 63-69);

- worked tirelessly to enhance the ethics of the insurance industry and the larger business community (*id*. at 51, 57-63);

- made landmark contributions to actuarial science and to the actuarial community (*id*. at 11-12);

- served his country patriotically when it was suffering through the tragedy of 9/11 (*id*. at 76-78);

- supported his religious community, his family and friends in a myriad of deeply meaningful ways going far beyond financial contributions (*id*. at 84-88); and

- created and promoted a culture of charitable giving and good works at Gen Re, motivating and mobilizing an army of people devoted to helping those less fortunate through a host of charitable activities and good works, and by giving generously to worthy causes (*id*. at 78-81).

In short, Ron Ferguson lives the principle of 'pay it forward' every day – drawing upon his experience, talents and compassion to try to make the world a better place, with no thought of or interest in receiving recognition, reward or *quid pro quo*. *Id*. at 42-43, 46-89; letter of Osner.

Moreover, Mr. Ferguson has been diligently studying for the ministry.  He is "a man on a mission . . . to help as many people as he can, in as many ways as he can, for as long as he can"

(Initial Memo at 15-16, 44-46), so he can "be of service to his fellow man" and "giv[e] back to people" in his community for the remainder of his life.  *Id.* at 44.

"[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance."  *Adelson*, 441 F. Supp. 2d at 513-14.  In this regard, it would be difficult to find a defendant whose lifetime of good works and high character are more deserving of recognition at sentencing than Mr. Ferguson.

Judge Rakoff's words about the defendant in *Adelson* aptly describe Mr. Ferguson: an unassuming man with an "exemplary" history of "good works and deep humanity," who possesses a "generosity of spirit," and an "ever-present willingness to go above and beyond the call of duty to help others," and who is "in the short category of people who we know we can rely on to be there for us no matter what we might need."  *Adelson*, 441 F. Supp. 2d at 513.[6]

While the prosecution fails to cite a single post-*Booker* case in addressing whether a variance is warranted pursuant to § 3553(a) based on a defendant's history and characteristics, even they acknowledge that grounds exist for a downward departure from the Guidelines where the "defendant's record of . . . involvement 'stands out from the crowd.'"  Gov't Reply at 23 (citation omitted).   Mr. Ferguson unquestionably stands out from the crowd.[7]   His honor,

---

[6]   *See also United States v. Arthur,* 2006 U.S. Dist. LEXIS 93819 at *25-27, 29, 34-35 (E.D. Wis. Dec. 22, 2006) (imposing non-Guidelines sentence "substantially below the guideline range" for an attorney convicted of bankruptcy fraud and money laundering conspiracies because, summarizing *twenty-two* letters, the "defendant's character was otherwise outstanding;" she "had a distinguished educational and employment record;" as a nursing home administrator, she showed "intelligence, wisdom, generosity, and integrity," and was praised for "the way she cared about our patients, something that wasn't even really in her job description;" she "led us all by her personal example;" she had a "significant history of good works in other areas;" and she was "someone who is caring, responsible and eager to help others.") (Ex. 1);  *United States v.  Serafini*, 233 F.3d 758, 772, 775 (3d Cir. 2000) (affirming downward departure for a state legislator who had performed "acts of giving time, of giving one's self" which were different from the ordinary elected official or wealthy individual).

[7]   The nature of the good works noted in the cases cited by the prosecution – all pre-*Booker* and from outside the Second Circuit – fall well short of Mr. Ferguson's good works.

decency and good works are surely "present to an exceptional degree." *Koon v. United States*, 518 U.S. 81, 96 (1996).

The "elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed Courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'" *Adelson*, 441 F. Supp. 2d at 514. Nothing "require[s] a judge to leave compassion and common sense at the door to the courtroom." *United States v. Johnson*, 964 F.2d 124, 125 (2d Cir. 1992). We respectfully request that the Court render a compassionate and commonsensical sentence that "weigh[s] the good with bad" and that reflects not merely Mr. Ferguson's aberrant behavior in connection with this single transaction but the entirety of Mr. Ferguson's extraordinary life.

## POINT II

### MR. FERGUSON'S EXCEPTIONAL HISTORY AND CHARACTERISTICS CANNOT LEGITIMATELY BE TAINTED BY THE CORAL RE AND ILFC TRANSACTIONS

In its effort to convince the Court that Mr. Ferguson is not entitled to any leniency under § 3553(a), the prosecution engages in a misguided (and sometimes *ad hominem*) attack on Mr. Ferguson's character (*see, e.g.,* Gov't Reply at 1, 2, 15 n.7, 27) and erroneously claims that under Mr. Ferguson's leadership Gen Re had a "culture of deception and deceit." *Id.* at 15. In doing so, the prosecution points to two transactions involving Gen Re and AIG, which it contends, without any supporting evidence, were shams and that Mr. Ferguson knew were shams. The prosecution's allegations are wrong.

### A.     The Coral Re/ Astral Re Transaction

According to the prosecution, the problematic nature of the Coral Re/Astral Re transaction stems from the fact that "CRD simply passed that reinsurance through to Astral Reinsurance Company, Ltd" and that "CRD's role was to serve as an intermediary between

Coral Re and Astral and thereby obfuscate the link between two AIG-related entities . . . ." Gov't Reply at 12-13.[8]  However, there is no evidence (and the prosecution offers none) (i) that Mr. Ferguson was ever aware of either part of the two-stage transaction (the Coral Re-CRD reinsurance or the CRD-Astral reinsurance) or (ii) that AIG actually *controlled* either Coral Re or Astral (whether they are merely "related" entities not being the relevant inquiry).

The prosecution's argument regarding Mr. Ferguson's knowledge rests on a single piece of evidence – a June 15, 1996 email from Joe Brandon, then Gen Re's CFO, to a group of executives including Mr. Ferguson, James Gustafson (then Gen Re's President and COO), Tom Kellogg (then Gen Re's Executive Vice President), Tad Montross (then Gen Re's Chief Underwriter and now its CEO) and Mr. Garand, relaying, without commentary, a June 14, 1996 Wall Street Journal article.[9]  This article, however, is about Coral Re only, not Astral, and it does *not* conclude that AIG "controls" Coral Re.  To the contrary, the article reports that, while questions have been raised about their relationship, "AIG disclaims ownership of Coral and maintains its accounting is proper" and "vigorously resisted any suggestion that it adopt a different accounting treatment," and that "some financial analysts familiar with the matter accept AIG's explanation of its accounting."  Gov't Reply, Ex. F.

Nevertheless, the prosecution stresses one phrase in one sentence of the article, a phrase highlighted by Mr. Brandon:

> One [financial analyst] also notes that any financial impact of a change in accounting would be muted by the fact that *Coral itself is understood to have a reinsurance contract in place with a large international reinsurer whose independence from AIG is unquestioned.*

---

[8]    The prosecution notes that the transaction was entered into by CRD in 1993, but fails to mention that this was *before Gen Re acquired any interest in CRD*.  It was not until December 1994 that Gen Re acquired a minority interest in Cologne Re, and it was still several years later that Gen Re's ownership interest (direct and indirect) in Cologne Re exceeded 50%.

[9]    The prosecution also claims (again without citing any evidence) that "[s]imilar to the sham LPT in this case, neither Coral Re nor Union Excess ever submitted any accounts to CRD after each calendar year, as the contract required."  Gov't Reply at 14, n.6.  Even if true, there is certainly no evidence Mr. Ferguson was aware of the absence of such accounts.

Gov't Reply at 14 (emphasis added).  The sentence on its face refers only to "a reinsurance contract [Coral was understood to have] in place with a large international reinsurer" – not to the second stage of the Coral/Astral transaction, *i.e.*, the reinsurance from CRD to Astral.  Moreover, the sentence does not seem to refer even to the first stage of the Coral/Astral transaction, *i.e.*, the reinsurance from Coral Re to CRD, because CRD was a tiny 20-person Irish company, not a "large international reinsurer."  On the other hand, it was known that Coral Re entered into a 'stop-loss' reinsurance agreement with Munich Reinsurance Company, a "large international reinsurer whose independence from AIG is unquestioned," which was designed to protect Coral Re from risk in excess of $480 million.  *See* Ex. 2.

The prosecution also never explains how Mr. Ferguson was supposed to figure out that AIG "controlled" Coral Re by reading this news story when the article itself indicates that the Delaware Insurance Department, which conducted a comprehensive examination, had not reached that conclusion.  Indeed, the prosecution fails to inform the Court that even the final Delaware Insurance Department Report of Examination reached no definitive conclusion, merely reciting why "the Department has expressed concerns that Coral Re may be 'under common control with' the AIG group companies . . . ."  Ex. 3.  The Department did not fine AIG or punish it in any way.  Nor did it order AIG to restate its financial statements.  The final Delaware report notes that the law firm of Cahill Gordon & Reindel had opined that AIG did not control Coral Re within the meaning of the New York Insurance Law, and that AIG had "agreed to stop ceding business to Coral Re and commute $100 million of the reinsurance credits currently being taken."  *Id.*

Finally, during the pre-trial Rule 404(b) motion practice, the prosecution effectively conceded that the highlighted statement in the Wall Street Journal article, standing alone, would *not* alert someone that Gen Re's reinsurance of Coral was part of "a sham."  The prosecution acknowledged that such an understanding would require access to certain CRD board materials

that Mr. Ferguson indisputably did *not* see.   Accordingly, the prosecution took the position that the "Coral Re/Union Excess transaction was clearly admissible to show knowledge and intent" on the part of defendants (who it alleged were privy to those other materials), but notably *not* Mr. Ferguson.   Gov't Omnibus Memo. in Opposition to Defendants' Motion to Exclude Evidence the Gov't Has Noticed Under Rule 404(b) at 28, n. 14; 31.   Its reversal of position at sentencing without any additional evidence is unsupportable.

In sum, the prosecution's reliance on the Coral Re transaction is entirely misplaced.

**B.**











## POINT III

### MR. FERGUSON'S INVOLVEMENT IN THE LPT DOES NOT WARRANT AN AGGRAVATING ROLE ENHANCEMENT

As previously demonstrated, an aggravating role enhancement under U.S.S.G. § 3B1.1(a) is not applicable (*see* Initial Memo at 95-97; Ferguson's Response to Gov't Sent. Memo [Dkt. # 1149] ("Ferguson Reply") at 1-25) and the prosecution failed in its Reply to present any additional evidence to support such an enhancement.

Instead, the prosecution unfairly accuses Mr. Ferguson of not being "a profile in courage" who "continues to place the blame for the [LPT]" on his "subordinates." Gov't Reply at 1. Mr. Ferguson is not trying to shift blame to anyone; instead, he is merely responding to the prosecution's effort to enhance his sentence by claiming he is more blameworthy for the charged fraud. Having put that at issue, Mr. Ferguson should not be castigated because his counsel addresses that very question, *i.e.*, the comparative culpability of LPT participants.

The prosecution also takes Mr. Ferguson to task for his "temerity" in suggesting he is less culpable than some of his subordinates given that he "praised his subordinates during the transaction." Gov't Reply at 2. The prosecution's attempt to transform Mr. Ferguson's unfailing politeness, good people-management skills, and a lifelong commitment to giving credit to others (*see* Initial Memo at 13, 66) into inculpatory evidence is unfair.

## A.   Mr. Ferguson Had No Motive for Personal Financial Gain or Career Enhancement and Received No Personal Financial Gain or Career Enhancement

The prosecution concedes that Mr. Ferguson "had no direct personal gain from" the LPT (*see* Gov't Reply at 4), a factor that seriously undermines the prosecution's aggravating role argument and strongly supports Mr. Ferguson's minor role argument. *See* Ferguson Reply at 23-24. But the prosecution nevertheless asserts that Mr. Ferguson had a "profit-oriented motive" to enter the LPT, because "Gen Re gained $5 million in essentially pure profit at no cost or risk to it whatsoever." Gov't Reply at 4-5. This argument is meritless.

First, the prosecution provides no authority for the proposition that gain to one's *employer* is a factor in assessing whether Mr. Ferguson's *individual* role is an "aggravating" one under the Guidelines. An aggravating role enhancement is intended for defendants that "tend to profit *more* from [the crime]" than others. *See* Ferguson Reply at 23-24; quoting U.S.S.G. § 3B1.1(a), Background (emphasis added); *see also* U.S.S.G. § 3B1.1(a), App. Note 4 (factors to consider include "the claimed right to a *larger* share of the fruits of the crime") (emphasis added). That a defendant's employer profits is not evidence that a defendant has "profit[ted]" at all, let alone "more" than anyone else.

Even assuming that the $5 million LPT fee was relevant to an aggravating role enhancement, and constituted a "gain" to Gen Re (*but see* Joint Loss Memo [Dkt. # 1134] at 41-50; Joint Loss Reply [Dkt.# 1150] at 38), the LPT fee was trivial to Gen Re. Initial Memo at 94.

Gen Re's after tax 2000 net income was $417 million. *See* Ex. 24. A $5 million pre-tax fee is indeed negligible in comparison to an after-tax net income of $417 million.[14]

In any event, Gen Re did not even book the LPT fee in 2000 and, thus, it had *zero* impact on Gen Re's net income that year. The LPT fee was first booked by Gen Re in late 2001 *after* Mr. Ferguson had resigned as CEO and no longer had any operational responsibility or influence or control over anyone. *See* Ferguson Reply at 7-8. That year, Gen Re suffered an after-tax $1.435 *billion* net income loss (largely attributable to 9/11 losses). Ex. 25. The LPT fee constituted a negligible 3/10th of 1% (0.3%) of that amount.

Second, the prosecution asserts that Mr. Ferguson was "keen to collect on this $5 million and stayed personally involved to see that it was collected." Gov't Reply at 4. But such a circumstance is hardly sinister and does not support an enhancement since, as the trial evidence demonstrated, the cash fee proposal resulted from a discussion with Mr. Buffett – whom the prosecution has never accused of any wrongdoing – and Mr. Ferguson followed up on the fee in light of Mr. Buffett's inquiries about its status. *See* Ferguson Reply Ex.'s 47, 48 ("Warren, just a quick note to let you know why I hesitated a moment when you mentioned the $5,000,000 fee").[15]

[redacted][16]

Third, the prosecution asserts that the "more important" argument in support of an aggravating role enhancement is that Mr. Ferguson allegedly "revered" Mr. Greenberg. Gov't Reply at 5. We do not understand how a defendant's purported reverence for another person is

---

[14]  Mr. Ferguson's Initial Memo included a typographical error, citing the figure as "$41 million." We apologize for the error.

[15]  To be clear, we are not blaming Mr. Buffett for anything, but simply explaining Mr. Ferguson's interest in learning the status of the fee.

[16]  The prosecution also cites a passage from this Court's Rule 29 decision discussing the fact that Mr. Ferguson "received" e-mails regarding the LPT fee. *See* Gov't Sentencing Reply at 4. Of course, receipt of e-mails does not demonstrate that an aggravating enhancement is warranted.

relevant to an aggravating role enhancement. Moreover, the prosecution cites no evidence to support its assertion that Mr. Ferguson "revered" Mr. Greenberg.

The prosecution next asserts that Mr. Ferguson's motive was to "ingratiate himself" with Mr. Greenberg and AIG. Gov't Reply at 25. Of course Mr. Ferguson wanted to have a strong business relationship with Mr. Greenberg and AIG, just as he (like any other prudent and competent CEO of a financial services company) wanted to have with all clients. But that does not translate into a motive to defraud. In fact, Mr. Napier testified that he never felt pressure from Mr. Ferguson (or anyone else) to grow the AIG business by doing anything improper or illegal or in violation of the Gen Re Code of Conduct. *See* Tr. at 1626.

Finally, the prosecution asserts that Mr. Ferguson's involvement in the LPT was not "selfless" or "altruistic." Gov't Reply at 25.[17] But Mr. Ferguson has never claimed it was, and, in any event, selflessness and altruism are not relevant to an aggravating role enhancement. What is relevant is that Mr. Ferguson had no personal financial or career-enhancing motive to commit the charged fraud, and received no personal financial or career-enhancing benefit.

**B.      Mr. Ferguson Did Not Make Any Alleged Misstatements to the Investing Public**

The prosecution next argues that the fact that Mr. Ferguson did not make any of the alleged misstatements to the investing public should be disregarded because (i) the "goal" of the fraud was "to allow AIG to lie on its financial statements" and (ii) Mr. Ferguson knew that "aid[ing] and abet[ting]" was a crime. Gov't Reply at 5. The prosecution misses the point. While such evidence is necessary to prove the charged crimes, it does not support an aggravating role enhancement. If it did, every defendant convicted of conspiracy to defraud or of aiding and abetting a fraud would warrant such an enhancement.

---

[17]   The prosecution cites *United States v. McClatchey*, 316 F.3d 1122 (10th Cir. 2003), where the court stated "[w]e are not inclined to view an executive's conduct benefitting the employer as selfless." *Id.* at 1134. The immediately preceding sentence, however, makes clear that the "financial security" of the defendant's company (and thus his job) was "closely linked to the success of the . . . scheme." *Id.*

That Mr. Ferguson did not issue any false statements to the public, had no control or influence over anyone at AIG who issued such statements, and actively sought transparency with AIG with respect to Gen Re's accounting treatment of the LPT are, however, relevant mitigating role factors. The prosecution's assertion that "transparency" was the "last thing that Mr. Ferguson wanted in the LPT" (Gov't Reply at 6) is meritless. Neither of the two pieces of evidence cited by the prosecution supports their assertion. First, Mr. Napier's testimony that he had never "received another e-mail like" GX 31 proves nothing because he had never before worked with Mr. Ferguson on finite reinsurance or loss portfolio transactions, and had no substantive involvement on any reinsurance treaties. *See* Tr. at 1224, 1482, 1484, 1636; *see also* Sentencing Reply at 18. Second, Ms. Monrad's recorded statement that "Ron had requested that the contract be kept as confidential as possible," is entirely consistent with Mr. Ferguson's longstanding commitment to respecting client confidentiality and with the Code of Conduct's strict confidentiality policies. Tr. at 1408; *see* Ferguson Reply at 15-19.

## C.   Mr. Ferguson Was Not Present When the Idea of a No Risk Transaction was Conceived

The prosecution unfairly accuses Mr. Ferguson of "continu[ing] to try to make a liar out of Richard Napier." Gov't Reply at 2. The truth is that, in the eight times Mr. Napier is mentioned in Mr. Ferguson's Initial Memo, not once is it suggested that Mr. Napier was a liar; to the contrary, all the cited statements of Mr. Napier are embraced as truthful and accurate, starting with his testimony that the idea of a "no risk" transaction was conceived during a meeting that took place no earlier than November 13, 2000 at which Mr. Ferguson was not present. Initial Memo at 96. Here are the other seven instances:

> (1) Mr. Napier told the prosecution that Ron was "professional and honorable" (*id.* at 28);
>
> (2) Mr. Napier testified to his belief that he was "surrounded by honorable people" at Gen Re. That was no accident. Mr. Napier was surrounded by honorable people at Gen Re because of the culture of integrity Ron promoted so relentlessly throughout his tenure as CEO (*id.* at 50);

(3) Mr. Napier [gave] testimony acknowledging that Ron cared deeply about the Code and expected everyone at Gen Re to comply with it (*id.* at 55);

(4) Mr. Napier confirmed at trial that Ron expected all Gen Re "associates" to say no to deals with which they were uncomfortable (*id.*);

(5) Mr. Ferguson instructed Mr. Napier to be open and transparent with Howie Smith, AIG's "point person" on the LPT and AIG's CFO, Chief Accounting Officer and board member, about Gen Re's intent to account for the LPT as a deposit transaction (*id.* at 94);

(6) Unlike Messrs. Houldsworth and Napier, who admitted they intended to deceive AIG's investors, Mr. Ferguson wanted, and took steps to assure, transparency in the deal (*id.*);

(7) Mr. Ferguson took steps to ensure the involvement in the LPT of those senior executives at Gen Re who would normally play a gatekeeper role to stop any illegal or fraudulent finite reinsurance transaction. In particular, he instructed Mr. Napier that the LPT team had to include "at a minimum," Tom Kellogg, Gen Re's COO, Lee Steeneck, Gen Re's Chief Actuary, and Joe Brandon (*id.* at 96-97).

Although the prosecution does not dispute that Mr. Ferguson did not attend the November 13 meeting, it purports to find it "difficult" to understand "why this fact makes Ferguson less culpable and not *more* culpable." Gov't Reply at 6. This position is meritless. As Mr. Napier testified, the idea of making the LPT a "no risk" transaction – the critical fact that made the LPT a fraud – was conceived without Mr. Ferguson's input, suggestion, or even presence. Surely, this fact does not render someone more culpable under the Guidelines. *See United States v. Bifield*, 42. F. Supp. 2d 477, 486 (M.D. Pa. 1999) (granting the defendant a 3-level mitigating role adjustment because she was not the one who "created the scheme") (vacated and remanded on other grounds).

Likewise, the prosecution's argument that Mr. Ferguson is more culpable because "two days later, on November 15," Mr. Ferguson was "present[ed]" with the idea of a "no-risk LPT structure" and "ultimately made the final decision to proceed," is baseless. Gov't Reply at 6. Mr. Napier testified that Mr. Ferguson was "told" in a "very general high level fashion" that "one thought would be to try something on a non-risk basis." Tr. at 738-39, 1438. When Mr. Ferguson and Mr. Greenberg discussed "the proposed" transaction, it was just that – a

"propos[al]."  Gov't Reply at 6, quoting *United States v. Ferguson*, 553 F. Supp. 2d 145, 160 (D. Conn. 2008).  Mr. Napier expressly testified that in mid-November, "the whole thing [*i.e.*, the LPT] has not been agreed to."  Tr. at 1366.  He further stated in his November 17, 2000 e-mail to Mr. Milton, that the LPT was still in the "discussion" stage, that the proposal was only a "very general overview of the [deal] structure" and that based on "Ron's discussions with MRG," the "very general overview . . . propose[d] . . . appears workable."  Ex. 26.  Indeed, as of November 30, 2000, "the ball [was still] in [the] court" of AIG's "finance folks."  Ex. 27.  Moreover, the prosecution itself recognizes that the LPT deal was not concluded during the November discussion between Mr. Ferguson and Mr. Greenberg by conceding that AIG "did not agree to [the LPT] . . . until December 28, 2000."  Gov't Response to Graham's Sent. Memo. at 13; *see also* Ex. 28.

The "ultimate[] . . . final decision to proceed" was made by the CEO of CRD and the Chief Underwriter of the Alternative Solutions ("Altsol") group, Mr. Houldsworth, after he secured the requisite approval from Mr. Montross.  *See* Ferguson Reply at 11-12.  According to Mr. Houldsworth, under the CRD Underwriting Guidelines which were in force at the time, "the only person who could clear [the LPT] was Tad Montross," now Gen Re's CEO and then its Chief Underwriting Officer.  *See* Tr. at 2369-70.  Mr. Houldsworth also informed the entire CRD Board of Directors about the LPT in accordance with those same underwriting guidelines.  *See* Ex. 29.[18]

## D.    John Houldsworth Was the Leader of the LPT

Although the prosecution concedes that Mr. Houldsworth "drafted the LPT," it incorrectly asserts that Mr. Houldsworth's "draft" contract was "subject to Ron Ferguson's approval," and that Mr. Ferguson "approved it and proposed it to AIG."  Gov't Reply at 6.  Once

---

[18]   The prosecution cites this Court's Rule 29 decision regarding Mr. Ferguson's *knowledge* of the conspiracy.  Gov't Reply at 6.  While knowledge is necessary for a *conviction*, it obviously does not provide a basis for an aggravating role enhancement.

again, the prosecution cites no evidence for this contention.  As mentioned above, according to Mr. Houldsworth's own repeated testimony, it was Mr. Montross that "signed off" on the LPT. Ferguson Reply at 11-12.

**E.     Mr. Ferguson Took Steps to Involve Gatekeepers And Did Not "Task" Any Subordinates with Carrying Out a Fraud**

The prosecution asserts (with no citation) that Mr. Ferguson "tasked" multiple "subordinates" "with carrying out the fraud for him." Gov't Reply at 1. Yet, in its initial brief, the prosecution correctly acknowledged that the *only* person "tasked" by Mr. Ferguson was Mr. Napier. *See* Gov't Sentencing Memo at 40-41. Of course, as Mr. Napier testified, there was nothing illegitimate about the LPT at the time he was so "tasked." *See* Ferguson Reply at 2-5.

As we previously demonstrated, Mr. Ferguson took proactive steps to ensure that all senior executives at Gen Re who would normally play a gatekeeper role in Gen Re's transactions were involved in the LPT.  *See* Initial Memo at 96-97; Ferguson Reply at 18-19.  The prosecution does not dispute this.  Instead, it asserts (once again, without citation) that "any such gatekeeping ceased to function" with respect to the LPT because "Ferguson made clear to all that the LPT was his deal, both initiated within Gen Re and approved by him." Gov't Reply at 7.

While Mr. Napier may have given some vague and conclusory testimony to this effect, he specifically testified that (i) Mr. Ferguson cared deeply about Gen Re's Code of Conduct (Tr. at 1618); (ii) Mr. Ferguson fostered a culture of collaboration at Gen Re and was a consensus builder (Tr. at 1617); (iii) Mr. Ferguson expected all Gen Re 'associates' to say "no" to any illegal or inappropriate deals, or deals that would be contrary to the Code of Conduct (Tr. at 1619); and (iv) Mr. Ferguson did not give any "byes" on the underwriting standards to anyone, including AIG (Tr. at 1622).

Moreover, Mr. Houldsworth confirmed that, despite Mr. Ferguson's involvement in the LPT, Gen Re's internal controls continued to function normally.  In particular, Mr. Houldsworth testified that, as the lead underwriter of the deal, he understood it was necessary (i) to present the LPT to the CRD Board in accordance with CRD's underwriting guidelines, which he did (*see*

Ex. 29), and (ii) to seek approval of the deal from Gen Re's Chief Underwriting Officer, Tad Montross, which he did (Tr. at 2369-70, 2880-81, 3158). Additionally, the multiple gate-keeping steps for any complex Gen Re transaction – including consultation with Gen Re professionals in the areas of tax (Sabella), actuarial (Steeneck), financial (including Brandon), legal (including McCaffrey) and underwriting (Montross, Vukelic, Gerhardt, Houldsworth), as well as Gen Re's independent auditors Deloitte & Touche, in the U.S. and Ireland (Parkin, Fulton) – were followed with respect to the LPT.

Significantly, Mr. Napier testified that Mr. Ferguson did not object to vetting the LPT with any of these professionals. *See* Ferguson Reply at 19. Even more significantly, the prosecution did not offer evidence from a single gatekeeper to support its assertion that "Ferguson made clear *to all*" that they were supposedly *not* to perform their normal gatekeeping functions or comply with the Code of Conduct. Gov't Reply at 7. As dozens of letters from Gen Re "associates" make clear, any such advice would have been contrary to Mr. Ferguson's standing instruction to all of his colleagues to always "do the right thing." *See, e.g.,* letters of Adajian, Ayer, Bovenizer, Casey, Affat, Agin, Domanico, Ahlmann, Fisher, Deutsch, Estes, Kogan, Hickey, Kelly, Mark. In fact, from the outset, Mr. Brandon made clear that he wanted his colleagues to scrupulously carry out their role as gatekeepers in all circumstances: "let us know if you see activities by any member of the Group that you think could cause a loss of either reputation or money." Ferguson Reply at 15 and Ex. 32. In Mr. Ferguson's e-mail to Mr. Brandon, copied to Mr. McCaffrey (Gen Re's General Counsel) and several other members of Gen Re's Legal Department, Mr. Ferguson emphatically responded: "Ditto!" *Id.*

**F.    Nine of the Sixteen Counts Were Based on Misstatements Issued After Mr. Ferguson Was No Longer CEO**

To support an aggravating role enhancement, "the [prosecution] must show that each member of the organization is answerable to the defendant *and is under his continuing control.*" *United States v. Smith*, 951 F.2d 1164, 1170 (10th Cir. 1991) (emphasis added). While the charged conspiracy continued until January 2004, it is indisputable that Mr. Ferguson did *not*

continue to have any control (or even influence) over any of the other participants in the LPT after mid-September 2001. Nevertheless, the prosecution asserts that "each one of the [subsequent] misstatements [was] based on the LPT, which was entered into and approved by Ferguson when he was CEO." Gov't Reply at 7. This misses the point. The expectation was for the LPT to remain in force for approximately two years. *See* Ex. 30. Upon Mr. Ferguson's resignation as CEO in September 2001, the decision whether to allow the LPT to continue in effect fell entirely on Mr. Brandon. As Mr. Napier testified, it was Mr. Brandon who decided against commuting the LPT after two years. Tr. at 1197-1199.

**G.     Mr. Ferguson Was Not on Any of the Recorded Phone Calls and Only a Few E-Mails**

As the trial evidence indicated, Mr. Ferguson personally spent a very limited amount of time on the LPT transaction – likely no more than an hour or two. Indeed, the prosecution does not dispute its prior acknowledgement that Mr. Ferguson was "mentioned on relatively fewer emails [than his co-participants], [was] not recorded on any tapes . . . . [and] the evidence in the record of Ferguson's state of mind [was] not as strong on a relative basis to the other members of the [alleged] conspiracy." Memo in Support of the Full Admissibility of Gov't Ex. 84, at 7, 9 [Dkt. #937]. Instead, the prosecution claims that our "use" of its own admission was somehow "misleading" because the admission "was made in the context of a legal argument about the probative value of a particular piece of evidence – GX 84." Gov't Reply at 8. Simply stated, no party can take one position to secure a favorable evidentiary ruling and then complain about the use of that same position against it in another context. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001); *see also Wight v. BankAmerica Corp.*, 219 F.3d 79, 89-90 (2d Cir. 2000).

Moreover, the prosecution's explanation as to why Mr. Ferguson "was not recorded on any calls" regarding the LPT – because "he was too high up on the 'chain'" – is inaccurate and unpersuasive. The prosecution cites Mr. Houldsworth's conclusory testimony that he "d[id]n't think [he] would have" called Mr. Ferguson, given the chain of command. Gov't Reply at 8, n.3. That, of course, flies in the face of the 'open door' policy set forth in the Code of Conduct (Ex.

31 at 5) and the fact that Mr. Houldsworth did not hesitate to directly e-mail and privately meet with Mr. Brandon about the LPT when Mr. Brandon was CEO of Gen Re. *See* Ex.'s 32, 33; Tr. at 2908-10, 3167-69.

Significantly, GX 84, an e-mail from Mr. Graham to Mr. McCaffrey does not afford the prosecution any "strong[er]" evidence of Mr. Ferguson's comparative culpability. As the prosecution is aware, there is no evidence that either Mr. Graham or anyone else advised Mr. Ferguson of any securities or regulatory risk. █████████████████████████████

Moreover, the prosecution's lead investigator, Agent Tendick, explicitly conceded at trial that he was unaware of any evidence that Mr. Ferguson was ever made aware of any risk that U.S. insurance or securities regulators might attack the LPT or Gen Re's part in it. *See* Ferguson Reply at 14.

## POINT IV

## ANYTHING MORE THAN A LENIENT SENTENCE WOULD RESULT IN UNWARRANTED SENTENCE DISPARITIES

The prosecution erroneously asserts that the Guidelines sentence it seeks "is squarely within the range of sentences that have been imposed in recent years on defendants convicted of securities fraud who have gone to trial." Gov't Reply at 26.[19] First, the Guidelines offense level sought by the prosecution – a level 49 (7 base level, plus 2 for sophisticated means, plus 4 for aggravated role, plus 6 for number of victims, plus 30 for loss) – is *higher than* the base offense

---

[19]  The prosecution's list of sentences purportedly imposed on thirteen defendants recently convicted of securities fraud contains inaccuracies. For example, in *United States v. Rutkoske*, the Second Circuit remanded the case back to the district court for re-sentencing. 506 F.3d 170, 171 (2d Cir. 2007). Mr. Rutkoske has yet to be re-sentenced. Accordingly, he has been excluded from the following analysis. With regard to John and Timothy Rigas, they were re-sentenced to 12 years and 17 years, respectively, after a portion of their convictions were reversed. *United States v. Rigas*, 490 F.3d 208, 211-12 (2d Cir. 2007); *United States v. Rigas*, 02 CR 1236 (LBS), Opinion and Order at 9 (Ex. 34). Similarly, Michael Cushing's original sentence of 97 months was vacated by the U.S. Supreme Court, *Cushing v. United States*, 543 U.S. 1106, 1116 (2005), and he was re-sentenced to 70 months. *United States v. Cushing*, No. 1:00-CR-01098 (WHP), Dkt. # 126 (Ex. 35).

level for first degree murder, U.S.S.G. § 2A1.1 (level 43); treason, U.S.S.G. § 2M1.1 (level 43); and even unlawful activity involving nuclear and biological weapons with the intent to injure the United States, U.S.S.G. § 2M6.1 (level 42).

This is the reason that, in *Adelson*, Judge Rakoff derided "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." 441 F. Supp. 2d at 512. There, the Sentencing Guidelines called for life imprisonment due in large part to the amount of loss. *Id.* at 511. Adelson, unlike Mr. Ferguson, acted out of self-interest in order to "keep his executive position, obtain significant bonuses, increase his salary and place himself in a position to do so, as well as increase the value of the substantial stock and stock options he held." *United States v. Adelson*, S2 05 Cr. 325 (JSR) Government's Sentencing Memorandum, dated May 22, 2006, p. 3 (Ex. 36). There, the prosecution argued that the court ought to impose a sentence consistent with those imposed on Bernard Ebbers, John and Timothy Rigas, Patrick Bennett, and Steven Hoffenberg. Judge Rakoff rejected the prosecution's position, noting that "neither in its written submissions nor in its oral argument did the Government attempt to show any detailed similarities between the particular facts pertaining to those defendants and to Adelson. Nor is any such comparison justified." *Adelson*, 441 F. Supp. 2d at 512. Judge Rakoff, appalled by the "barbarity" of the Guidelines' "patently absurd" recommendation, sentenced the 40-year-old Adelson to 42 months of imprisonment. *Id.* at 507, 511, 514, 515,

Second, all twelve defendants listed by the prosecution were far more culpable than Mr. Ferguson. In each case, the defendants were found guilty of securities fraud related to the stock of their own company, and misrepresentations or omissions concerning (or the looting of) their own company; all but one personally benefited from their crimes, often to the tune of millions of dollars; one had previously been convicted of securities fraud; and six presided over the demise of their own companies with horrific consequences to employees, pensioners and shareholders alike. Moreover, all but one were younger than Mr. Ferguson. For ease of analysis, we have divided these twelve defendants into two categories.

25

A.    **Five of the Defendants In Cases Cited By the Prosecution Were Involved in Massive Frauds Causing the Demise or Crippling of Their Companies**

Five defendants cited by the prosecution directed – and were enormously enriched as a result of – four of the largest white collar frauds ever committed in the United States, causing the total collapse of their companies (or at least a collapse in the stock price) and resulting in wide scale layoffs and loss of pensions.  Those defendants committed those frauds against companies of which they were the principal shareholders.

- **Enron:**  Jeffrey Skilling "enriched [himself] as a result of the scheme through salary, bonuses, grants of stock and stock options," and "received approximately $200 million from the sale of Enron stock options and restricted stock, netting over $89 million in profit, and was paid more than $14 million in salary and bonuses."  Moreover, Skilling's fraud directly caused Enron's collapse, which resulted in 5,600 layoffs and a loss of $2.3 billion to its employees 401(k) accounts.[20]

- **Adelphia:**  John and Timothy Rigas "took over $200 million dollars from Adelphia's Cash Management System for personal expenses."  On the day the fraud was disclosed, Adelphia's stock "plummeted" by about 25%.  By the time it was delisted, it dropped another 94%.  Adelphia filed for bankruptcy as a result of the fraud, wiping out all shareholder value.[21]

- **WorldCom:**  Bernard Ebbers "engineered a scheme to disguise WorldCom's declining operating performance" in order to continue an opulent lifestyle and avoid being "wiped out financially by margin calls."  When WorldCom disclosed the fraud, its stock dropped 90% and it filed for bankruptcy.  Approximately 17,000 WorldCom employees lost their jobs.[22]

- **Cendant:**  Walter Forbes personally stole millions of dollars from Cendant shareholders.  The fraud "caused most, if not all, of the $14 billion loss [to shareholders]."  Cendant laid off over 2,000 employees in the immediate aftermath of the revelation of the fraud.  Cendant was

---

[20]    *United States v. Causey*, 2005 U.S. Dist. LEXIS 39619 at *4 (S.D. Tex. Dec. 28, 2005) (Ex. 37); *The Enron Verdicts*, Wall Street Journal (May 26, 2006), at A10 (Ex. 38).

[21]    *Rigas*, 490 F.3d at 212, 218.

[22]    *United States v. Ebbers*, 458 F.3d 110, 112-17 (2d Cir. 2006); Dionne Searcey, et al., *Ebbers is Sentenced to 25 Years for $11 Billion WorldCom Fraud*, Wall St. J. (July 14, 2005) at A1 (Ex. 39).

broken up into four companies, three of which later dissolved. Today only
a rental car company remains.[23]

**B.    The Remaining Defendants Cited by the Prosecution Were All Involved in Frauds
Motivated by Greed**

Unlike Mr. Ferguson, the remaining seven defendants cited by the prosecution were all
involved in frauds motivated by personal greed.  Moreover, they were all younger than Mr.
Ferguson – most of them considerably younger – and two were sentenced pre-*Booker*.

- Richard Adelson, who was 40 at the time of sentencing, was able to "keep
  his executive position, obtain significant bonuses, increase his salary and
  place himself in a position to do so, as well as increase the value of the
  substantial stock and stock options he held" as a result of his fraud.  The
  fraud caused Impath to file for bankruptcy, resulting in over 1,000
  employees losing their jobs.[24]

- Patrick Bennett, who was 47 at the time of his pre-*Booker* sentencing (and
  49 at the time of re-sentencing) was the "prime mover in a fraud that took
  hundreds of millions of dollars from the victim investors," "shift[ed]
  millions of dollars . . . into his personal bank account," and thereby
  "wiped out the savings of thousands of people."  "Many of [his victims]
  will spend the rest of their lives living on the border of poverty."  He also
  obstructed justice.[25]

- John Surgent, a disbarred attorney, had previously been convicted of
  securities fraud and personally profited by $4 million as a result of his
  most recent crime.[26]

---

[23]    *See* http://www.cendant.com; *United States v. Forbes*, No. 3:02 CR 264 (AHN), Sentencing
Memorandum of the United States, Jan. 14, 2007, p. 25 (Ex. 40); *United States v. Forbes*, 2007 WL
141952 at *9 (D. Conn. Jan. 17, 2007) (Ex. 41); Oliver August, *Cendant to cut 2000 jobs in US Shake-
Up*, Times Newspapers (Oct. 13, 1998) at T28 (Ex. 42).

[24]    *See* Impath, Inc., Form 10-K for the period ending 12/31/2002 (Filed 4/15/2003) (Ex. 43); *United
States v. Adelson*, S2 05 Cr. 325 (JSR) Government's Sentencing Memorandum, dated May 22, 2006, p. 3
(Ex. 36); *United States v. Adelson*, *supra*, 441 F. Supp. 2d at 509; SEC Litigation Release No. 19159,
*SEC Charges 7 Former Impath Executives with Financial Fraud*, March 29, 2005 (Ex. 44); *Sentence in
Impath Fraud*, New York Times, May 31, 2006 (Ex. 45).

[25]    *See United States v. Bennett*, 252 F.3d 559, 566-67 (2d Cir. 2001); *United States v. Bennett*, 2000
U.S. Dist. LEXIS 4928 at *1, *4 (S.D.N.Y. Apr. 18, 2000) (Ex. 46); *Metro News Briefs: New York; 30-
Year Sentence Given for a Pyramid Scheme*, New York Times, Apr. 29, 2000 (Ex. 47); *Bennett v. United
States*, 2006 U.S. Dist. LEXIS 12395 at *1 (S.D.N.Y. March 22, 2006) (Ex. 48).

[26]    *See United States v. Sturgent*, 2006 U.S. Dist. LEXIS 62698 at *1-*3 (E.D.N.Y. Sept. 1, 2006) (Ex.
49).

- Gregory Earls redirected investor funds to his own personal accounts. He misappropriated $1.5 million from one transaction alone.[27]

- Mitchell Cushing, who was 43 at the time of sentencing, manipulated the price of Wamex stock, where he was CEO, by issuing false and misleading press releases. In total, Cushing and his co-conspirators made approximately $24 million in profit from sales of Wamex stock during the scheme. His scam caused "hundreds of investors to lose millions and millions of dollars," he conspired to obstruct the SEC's investigation, and he committed perjury at his SEC deposition and during his trial. Moreover, Cushing fraudulently misrepresented his qualifications for the CEO position by concealing that he had previously worked at three criminally investigated "boiler room" firms.[28]

- Jamie Olis, a tax lawyer and accountant, who was 38 at the time of initial sentencing (and 40 at the time of re-sentencing), "earned a promotion and stock options" as a result of his tax and accounting fraud. Soon after Dynegy announced the formal investigation by the SEC, it laid off 340 employees.[29]

- Clifford Hotte, who was 51 at the time of his pre-*Booker* sentencing, was CEO and Chairman of HMI and owned over 1.1 million shares of its stock, whose price he fraudulently propped up. Additionally, Mr. Hotte lied to internal investigators and "went to considerable efforts to urge the participants in the fraud to lie to [internal] investigators."[30]

---

[27]   *See United States v. Earls*, 2004 U.S. Dist. LEXIS 12295 at *7 (S.D.N.Y. July 2, 2004) (Ex. 50). *United States v. Earls*, 2004 U.S. Dist. LEXIS 2758 at *4-*5 (S.D.N.Y. Feb. 25, 2004) (Ex. 51). *United States v. Earls*, 157 Fed. Appx. 421, 422 (2d Cir. 2005) (unpublished opinion).

[28]   *See* SEC Litigation Release No. 17602, *United States v. Mitchell H. Cushing, S3 00-CR-1089 (WHP) (S.D.N.Y.)*, dated July 9, 2002 (Ex. 52); *United States v. Cushing*, No. 00-cr-1098 (S.D.N.Y 2002), Gov't Letter to Court, [Dkt. #98] (Ex. 53); *United States v. Cushing*, 99 Fed. Appx. 269 (2d Cir. 2004) (unpublished opinion) (vacated on other grounds); *United States v. Cushing*, 2002 U.S. Dist. LEXIS 10926 at *6 (S.D.N.Y. June 18, 2002) (Ex. 54); Wamex Holdings, Inc., Form 8-K (file date: March 15, 2000) (listing Cushing's age in 2000 as 37) (Ex. 55); *United States v. Cushing*, No. 1:00-CR-01098 (WHP), Dkt. # 126 (resentencing in 2006) (Ex. 35).

[29]   *See United States v. Olis*, 2006 U.S. Dist. LEXIS 68281 at *41 (S.D. Tex. Sept. 22, 2006) (Ex. 56); *United States v. Olis*, 429 F.3d 540, 541 (5th Cir. 2005); Chip Cummins, "*Dynegy Replaces Financial Chief*," Wall St. J. (Jun. 20, 2002) at C1 (Ex. 57); Laurie Cohen, *Dynegy Ex-Lawyer Olis Gets Prison Term Cut to Six Years*, Wall St. J. (Sept. 23, 2006) (Ex. 58).

[30]   *See United States v. Hotte*, 1999 U.S. App. LEXIS 20142 at *2-*6 (2d Cir. Aug. 20, 1999) (Ex. 59); *Hotte v. United States*, Petition for a Writ of Certiorari, October Term 2000, p. 8 (Ex. 60); *Monday Morning: Weekly Electronic Business Update for Health Industry Executives*, No. 305, Nov. 23, 1998 (Ex. 61).

We respectfully suggest that the Court should also note the sentences imposed on William Grabske (27 months), Gregory Reyes (21 months) and Irwin Selinger (18 months), all of whom were CEO's convicted at trial of securities fraud or conspiracy to commit securities fraud, as well as CFO Carole Argo (6 months), who pled guilty to securities fraud.   Unlike Mr. Ferguson, all four defrauded their own companies in order to enjoy personal gain.

Mr. Grabske, CEO of Indus International, participated in a scheme to overstate revenue in order to "increase the value of [his] stock and options, to maximize his bonuses, and to maintain his position in the company."[31]   Mr. Reyes, CEO of Brocade Communications Systems, "knowingly approved backdated [stock] options" and then "actively and systematically lied to the auditors, directors and shareholders" in order to thwart proper supervision.   Mr. Reyes' personal gain from the backdating was estimated at more than $5 million.   Moreover, Mr. Reyes obstructed justice by submitting a declaration to the court that contained two knowingly false statements.[32]   Mr. Selinger, CEO of Graham-Field Health Products and a large shareholder, artificially boosted Graham-Field's earnings in order to meet analyst expectations and maintain its stock price.[33]   Mr. Selinger also "arranged for the creation of false documents, he lied to his company's financial officers, and he covered up his criminal conduct by later lying to investigators."   *Id.*   Moreover, Mr. Sellinger was given an obstruction of justice enhancement for "willfully" lying under oath before the jury.[34]   Ms. Argo, CFO of SafeNet, Inc., committed securities fraud by backdating stock options for her own $236,000 personal benefit.   She stood to

---

[31]   *United States v. Grabske*, Government Sentencing Memorandum, CR-01-0324 CRB, (N.D. Cal.), at p. 3 (Ex. 62); *United States v. Grabske*, 260 F.Supp. 2d 866, 866 (N.D. Cal. 2002).

[32]   *United States v. Reyes*, 2007 U.S. Dist. LEXIS 66074 at *4 (N.D. Cal. Aug. 29, 2007) (Ex. 63); *United States v. Reyes*,  CR 06-0556 CRB (N.D. Cal.), The United States' Sentencing Memorandum, Jan. 10, 2008, p. 3 (Ex. 64); Sentencing Transcript, Jan. 16, 2008, pp. 5-6 (Ex. 65); The United States' Preliminary Sentencing Brief, Sept. 21, 2007, p. 10 (Ex. 66).

[33]   *United States v. Selinger*, No 02 CR 1274 (E.D.N.Y.), Government Response in Opposition to Defendants' Motion for Judgment of Acquittal, p. 19 (Ex. 67).

[34]   *United States v. Selinger*, CR-02-1274 (DRH), Transcript of Sentencing, Apr. 15, 2005, p. 24 (Ex. 68).

gain over one million dollars if her fraud was not disclosed. The Guidelines called for a sentence of 97 to 121 months. She received 6 months.[35]

In sum, a short sentence that includes community service, along with any other sanctions that the Court deems necessary would not create any unwarranted sentence disparities.

## POINT V

### ANYTHING MORE THAN A LENIENT SENTENCE IS UNNECESSARY TO ACHIEVE ADEQUATE DETERRENCE

We previously explained how "sufficient deterrence" has already been achieved as a result of the cumulative impact of several factors including (i) the potentially enormous liability that Mr. Ferguson faces in related civil actions; (ii) the greater scrutiny received by the reinsurance industry in the wake of this trial and the new standards and regulations that it has already adopted to ensure better protections are in place; and (iii) Mr. Ferguson's public disgrace, which has caused excruciating pain to him and his family. *See* Initial Memo at 89-90.[36] The prosecution nevertheless argues that Mr. Ferguson should be given a "lengthy prison sentence [that] . . . will send an unmistakable message to corporate executives across the nation" and serve as a "powerful deterrent to other executives." Gov't Reply at 3, 16-21. The prosecution's argument should be rejected.

---

[35] *United States v. Argo*, 1:07 CR 0683 (JSR) (S.D.N.Y.), Sentencing Memorandum in Aid of Carole D. Argo, Jan. 16, 2008, p. 2 (Ex. 69); Sentencing Transcript, Jan. 28, 2008, pp. 2, 17-18 (Ex. 70).

[36] We do not contend Mr. Ferguson's public humiliation *alone* provided adequate deterrence, but rather that the *cumulative* impact of this factor as well as several others noted herein has provided adequate deterrence. *Cf. United States v. Cutler*, 520 F.3d 136, 171 (2d Cir. 2008) (criticizing "the imposition of a nonincarceratory sentence on the basis that a defendant has suffered sufficiently *simply* because he was prosecuted and convicted") (emphasis added).

Notably, the prosecution distorts Mr. Ferguson's argument by asserting that Mr. Ferguson should not be given a lenient sentence merely because he is "wealthy," "rich" and "powerful." Gov't Reply at 18-19. Mr. Ferguson, of course, never suggested that wealth or power was relevant to the deterrent impact of his conviction. To the contrary, Mr. Ferguson explained that in the interest of both (i) just punishment (§ 3553(a)(2)(A)), and (ii) the goal of deterrence (§ 3553(a)(2)(B)), this Court should take note that Mr. Ferguson and his family have already suffered significantly as a result of Mr. Ferguson's very public fall from grace, from a man who had a unique and well-earned reputation for honesty and integrity, to a convicted felon. Wealth and power have nothing to do with it.

First, the prosecution has conceded that a "message" has already been sent by the *verdict itself*. In a government press release issued upon the conviction, the United States Attorney for the Eastern District of Virginia stated:

> Take note – this is a resounding verdict and a strong message of deterrence and accountability in a significant corporate fraud prosecution.

Ex. 71 (2/2008 Press Release) (emphasis added). A lenient sentence for Mr. Ferguson would not lesson the "strong message of deterrence" sent by the "resounding verdict."

Second, the prosecution erroneously asserts that Mr. Ferguson's potentially severe civil liability is somehow irrelevant because "civil liability is not part of the *sentence* in this case, and the statute is clear that there is a need for the sentence here to afford adequate deterrence." Gov't Reply at 21. The prosecution has clearly misread the statute. The statute states: "The court, in determining the particular sentence to be imposed, shall consider . . . *the need* for the sentence imposed . . . to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(1)(B) (emphasis added). Plainly, if adequate deterrence has already been achieved through other means, there would be no "*need*" for the "sentence . . . to afford" further deterrence. *Id.*

Third, the prosecution's argument that a lengthy sentence would provide a "*powerful*" deterrent distorts the applicable congressionally-mandated goal of sentencing. The applicable goal of sentencing is "*adequate*" deterrence, not "powerful" deterrence. 18 U.S.C. § 3553(a)(2)(B) (emphasis added). Indeed, § 3553(a) begins with a mandate for leniency – *i.e.*, the sentence imposed must "*not [be] greater than necessary*."[37]

Fourth, the prosecution speculates – contrary to the empirical evidence – that business executives will "think twice before engaging in crimes . . . *only* when [they] see other similarly

---

[37] Thus, the three law journal articles on which the prosecution relies (including one that concerns securities laws *in a foreign country*) to support the argument that imposing a lengthy prison sentence on Mr. Ferguson would be an "effective deterrence" (Gov't Reply at 19-20) are irrelevant. In any event, as noted earlier, Judge Rakoff in *Adelson* cited one of those very same journal articles in concluding that "there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514.

situated executives, such as Ferguson, go to prison for a substantial period of time." Gov't Reply at 17 (emphasis added). In reality, executives have been, and will continue to be, deterred even by short prison sentences, as well as by the fear of being caught, investigated and convicted, and of subjecting themselves, their family and loved ones to public disgrace, and of facing the loss of their families' financial well-being by being subject to enormous civil liability. *See* Initial Memo at 89-90; *see also* Richard Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005) ("White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from being convicted regardless of the penalty."). Indeed, as a result of Mr. Ferguson's trial, executives have already "th[ought] twice":

> To an industry slowly recovering from a four-year period of intense regulatory scrutiny, the recent federal jury decision to convict five former senior insurance executives of securities fraud in connection with a finite reinsurance deal is yet another black eye, experts say. . . . Many are expecting the guilty verdicts . . . to impact decisions in company boardrooms going forward . . . As a result of all the negative attention, *there's very little market appetite for finite reinsurance deals*, said Paul Hummer, an attorney who chairs the insurance practice group at the law firm of Saul Ewing.

David Dankwa, *Future impact: the use of finite reinsurance is tied to federal guilty verdicts*, 108 A.M. Best Company, Inc. 12 at 76 (April 1, 2008) (emphasis added) (Ex. 72); *see also* C. O'Connell, *Contract Certainty: A Market Driven Approach*, (6/21/06) (The "considerable scrutiny" faced by the finite reinsurance industry "has led many (re)insurers to review transactions entered into, often several years ago, to consider whether they withstand external scrutiny in the cold light of 2005 and, in some cases, to review their involvement in the market per se.") (Ex. 73).

　　The only case cited by the prosecution on this point, *United States v. Martin*, does not support its assertion that severe sentences are the *only* way to make business executives "think twice" before committing a crime. To the contrary, in *Martin*, the Eleventh Circuit indicated that

white collar criminals are deterred, not only by imprisonment, but by monetary penalties as well. 455 F.3d 1227 (11th Cir. 2006).[38]

The prosecution next tries to associate the LPT with the massive fraud in Enron, and argues that the LPT "further undermined" the "entire marketplace." Gov't Reply at 17. While serious, this case is clearly not Enron. As a result of the Enron fraud, Enron went bankrupt, wiping out all $11.74 billion of Enron's shareholder's equity, some 5,600 Enron workers lost their jobs, and Enron's employees lost $2.3 billion in 401(k) accounts. *See* Ex.'s 38, 74. As a result of the LPT, on the other hand, there were no bankruptcies, no layoffs and no pensions lost. Indeed, two years after the LPT had been fully disclosed, AIG moved up several spots on the Fortune 100 list (Initial Memo at 2), and the restatement of the LPT had no or virtually no effect on AIG's stockholder's equity or net income. *See* Stipulation [Dkt. # 722].

The only authority cited by the prosecution in support of its claim that "low sentences traditionally handed down to white collar defendants under the Sentencing Guidelines failed to adequately deter corporate crime," is a law review article by one of the Enron prosecutors, who expressly notes that his opinions are "obviously biased." Gov't Reply at 18, citing 76 U. Colo. L. Rev. 57, at 137, n.2 (2005). In contrast, many objective commentators agree that monetary sanctions are not only effective, but often are a *more* effective means of deterrence on white collar criminals. *See, e.g.,* Professor J. Kelly Strader, *White Collar Crime and Punishment: Reflections on Michael, Martha, and Milberg Weiss,* 15 Geo. Mason L. Rev. 45, 102 (2007) (stating that "civil and administrative sanctions are more effective and efficient than criminal penalties in white collar cases" and citing "substantial evidence that white collar defendants are

---

[38] In *Martin*, the defendant personally "benefited" through "huge salaries and bonuses" that amounted to "over $14 million" as a result of his crimes, and caused "devastating losses" to "many victims." *Id.* at 1231. The Eleventh Circuit found the defendant's "7-day sentence" too lenient and inadequate to provide deterrence, because the "message" sent was that "would-be white-collar criminals stand to lose *little more than a portion of their ill-gotten gains* and practically none of their liberty." *Id.* at 1240 (emphasis added). Here, however, Mr. Ferguson indisputably received *no ill gotten gains*. Yet, Mr. Ferguson still faces potentially severe monetary damages and penalties in related civil actions and, of course, the prosecution seeks a sentence far more severe than 7 days.

strongly deterred by civil/administrative sanctions") (Ex. 75); Jamie L. Gustafson, *Cracking Down on White-Collar Crime: An Analysis of the Recent Trend of Severe Sentences for Corporate Officers*, 40 Suffolk U. L. Rev. 685 (2007) (noting that "fines may be the most effective means of punishment" and questioning "whether it is justifiable for corporate officers to receive and serve the same sentences as rapists, drug dealers, and murderers.") (Ex. 76); *cf.* Initial Memo at 89-90.[39]

## POINT VI

### ANYTHING MORE THAN A LENIENT SENTENCE IS UNWARRANTED IN LIGHT OF THE NATURE, CIRCUMSTANCES AND SERIOUSNESS OF THE OFFENSE

Mr. Ferguson fully appreciates that any fraud offense is serious.  However, as we have explained, (i) Mr. Ferguson did not seek to and did not personally gain anything from the offense; (ii) Gen Re did not gain anything from the offense; (iii) Gen Re properly accounted for the LPT as a deposit transaction; (iv) Mr. Ferguson instructed Mr. Napier to be open and transparent with AIG concerning Gen Re's intent to do so; (v) Mr. Ferguson had no influence or control over AIG's improper accounting; and (vi) anyone in Mr. Ferguson's position, as an experienced reinsurance executive and actuary, would have perceived the LPT reserves as immaterial to AIG.  *See* Initial Memo at 94-95.  The prosecution nevertheless argues that "a substantial term of imprisonment" is necessary to reflect the seriousness of the offense.  That argument is meritless.

---

[39]  Finally, in a footnote, the prosecution argues that, because the LPT fraud was an "aiding and abetting case," which is typically "exceedingly hard to detect," the punishment must be "severe" for "general deterrence to have its proper effect."  Gov't Reply at 5, n.2.  In support of this argument, the prosecution cites only one case, *United States v. Trupin*, 475 F.3d 71 (2d Cir. 2007), which, as the prosecution notes, has been "vacated and remanded for further consideration in light of *Gall v. United States*, 128 S. Ct. 586 (2007).

A.    **The Prosecution's Affirmative Arguments as to Why the Nature of the LPT Was Especially Serious Should Be Rejected**

Much like its effort to compare these events to those in Enron, the prosecution overreaches when, in its response to another defendant's sentencing brief, it seeks to draw a connection between the impact of the LPT and AIG's recent travails stemming from the credit and liquidity crises in the financial markets. *See* Gov't Reply to Graham's Sentencing Memo [Dkt. 1146] at 21. There plainly is no such connection. The LPT took place eight years ago. The LPT was fully disclosed to the market place nearly three and one half years ago. As we pointed out in the Initial Memo, at the end of 2007 – more than two years after the LPT was fully disclosed – AIG had moved higher on the Fortune 500 list. Moreover, AIG's current financial woes are attributable to AIG's exposure to credit default swaps on subprime collateralized debt obligations.

The prosecution also argues, without citing any support, that the LPT "undermined the very essence of our country's securities laws," stressing the "serious . . . impact that the offense conduct in this case and other similar cases has on the public's perception of our nation's securities markets." Gov't Reply at 15 (emphasis added). The same sweeping claim could, of course, be made about any securities-related offense. While we recognize the seriousness of the charged offense and the loss found by the Court in this case, there simply is no evidence, and certainly none is put forward by the prosecution, to conclude that the LPT impacted the public's consciousness or undermined the public's confidence in a manner similar to the enormous Enron, WorldCom, Cendant or Adelphia frauds or the subsequent and unrelated problems faced by many companies in today's credit and liquidity crisis.

B.    **The Prosecution's Response to Mr. Ferguson's Arguments Concerning the Nature, Circumstances and Seriousness of the LPT Should Be Rejected**

1.    **Mr. Ferguson's Lack of Motive and Personal Gain Warrants Leniency**

The prosecution cites *Untied States v. Cutler* for the proposition that "a defendant's lack of personal profit from the offense of conviction is not *ordinarily* a ground for departure." 520

F.3d at 161 (emphasis added). *Cutler* is inapposite. First, in *Cutler*, unlike here, the defendant *intended* to steal more than $80 million through a bank fraud scheme. *See id.* at 147-48; *see also id.* at 161. Second, the defendant in *Cutler* did, in fact, personally profit greatly from the charged offense. *Id.* at 162 ("the district court found that both Cutler's salary during the period of the bank fraud conspiracy (totaling more than $970,000) and his receipt of stock in the casino venture (worth more than $400,000) resulted from his participation in the bank fraud conspiracy").

The *Cutler* language cited by the prosecution is originally from *United States v. Broderson*, 67 F.3d 452, 459 (2d Cir. 1995), in which the court affirmed the sentencing court's decision to downwardly depart based on the defendant's lack of personal gain. *See Cutler*, 520 F.3d at 161; *see also Broderson*, 67 F.3d at 459. The defendant in *Broderson* was "worthy" of this departure (*Cutler,* 520 F.3d at 161) because, among other things, like Mr. Ferguson (and unlike the defendant in *Cutler*), he neither personally profited nor intended to personally profit from the charged offense and, thus, "his criminal intent was significantly different from that of the typical fraud defendant." *Broderson*, 67 F.3d at 459.

The prosecution also erroneously cites the Seventh Circuit's decision in *United States v. Seacott*, 15 F.3d 1380, 1387 (7th Cir. 1994), in support of its argument that Mr. Ferguson's lack of any personal financial motive is not a valid basis for a downward departure. The Second Circuit has rejected this argument. Indeed, in *Broderson*, the Second Circuit, after explicitly considering *Seacott*, affirmed the sentencing court's downward departure based on the defendant's lack of motive for personal gain. *Broderson*, 67 F.3d at 459.

Finally, the prosecution's argument is undercut by one of its own cases, *United States v. Olis*, 2006 U.S. Dist. LEXIS 68281 (S.D. Tex. Sept. 22, 2006) (Ex. 56). Even though the defendant in *Olis*, unlike Mr. Ferguson, earned a promotion and obtained personal pecuniary advantage in the form of stock options, the court stated that the absence of any "substantial pecuniary benefits" from his crime (among other things) "mitigate[s] against the type of harsh

sentence that may be deserved in cases where the defendant's conduct enriched him at the company's detriment or brought about the downfall of the company." *Id* at *41.

### 2. Mr. Ferguson Instructed Mr. Napier to be Open and Transparent With AIG about Gen Re's Intent to Account for the LPT as a Deposit Transaction

The prosecution does not dispute that Mr. Ferguson instructed Mr. Napier to be open and transparent with Mr. Smith, AIG's CFO, about Gen Re's intent to properly account for the LPT as a deposit transaction. *See* Gov't Reply at 25-26; *see also* Initial Memo at 94. Instead, the prosecution asserts that, "[b]oiled down, Ferguson is arguing that some unwitting accountant at AIG should have stopped his fraud before it succeeded," and that "[f]ar from warranting leniency, Ferguson's argument only underscores the fact that he still does not 'get it' and refuses to accept responsibility for his crimes." Gov't Reply at 25. This entirely mischaracterizes Mr. Ferguson's position. He does not blame Mr. Smith for anything. However, far from being "some unwitting accountant," Mr. Smith was AIG's "point person" on the LPT, and AIG's CFO, Chief Accounting Officer, a member of AIG's board of directors and a CPA.

The prosecution also unfairly argues that "the reason that Ferguson wanted to tell AIG that Gen Re was booking the deal as a deposit was to avoid AIG from being 'surprised' as AIG 'would not be booking it as deposit.'" Gov't Reply at 26; citing Tr. at 891, 892. However, contrary to the prosecution's claim, Mr. Napier clearly testified that he understood he needed to tell Mr. Smith that Gen Re was booking the LPT as a deposit because it was "something [AIG's financial professionals would] need to factor in their decision-making process [as to how to account for the LPT]." Tr. at 891. In other words, Mr. Napier understood that he was imparting information to AIG's financial professionals that would be useful to AIG in reaching its decision as to how it would book the LPT.

### 3. Anyone in Mr. Ferguson's Position as an Experienced Reinsurance Executive Would Have Perceived the LPT Reserves as Immaterial To AIG

The prosecution wrongly asserts that Mr. Ferguson's argument – that anyone in his position, as an experienced reinsurance executive and actuary, would have perceived the LPT reserves as immaterial to AIG – "is easily dismissed." Gov't Reply at 26.

First, the prosecution claims (with no citation) that "Ferguson knew that AIG's stock dropped almost 6% in reaction to AIG's release of its third quarter loss reserve figures." Gov't Reply at 26. There is no evidence that Mr. Ferguson "knew" this or, more fundamentally, that it is true.

Second, the prosecution cites Mr. Napier's November 1, 2000 e-mail in support of the proposition that Mr. Ferguson "knew" that Mr. Greenberg requested the transaction in response to "analyst criticism" about AIG's third quarter 2000 loss reserve decline. Gov't Reply at 26. While Mr. Napier's e-mail indicates that this was AIG's reason, the truth is that not a single analyst actually expressed such criticism.[40] And even if Mr. Ferguson believed that analysts had criticized the adequacy of AIG's loss reserves, no one in his position would have thought that a transaction that increased AIG's net loss reserves by only 1% in two successive quarters would be perceived as making any meaningful difference. After all, the range of reasonableness (or margin of error) for AIG's loss reserves was 5%. Tr. at 359-60 (Hamrah).

Third, the prosecution, to stress the alleged importance of the LPT to AIG, reiterates that "Ferguson and Greenberg agreed to a $5 million price" for it. Gov't Reply at 26. However, someone in Mr. Ferguson's shoes would surely have recognized that the $5 million fee was trivial to AIG, whose reported net income was over $5 *billion* for 2000, and over $6 *billion* for 2001. *See* Ex. 77.

---

[40] To the contrary, while some analysts speculated that the market or unspecified others may have been concerned about AIG's loss reserves, those analysts expressed their disagreement with any such concern. *See, e.g.*, GX 7 (Analyst Ronald Frank stated that "any concern" was "misplaced"; Analyst Alice Cornish stated that "Some were concerned about the 0.2% drop in reserves – they must be kidding;" Analyst Jeffry Thompson stated: "A negative change in p-c reserves in the quarter is not significant;" and even Analyst Alice Schroeder stated "concerns over reserves appear overblown").

## CONCLUSION

A short sentence that includes community service, along with any other sanctions that the Court deems necessary is warranted for all the foregoing reasons, including that Mr. Ferguson, a first offender, will be 67 years old in January, presents no risk of recidivism, had no intent to personally gain anything and, in fact, received no personal benefit from the LPT, and he has led a truly exemplary life and is "on a mission . . . to help as many people as he can; in as many was as he can; for as long as he can" (letter of Treash).


Dated:      New York, New York
            November 21, 2008

                                        Respectfully submitted,


                                        _____/s/ Clifford H. Schoenberg_____
                                        CADWALADER, WICKERSHAM & TAFT LLP
                                        Clifford H. Schoenberg (Bar No. ct16215)
                                        Douglas I. Koff (Bar No. phv01207)
                                        One World Financial Center
                                        New York, NY  10281
                                        Telephone:  (212) 504-6000

                                        DALY & PAVLIS LLC
                                        Alfred U. Pavlis (Bar No. ct08603)
                                        107 John Street
                                        Southport, CT 06890
                                        Telephone:  (203) 255-6700
                                        *Attorneys for Defendant Ronald E. Ferguson*

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2008, a true and correct copy of Defendant Ronald E. Ferguson's Supplemental Sentencing Memorandum was filed electronically in redacted form and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by electronic mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_____/s/ Clifford H. Schoenberg_____
Clifford H. Schoenberg (Bar No. ct16215)
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY  10281
Telephone:  (212) 504-6000